# EXHIBIT 2
Certificate of Public Convenience and Necessity

164 FERC ¶ 61,103
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Kevin J. McIntyre, Chairman;
Cheryl A. LaFleur, Neil Chatterjee,
and Richard Glick.

| | |
|---|---|
| Midship Pipeline Company, LLC | Docket No. CP17-458-000 |

ORDER ISSUING CERTIFICATE

(Issued August 13, 2018)

1.      On May 31, 2017, Midship Pipeline Company, LLC (Midship) filed an application pursuant to section 7(c) of the Natural Gas Act (NGA)[1] and Part 157 of the Commission's regulations[2] for authorization to construct and operate the Midcontinent Supply Header Interstate Pipeline Project (MIDSHIP Project), a new interstate pipeline system.  The project is designed to provide up to 1,440 million standard cubic feet (MMcf) per day of firm transportation capacity from the South Central Oklahoma Oil Province and the Sooner Trend Anadarko Basin Canadian and Kingfisher gas plays in the Anadarko Basin in Oklahoma to existing natural gas pipelines near Bennington, Oklahoma, for subsequent transport to Gulf Coast and Southeast markets.  In conjunction with this project, Midship filed a *pro forma* FERC NGA Gas Tariff for Commission approval. Midship also requests a blanket certificate under Part 157, Subpart F of the Commission's regulations to perform certain routine construction activities and operations, as well as a blanket certificate under Part 284, Subpart G of the Commission's regulations to provide open-access firm and interruptible interstate natural gas transportation services on a self-implementing basis with pre-granted abandonment for such services.  As discussed below, the Commission will grant the requested authorizations, subject to conditions.

## I.      **Background and Proposal**

2.      Midship, a new company organized under Delaware laws with its principal place of business in Texas, is wholly-owned by Midship Holdings, LLC, which is indirectly owned by Cheniere Energy, Inc. and one or more funds or companies managed or owned

---

[1] 15 U.S.C. § 717f(c) (2012).

[2] 18 C.F.R. pt. 157 (2017).

by EIG Management Company.  Midship does not currently own any pipeline facilities, nor is it engaged in any natural gas transportation operations.  Upon commencement of operations proposed in its application, Midship will become a natural gas company within the meaning of section 2(6) of the NGA,[3] and, as such, will be subject to the jurisdiction of the Commission.

### A.       The MIDSHIP Project

3.       Midship proposes to construct an approximately 199.7-mile mainline pipeline in Oklahoma, including compressor stations, metering and regulation (M&R) stations, and appurtenant facilities, and 34.4 miles of lateral pipeline and appurtenant facilities. Specifically, Midship proposes to construct the following facilities as described below.

### 1.       Mainline Pipeline

4.       The MIDSHIP Project mainline will comprise approximately 199.7 miles of 36-inch-diameter pipeline beginning at the Okarche Gas Processing Plant near Okarche, Oklahoma, and ending at interconnects with existing interstate natural gas pipelines near the Town of Bennington, Oklahoma.  The mainline will be rated for a Maximum Allowable Operating Pressure (MAOP) of up to 1,480 pounds per square inch gauge (psig).

### 2.       Compressor Stations

5.       The MIDSHIP Project will include the following three mainline compressor stations:

### a.       Calumet Compressor Station

6.       The Calumet Compressor Station will be located in Canadian County, Oklahoma, at, approximately, milepost (MP) 17.6.  This compressor station will be ISO-rated for 28,160 horsepower (hp) and will include two Solar Centaur 50 gas-fired turbine units (6,130 hp each), one Solar Mars 100 gas-fired turbine unit (15,900 hp), and two gas-fired emergency generators (Caterpillar G3512).

### b.       Tatums Compressor Station

7.       The Tatums Compressor Station will be located in Garvin County, Oklahoma, at approximately MP 99.4 and will be ISO-rated for 44,230 hp.  This station will include two Solar Taurus 70 gas-fired turbine units (10,915 hp each), one Solar Titan 130 gas-fired turbine unit (22,400 hp), and two gas-fired emergency generators (Caterpillar G3512).

---

[3] 15 U.S.C. § 717a(6) (2012).

### c. **Bennington Compressor Station**

8.     The Bennington Compressor Station will be located in Bryan County, Oklahoma, at approximately MP 198.4.  This compressor station will be ISO-rated for 42,260 hp and will include two Solar Centaur 50 gas-fired turbine units (6,130 hp each), one Solar Titan 250 gas-fired turbine unit (30,000 hp), and two gas-fired emergency generators (Caterpillar G3512).

### 3.     **Meter Facilities/Receipt Taps**

9.     The MIDSHIP Project will include the following meter facilities and receipt taps along the mainline pipeline:

Receipt Meter Stations/Taps:

• Okarche/Mark West Meter Station at MP 0.0 (2 receipt meters)

• Canadian Valley Receipt Tap at MP 10.6

• Cana Meter Station at MP 15.2

• Iron Horse Meter Station at MP 47.5

• Bradley Receipt Tap at MP 74.1

• Grady Meter Station at MP 78.8

• Wildhorse Receipt Tap at MP 94.7

Delivery Meter Stations:

• Natural Gas Pipeline Company, LLC ("NGPL") 801 Meter Station at MP 119.1

• NGPL Meter Station at MP 198.4

• Bennington Meter Station at MP 199.6 (2 delivery meters) at interconnections with Midcontinent Express Pipeline LLC and Gulf Crossing Pipeline Company.

### 4.     **Appurtenant Facilities**

10.    The company will construct the following appurtenant facilities on the mainline pipeline:

• Eight (8) standalone mainline valves

- One (1) pig launcher at MP 0.0

- One (1) pig receiver at the Bennington Meter Station at MP 199.7

### 5.    Lateral Pipeline Facilities

11.    The MIDSHIP Project will include two lateral pipelines, the Chisholm and Velma Laterals.  The Chisholm Lateral will consist of 20.5 miles of 30-inch-diameter pipeline and will be located entirely in Kingfisher County, Oklahoma, with a tie-in to the mainline near MP 0.0, and appurtenant facilities including a pig launcher, a pig receiver, a standalone valve, and receipt meter.  The Velma Lateral will consist of 13.8 miles of 16-inch-diameter pipeline and will be located in Stephens, Carter, and Garvin Counties, Oklahoma, with a tie-in to the mainline at the Tatums Compressor Station near MP 99.4, and appurtenant facilities including a pig launcher, a pig receiver, a booster station, a meter station, and receipt taps.  Both laterals will be rated for an MAOP of up to 1,480 psig.  The Sholem booster station will be located along the Velma Lateral in Stephens County, Oklahoma, at approximate MP VE6.8.  This booster station will be rated for 3,750 hp.  One meter station, the Velma Meter Station at MP VE13.6, will be constructed on the Velma Lateral.  One receipt tap, the Chisholm receipt tap, will be constructed at CH0.0 on the Chisholm Lateral, and two receipt taps, the Velma and Sholem receipt taps, will be constructed at VE0.0 and VE6.8, respectively, on the Velma Lateral.

12.    Of the project's 1,440 MMcf total design capacity, 925 MMcf (approximately 64 percent) is subscribed by four shippers under precedent agreements.  Midship executed precedent agreements with Marathon Oil Company (Marathon), Gulfport Energy Corporation (Gulfport), and Devon Gas Services, L.P. (Devon) as foundation shippers for firm transportation totaling 850 MMcf per day, each for a minimum term of 10 years.  The remaining 75 MMcf per day is subscribed by Corpus Christi Liquefaction, an affiliated entity.  All shippers have elected to pay negotiated rates.  Midship also held an open season to solicit additional interest in firm transportation on the project, and continues to market the remaining capacity.[4]

13.    Midship requests approval of its proposed *pro forma* tariff.  Midship will offer firm transportation, interruptible transportation, and interruptible park and loan services under the terms and conditions of its proposed Rate Schedules FTS, ITS, and PALS, and proposes initial minimum and maximum recourse reservation rates for each of its proposed services, usage rates for its firm transportation service, and minimum and maximum recourse rates for its interruptible and parking and lending services.  Midship requests a blanket certificate pursuant to Part 284, Subpart G of the Commission's regulations authorizing Midship to provide open-access firm and interruptible interstate

---

[4] *See* Midship's Data Responses dated June 27, 2018, and July 25, 2018.

natural gas transportation services on a self-implementing basis with pre-granted abandonment for such services.[5]  Midship also requests a blanket certificate pursuant to section 157.204 of the Commission's regulations, authorizing Midship to construct, operate, acquire, and abandon certain facilities as described in Part 157, Subpart F.[6]

## II.    Notice, Interventions and Comments

14.    Notice of Midship's application was published in the *Federal Register* on June 21, 2017 (82 Fed. Reg. 28,313).  Southern Company Services, Inc., Devon Gas Services, L.P., and Gulfport Energy Corporation filed timely, unopposed motions to intervene.[7]

15.    Two of the shippers, Gulfport Energy Corporation and Devon Gas Services, L.P. filed comments supporting the project.[8]  Other commenters have raised numerous issues, including concerns regarding use of eminent domain and environmental impacts including crop damage, lost agricultural production, safety, and surface watershed protection.

## III.    Discussion

16.    Midship's proposal to construct and operate facilities to transport natural gas in interstate commerce subject to the jurisdiction of the Commission is subject to the requirements of subsections (c), and (e) of NGA section 7.[9]

---

[5] 18 C.F.R. § 284.221 (2017).

[6] 18 C.F.R. § 157.204 (2017).

[7] Timely, unopposed motions to intervene are granted by operation of Rule 214 of the Commission's Rules of Practice and Procedures.  *See* 18 C.F.R. § 385.214 (2017).

[8] In addition, shippers Gulfport, Devon and Marathon each filed in July 2018, requests for expedited approval of the MIDSHIP project noting that any delay in construction of the project would create a "detrimental delay in the ability of large quantities of stranded gas in the South Central Oklahoma Oil Province and Sooner Trend Anadarko Basin Canadian and Kingfisher gas plays to reach market."  Marathon Oil Pipeline, Request for Expedited Commission Approval, Docket No. CP17-458-000 (July 23, 2018).

[9] 15 U.S.C. §§ 717f(b), 717f(c) and 717f(e) (2012).

## A.    Application of Certificate Policy Statement

17.    The Certificate Policy Statement provides guidance for evaluating proposals to certificate new construction.[10]  The Certificate Policy Statement establishes criteria for determining whether there is a need for a proposed project and whether the proposed project will serve the public interest.  The Certificate Policy Statement explains that in deciding whether to authorize the construction of major new natural gas facilities, the Commission balances the public benefits against the potential adverse consequences.  The Commission's goal is to give appropriate consideration to the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain in evaluating new pipeline construction.

18.    Under this policy, the threshold requirement for pipelines proposing new projects is that the pipeline must be prepared to financially support the project without relying on subsidization from its existing customers.  The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, or landowners and communities affected by the route of the new pipeline.  If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects.  This is essentially an economic test.  Only when the benefits outweigh the adverse effects on economic interests will the Commission proceed to consider the environmental analysis where other interests are addressed.

19.    As discussed above, the threshold requirement for pipelines proposing new projects is that the applicant must be prepared to financially support the project without relying on subsidization from its existing customers.  Midship is a new company with no existing shippers.  Thus, there is no potential for subsidization on Midship's system or degradation of service to existing customers.  In addition, there is no evidence that the MIDSHIP project will adversely affect other pipelines or their customers.  The project is not intended to replace service on other pipelines, moreover, no pipeline company or their captive customers have protested Midship's application.

20.    We are additionally satisfied that Midship has taken appropriate steps to minimize adverse impacts on landowners and surrounding communities.  Approximately 54 percent of the pipeline route is collocated with other pipeline, utility or road corridors.  In

---

[10] *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).

addition, Midship engaged in public outreach during the pre-filing process.  It worked
with all interested stakeholders, solicited input on any concerns and engaged in re-routes
where practicable to minimize impacts on landowners and communities.   Specifically,
Midship incorporated 28 route variations into its proposed route for various reasons,
including landowner requests, avoidance of sensitive resources, or engineering
considerations.[11]

21.     A commenter expressed concerns about easement negotiations and the possible
misuse of eminent domain.  We note that Midship may not start construction without
satisfying a number of requirements for obtaining a notice to proceed with construction; a
certificate order does not authorize a company to construct at its own schedule.  We also
note that Midship has expressed its commitment to working collaboratively with
landowners to acquire necessary property rights.  In the event affected landowners are
unable to reach agreement with Midship, Midship, pursuant to NGA section 7(h), may
acquire the needed property rights through the eminent domain process in state or federal
court.[12]  In such a proceeding, the court will take into account the fair market value of the
necessary property rights in deciding the compensation due.  The sufficiency of
compensation is a contractual matter or, if agreement is not reached, a matter for a court
with appropriate jurisdiction and not an area over which the Commission has jurisdiction.
The timing of eminent domain proceedings is likewise a matter for a court with
appropriate jurisdiction and not an issue over which the Commission has jurisdiction.
Accordingly, for purposes of our consideration under the Certificate Policy Statement, we
find that Midship has taken sufficient steps to minimize impacts on landowners and
surrounding communities.

22.     Several intervenors and commenters support Midship's proposed project,[13] and no
comments were filed questioning the need for the project.  Under the Certificate Policy
Statement and Commission precedent, precedent agreements are significant evidence of
project need or demand.[14]  Here, Midship has entered into long-term precedent
agreements with four customers for a total of 925 MMcf per day of firm transportation
capacity – about 64 percent of the system's capacity.  This is a substantial demonstration

---

[11] Final EIS at 3-3 to 3-6.

[12] *See generally*, *Mountain Valley Pipeline LLC*, 161 FERC ¶ 61,043, at PP 59-62
(2017), *on reh'g*, 163 FERC ¶ 61,197, at PP 48-51 (2018).

[13] *See supra* P 11, n.8.

[14] Certificate Policy Statement, 88 FERC at 61,748*; see also Minisink Residents
for Environmental Preservation and Safety v. FERC*, 762 F.3d 97, 110, n.10 (D.C. Cir.
2014) (affirming that the Commission may reasonably accept the market need reflected
by the applicant's precedent agreement with shippers).

of market demand, both in general and in the context of the total design capacity of the MIDSHIP Project.[15] Moreover, Midship has no existing customers from whom it could recover any of the costs associated with the unsubscribed capacity. Additionally, Midship's recourse rates will be based on the design capacity of the constructed pipeline. These factors operate to place all risk for any unsubscribed capacity solely upon Midship, assuring the Commission that the project will not go forward unless it is financially viable.[16] Under these circumstances, Midship has sufficiently demonstrated a need for the project.

23.     As discussed above, Midship's proposed project will serve a demonstrated demand for the transportation of natural gas. Based on the benefits the project will provide and the minimal adverse impacts on existing shippers, other pipelines and their captive customers, and landowners and surrounding communities, we find, consistent with the Certificate Policy Statement and NGA section 7(c), that the public convenience and necessity requires approval of the project, subject to the environmental and other conditions in this order.

### B.    Blanket Certificates

24.     Midship requests a Part 284, Subpart G blanket certificate in order to provide open-access transportation services. Under a Part 284 blanket certificate, Midship will not require individual authorizations to provide transportation services to particular customers. Midship filed a *pro forma* Part 284 tariff to provide open-access transportation services. Since a Part 284 blanket certificate is required for Midship to offer these services, we will grant Midship a Part 284 blanket certificate, subject to the conditions imposed herein.

25.     Midship has also applied for a Part 157, Subpart F blanket certificate. The Part 157 blanket certificate gives an interstate pipeline NGA section 7 authority to automatically, or after prior notice, perform certain activities related to the construction, acquisition, abandonment, and replacement and operation of pipeline facilities. Since a Part 157 blanket certificate is required for Midship to perform these activities, we will grant Midship a Part 157 blanket certificate, subject to the conditions imposed herein.

---

[15] *See e.g. NEXUS Gas Transmission, LLC*, 160 FERC ¶ 61,022, at P 41 (2017), *order on rehearing*, 164 FERC ¶ 61,054 (2018) (finding need for a new pipeline system that was 59 percent subscribed).

[16] Certificate Policy Statement, 88 FERC at 61,746; and *Constitution Pipeline Company, LLC*, 149 FERC ¶ 61,199, at P 28 (2014).

### C.      Initial Rates

26.      In its initial filing, Midship proposed an initial maximum recourse reservation charge of $11.8666/Dth for firm transportation service, an initial usage charge of $0.00/Dth, and a recourse rate of $0.3901/Dth for interruptible transportation service (IT), authorized overrun service, and parking and loan service (PAL).  In support of the proposed initial recourse rates, Midship submitted a cost of service and rate-design study showing the recourse rate was calculated using a total first year cost of service of $205,054,918[17] divided by billing determinants of 17,280,000 Dth.[18]  Midship developed its proposed cost of service based on a 50-50 debt/equity capital structure, a cost of debt of 7.75 percent, a return on equity of 14.00 percent and a depreciation rate of 2.50 percent.[19]  Midship estimates that the total cost of construction for the project will be about $1,025,219,819.

27.      In response to a November 24, 2017 Commission data request, Midship identified $1,191,467 of non-labor O&M costs in Account Nos. 853, 857, 864 and 865.[20]  Consistent with the Commission's regulation requiring straight fixed-variable rate design (SFV),[21] these are variable costs, which should not be recovered through the reservation charge.[22]  Accordingly, Midship must recalculate its recourse reservation charge to recover only fixed costs when it files actual tariff records and recalculate its usage charge to recover its variable costs.

28.      In a January 30, 2018 response to a staff data request, Midship provided an adjusted cost of service and recalculated its initial recourse reservation charge to reflect changes in the federal tax code, as per the Tax Cuts and Jobs Act of 2017,[23] which became effective January 1, 2018.  Midship's work papers show that the tax code change

---

[17] A credit of $200,000 has been applied to the total cost of service in order to allocate costs to interruptible transportation services.

[18] Application at Exhibit N, p. 3.

[19] Application at Exhibit K and N.

[20] Midship's November 28, 2017 Response to Question No. 2 of FERC Data Request Dated November 24, 2017.

[21] 18 C.F.R. § 284.7(e) (2017).

[22] *Columbia Gulf Transmission, LLC*, 152 FERC ¶ 61,214 (2015); and *Dominion Transmission, Inc.*, 153 FERC ¶ 61,382 (2015).

[23] Pub. L. No. 115-97, 131 Stat. 2054 (Dec. 22, 2017).

reduces the estimated cost of service to $185,260,871, the initial recourse reservation charge to $10.7211 per Dth, and the initial Rate Schedule ITS, Overrun and Rate Schedule PAL rates to $0.3525 per Dth.

29.     On March 15, 2018, the Commission issued the Revised Policy Statement on Treatment of Income Taxes.[24]  The Revised Policy Statement finds that an income tax double recovery results from granting a Master Limited Partnership (MLP) a separate income tax allowance and a pre-tax return on equity (ROE), and accordingly, establishes a policy that MLPs are not permitted to recover an income tax allowance in their cost of service.[25]  The Revised Policy Statement also explains that other partnership and pass-through entities not organized as an MLP should, if claiming an income tax allowance, address the double-recovery concern.  In an April 17, 2018 response to an April 6, 2018 staff data request, Midship confirms a proposed income tax allowance of $24,273,309, as indicated in its Updated Exhibit N.  Midship states that it is not an MLP; rather, it is a Delaware limited liability company, a pass-through entity for income tax purposes, and that the income tax allowance proposed as part of its cost of service does not apply to income tax incurred in Midship's own name.  To explain why its proposal to include an income tax allowance will not result in a double recovery of income taxes Midship states that "corporations that are subject to federal and state income taxes own an overwhelming majority of the equity interests in Midship."

30.     The Commission finds Midship's filings (including its April 17, 2018 response to the data request) have not adequately addressed the double recovery concern and has therefore failed to sufficiently support its request for a separate income tax allowance.  Accordingly, because Midship's filings have not provided sufficient justification, Midship must revise its work papers to remove the proposed income tax allowance, and revise its tariff to reflect initial recourse rates calculated to reflect this change at least 60 days prior to the commencement of interstate service.  In the alternative, Midship may provide, no later than 180 days prior to commencement of service, additional and detailed arguments as to why Midship is entitled to an income tax allowance, for review and further order by the Commission.[26]  The additional information provided by Midship should describe in detail the pipeline's ownership structure, including the percentage of

---

[24] *Inquiry Regarding the Commission's Policy for Recovery of Income Tax Costs*, FERC Stats. & Regs. ¶ 35,060 (2018) (Revised Policy Statement).

[25] *Id.* P 2.

[26] *See also Trailblazer Pipeline Co. LLC*, 164 FERC ¶ 61,074 (2018).

the equity interests owned by corporations, individuals and other entities.[27]  Addressing all applicable Commission precedent, Midship should describe how its different ownership interests are relevant to the income tax allowance issue and the extent to which the double-recovery concern raised by *United Airlines*[28] applies to each of Midship's ownership interests (including the corporate ownership interests).[29]  Among other issues, Midship should specifically explain why its ownership interests should be distinguished from an MLP's ownership interests for purposes of evaluating the *United Airlines* double-recovery concern.[30]

31.     The Commission has reviewed Midship's proposed cost of service and initial rates, as updated in its data responses, and generally finds them reasonable for a new pipeline.  Therefore, as discussed above, the Commission accepts Midship's proposed recourse rates, modified as required above, as the initial rates for service on the pipeline.

### D.     **Fuel**

32.     Midship states it will recover Fuel, Lost, and Unaccounted for (FL&U) gas on a system-wide basis through a FL&U percentage, which will be subject to an annual tracking mechanism.  Midship proposes to set an initial FL&U charge at 0.80 percent, which includes fuel, lost and unaccounted for gas and any imbalances due to meter equipment tolerances between receipt and delivery point meters.  Midship states that each year it will make a fuel tracker filing pursuant to section 4 of the NGA to true-up any differences between the fuel retained from shippers and the actual fuel consumed.  The Commission finds the initial retainage percentage reasonable and therefore accepts Midship's retainage percentage for service on the pipeline.

### E.     **Three-Year Filing Requirement**

33.     Consistent with Commission precedent, Midship must file a cost and revenue study no later than three months after the end of its first three years of actual operation to

---

[27] Midship states that corporations own an "overwhelming majority of the equity interests,"  However, Midship does not provide the actual percentage of corporate ownership or how this corporate ownership fits within Midship's ownership structure.

[28] *United Airlines v. FERC*, 827 F.3d 122 (D.C. Cir. 2016).

[29] *See also Trailblazer Pipeline Co. LLC*, 164 FERC ¶ 61,074 (2018).

[30] *See, e.g., Enable Mississippi River Transmission, LLC*, 164 FERC ¶ 61,075, at PP 29-40 (2018).

justify its existing cost-based firm and interruptible recourse rates.[31]  In its filing, the projected units of service should be no lower than those upon which Midship's approved initial rates are based.  The filing must include a cost and revenue study in the form specified in section 154.313 of the Commission's regulations to update cost of service data.[32]  Midship's cost and revenue study should be filed through the eTariff portal using a Type of Filing Code 580.  In addition, Midship must include as part of the eFiling description, a reference to Docket No. CP17-458-000 and the cost and revenue study.[33] After reviewing the data, the Commission will determine whether to exercise its authority under NGA section 5 to investigate whether the rates remain just and reasonable.  In the alternative, in lieu of this filing, Midship may make a NGA general section 4 rate filing to propose alternative rates to be effective no later than three years after the in-service date for its proposed facilities.

### F.    Negotiated Rates

34.    Midship states that it will provide service to the project's shippers under negotiated rate agreements pursuant to negotiated rate authority in its General Terms and Conditions (GT&C) section 6.31.  Midship must file either its negotiated rate agreements or tariff records setting forth the essential terms of the agreements in accordance with the *Alternative Rate Policy Statement*[34] and the Commission's negotiated rate policies.[35]

---

[31] *Bison Pipeline, LLC,* 131 FERC ¶ 61,013, at P 29 (2010); *Ruby Pipeline, LLC,* 128 FERC ¶ 61,224, at P 57 (2009); *MarkWest Pioneer, L.L.C.,* 125 FERC ¶ 61,165, at P 34 (2008).

[32] 18 C.F.R. § 154.313 (2017).

[33] *Electronic Tariff Filings*, 130 FERC ¶ 61,047, at P 17 (2010).

[34] *Alternatives to Traditional Cost-of-Service Ratemaking for Natural Gas Pipelines; Regulation of Negotiated Transportation Services of Natural Gas Pipelines*, 74 FERC ¶ 61,076 (1996), *clarification granted*, 74 FERC ¶ 61,194 (1996), *order on reh'g and clarification*, 75 FERC ¶ 61,024, *reh'g denied*, 75 FERC ¶ 61,066, *reh'g dismissed*, 75 FERC ¶ 61,291 (1996), *petition denied sub nom. Burlington Res. Oil & Gas Co. v. FERC*, 172 F.3d 918 (D.C. Cir. 1998).

[35] *Natural Gas Pipelines Negotiated Rate Policies and Practices; Modification of Negotiated Rate Policy,* 104 FERC ¶ 61,134 (2003), *order on reh'g and clarification,* 114 FERC ¶ 61,042 (2006), *reh'g dismissed and clarification denied,* 114 FERC ¶ 61,304 (2006).

Midship must file the negotiated rate agreements or tariff records at least 30 days, but not more than 60 days, before the proposed effective date for such rates.[36]

### G.    Tariff

35.    Midship submitted revised *pro forma* tariff records on March 12, 2018 (March 12 Tariff Filing),[37] which it further revised in its March 30, 2018 supplemental filing, to make typographical and formatting revisions.  As discussed below, some of Midship's proposed revisions are acceptable; other tariff provisions require further revision.

Acceptable Tariff Revisions

36.    The following revised *pro forma* tariff records filed in both the March 12, 2018 Response to Data Request and the March 30 Supplemental Filing reflect current Commission policy.  Accordingly, Midship shall make these proposed revisions in its compliance filing:

     a.    Midship proposes to revise Sections 5.1.4.B.2, and 6.19.7 of its *pro forma* tariff to clarify Midship's methodology on assessing refunds to non-offending shippers for penalties associated with Unauthorized Overrun Gas and to update Section 5.1.4.B.2(a) of its *pro forma* tariff to reflect the index location from "Platt's Monthly Price Guide" to "Platt's Gas Daily - Final Daily Price Survey."

     b.    Midship proposes to revise Section 5.3 (Rate Schedule PALS) and Section 6.1 (Definitions) to update the correct references as it had inadvertently stated incorrect references in Section 5.3.1(C) and Section 6.1.15 of Midship's *pro forma* tariff.

     c.    Midship proposes to revise Section 6.2.1.d to update its Gas Quality description to remove an incorrect reference to H2S.

     d.    Midship proposes to strike Section 6.10.3.a(i)(3) and include imbalance payback with the scheduling priorities of all interruptible services as well as adding that Operational Transactions will have a lower scheduling priority than firm transportation services.

---

[36] Pipelines are required to file any service agreement containing non-conforming provisions and to disclose and identify any transportation term or agreement in a precedent agreement that survives the execution of the service agreement.

[37] *See* Midship's March 12, 2018 Response to Data Request.

e.      Midship proposes to eliminate Section 6.16.7 in its entirety, as the facilities proposed in Midship's section 7(c) application in Docket No. CP17-458 do not include electric power compression.  In the event Midship seeks to add electric power compression, Midship states that it will file tariff records to comply with section 154.403 of the Commission's regulations.

f.      Midship proposes to revise Section 6.17 (Invoicing and Payment) of the GT&C of its *pro forma* tariff to delete the reference to "Operational Control Provisions" which was inadvertently included in Midship's tariff.

g.      Midship proposes to revise Section 6.22 to provide clarification between a regulatory right of first refusal (ROFR) provided pursuant to the Commission's regulations and a Contractual ROFR.

h.      Midship proposes to revise Section 6.24.2 of the GT&C of its *pro forma* tariff to conform with section 154.401 of the Commission's regulations.

i.      Midship proposes to revise Appendix A of the form FTS Service Agreement to align with the Appendix A format described in Section 5.1.2.D (Rate Schedule FTS) of Midship's *pro forma* tariff.

j.      Midship proposes to revise ITS Service Agreement to replace the reference to MDTQ with contracted interruptible capacity, consistent with Section 5.2.5.  In addition, Midship is revising Appendix A of the form ITS Service Agreement to align with Appendix A of the form FTS Service Agreement for consistency purposes.

Section 6.10: Nominations, Confirmations, Scheduling

37.     Revised GT&C section 6.10.3 (Scheduling) contains Midship's proposed scheduling priorities.  Midship proposes to schedule mainline capacity first and, to the extent receipt or delivery point capacity is constrained, it will allocate point capacity. Midship will schedule mainline capacity and receipts and deliveries based on five categories:  (a) firm primary receipt and delivery points within the path; (b) firm secondary receipt or delivery points within the path; (c) firm secondary receipt or delivery points outside the path; (d) Operational Transactions as defined in Section 6.11; and (e) interruptible services including imbalance payback and overrun service from firm contracts, based on the effective rate.

38.     We approve Midship's proposed scheduling priorities, with one exception. Midship uses the term "payback," which is not defined in its tariff and is not a service. Midship must either remove these payback provisions from section 6.10.3 or list it last among the other scheduling priorities.

Section 6.22: Pre-Granted Abandonment – ROFR

39.     In Order No. 636-B, the Commission clarified that the right of first refusal permits the existing capacity holder to elect to retain a volumetric portion of its capacity subject to the right of first refusal.[38]  Midship is directed to further revise the proposed sections 6.22.2.b.iv and 6.22.2.b.v to clarify that shippers may elect to exercise their ROFRs for all or a volumetric portion of capacity.

North American Energy Standards Board (NAESB)

40.     GT&C section 6.26, NAESB Standards, implements the NAESB Wholesale Gas Quadrant Version 3.0 business practice standards that the Commission incorporated by reference in its regulations.[39]  To ensure consistency with the NAESB standards, Midship is directed to revise its tariff accordingly to:

(1)     revise the text of GT&C section 6.20.11.d.vi.2.b to provide that: For recall notification provided to Transporter after 5:00 p.m. and prior to 7:00 a.m., Transporter should provide notification to all affected Replacement Shippers no later than 8:00 a.m. after receipt of such recall notification (Central Clock Time);

(2)     change the reference from "General Standards and Location Data Downloads:" to "General:" in GT&C section 6.26, NAESB Standards;

(3)     include definition 0.2.5 in a section titled "Definitions:" under the heading "Additional Standards: – General:" in GT&C section 6.26, NAESB Standards;

(4)     remove definition 0.2.5 from section titled "Gas-Electric Operational Communications:" in GT&C section 6.26, NAESB Standards;

(5)     include a new section titled "Location Data Download" under the heading "Additional Standards:" in GT&C section 6.26, NAESB Standards;

---

[38] *See Algonquin Gas Transmission Co.*, 94 FERC ¶ 61,383, at p. 62,440 (2001) (noting that Order No. 636-B clarified that the ROFR process permits the existing capacity holder to retain a volumetric portion of its capacity and reiterating that "the regulatory right of first refusal permits the capacity holder to elect to retain a volumetric portion of its capacity, regardless of the terms of any tariff").

[39] *Standards for Business Practices of Interstate Natural Gas Pipelines; Coordination of the Scheduling Processes of Interstate Natural Gas Pipelines and Public Utilities*, Order No. 587-W, FERC Stats. & Regs. ¶ 31,373 (2015), *order on reh'g*, 154 FERC ¶ 61,207 (2016).

(6)     include dataset 0.4.4* and standards 0.3.23, 0.3.24, 0.3.25, 0.3.26, 0.3.27, 0.3.28, and 0.3.29 in the new section titled "Location Data Download;"

(7)     remove dataset 0.4.4* from section titled "Operating Capacity and Unsubscribed Capacity;"

(8)     remove standards 0.3.23, 0.3.24, 0.3.25, 0.3.26, 0.3.27, 0.3.28, and 0.3.29 from section titled "General Standards and Location Data Downloads:;"

(9)     include an asterisk [*] for standard 5.3.56 in GT&C section 6.26, NAESB Standards;

(10)    remove standard 5.3.73 from section titled "Standards Incorporated by Reference: – Capacity Release Standards:" in GT&C section 6.26, NAESB Standards, because the text of the standard is included in GT&C section 6.20.14; and,

(11)    include standard 5.3.73 in the section titled "Standards Not Incorporated by Reference and their Location in Tariff:" in GT&C section 6.26, NAESB Standards.

GT&C Section 6.8 Force Majeure

41.     GT&C section 6.8.3 includes in the definition of *force majeure* "the inability of Transporter's pipeline system to deliver gas…."  The above phrase is overly broad and could include circumstances that are not both unexpected and outside the pipeline's control, which conflicts with established Commission policy.

42.     Midship's proposed definition of *force majeure* events also includes "acts of civil or military authority (including, but not limited to, courts, the government or any administrative or regulatory agencies)…."  This proposed language conflicts with Commission policy because it can be interpreted to include regular, periodic maintenance activities required to comply with government actions as *force majeure* events.  The Commission has clarified the basic distinction as to whether outages resulting from governmental actions are *force majeure* or non-*force majeure* events.[40]  The Commission found that outages necessitated by compliance with government standards concerning the regular, periodic maintenance activities a pipeline must perform in the ordinary course of business to ensure the safe operation of the pipeline, including the Pipeline and

---

[40] *Kinder Morgan Louisiana Pipeline LLC,* 154 FERC ¶ 61,145, at P 30 (2016); *TransColorado Gas Transmission Co., LLC ,* 144 FERC ¶ 61,175, at PP 35-43 (2013); and *Gulf South Pipeline Co., LP*, 141 FERC ¶ 61,224, at PP 28-47 (2012), *order on reh'g*, 144 FERC ¶ 61,215, at PP 31-34 (2013).

Hazardous Materials Safety Administration's integrity management regulations, are non-*force majeure* events requiring full reservation charge credits. Outages resulting from one-time, non-recurring government requirements, including special, one-time testing requirements after a pipeline failure, are *force majeure* events requiring only partial crediting.[41] Midship must revise GT&C section 6.8.3 to comply with Commission policy, as discussed above.

GT&C Section 6.28 Discounting

43.    GT&C Section 6.28 provides that usage charges are subject to discounting. In Midship's response to the Commission's February 27, 2018 Data Request, Midship stated "In its sole discretion, Midship may at any time, on a non-discriminatory basis, determine that it will offer discounted transportation rates, including usage charge base rates, to Shippers. Such discounted rates shall not be greater than the maximum rate or less than the minimum rate for the applicable service as set forth in Section 4 of its Tariff."

44.    The Commission does not permit pipelines to offer discounts below their minimum rates, which are based on the variable costs allocated to the service to which the rate applies. Therefore, a pipeline such as Midship, using an SFV rate design, cannot discount its usage charges because those usage charges only contain variable costs. Accordingly, Midship must remove usage charges from GT&C Section 6.28.

## H.    **Accounting**

45.    Midship proposes to capitalize a total allowance for funds used during construction (AFUDC) of $85,783,575 as part of its MIDSHIP Project.[42]  Midship explains that it began accruing costs associated with the project on October 28, 2016.[43]

46.    AFUDC is a component part of the cost of constructing Midship's facilities. Gas Plant Instruction 3(17) prescribes a formula for determining the maximum amount of AFUDC that may be capitalized as a component of construction cost.[44]  That formula, however, is not applicable here, as it uses prior year book balances and cost rates of borrowed and other capital that either do not exist or could produce inappropriate results for initial construction projects of newly created entities such as Midship. Therefore, to ensure that the amounts of AFUDC are properly capitalized in this project, we will

---

[41] *See Algonquin Gas Transmission, LLC*, 153 FERC ¶ 61,038, at P 104 (2015).

[42] Application at 14 and Exhibit K.

[43] Application at 1.

[44] 18 C.F.R. pt. 201 (2017).

Docket No. CP17-458-000                                                                   - 18 -

require Midship to capitalize the actual costs of borrowed and other funds for construction purposes, not to exceed the amount of debt and equity AFUDC that would be capitalized based on the overall rate of return approved.[45]

## I.    **Environmental Analysis**

### 1.    **Pre-filing and Application Review**

47.    On November 9, 2016, Commission staff granted Midship's request to use the pre-filing process in Docket No. PF17-3-000.  As part of the pre-filing review in that docket, on January 27, 2017, the Commission issued a *Notice of Intent to Prepare an Environmental Impact Statement for the Planned Midcontinent Supply Header Interstate Pipeline Project, Request for Comments on Environmental Issues, and Notice of Public Scoping Sessions*.  The NOI was published in the *Federal Register* on February 2, 2017, and mailed to over 1,100 interested parties on the environmental mailing list (including federal, state, and local government representatives and agencies; elected officials; environmental and public interest groups; Native American tribes; affected property owners; other interested parties; and local libraries and newspapers).

48.    The NOI briefly described the project and environmental review process, provided a preliminary list of issues Commission staff identified, invited written comments on the environmental issues that should be addressed in the draft environmental impact statement (EIS), listed the date and location of four public scoping sessions[46] to be held in the project area, and established a February 27, 2017 closing date for receipt of comments.

49.    On March 22, 2017, the Commission issued a *Supplemental Notice of Intent to Prepare an Environmental Impact Statement for the Planned Midcontinent Supply Header Interstate Pipeline Project and Request for Comments on Environmental Issues Related to New Pipeline Lateral and Booster Station* (Supplemental NOI) to seek comments on additional facilities Midship identified as part of the project, specifically the Velma Lateral and Sholem Booster Station.  The Supplemental NOI was published in the *Federal Register* on March 28, 2017, and mailed to over 1,260 interested parties on the updated environmental mailing list.  The Supplemental NOI briefly described the new facilities, invited newly affected landowners to participate in the environmental review process, and established an April 21, 2017, closing date for receipt of comments.

50.    Six people commented on the project at the scoping sessions.  In addition to the comments received at the scoping sessions, nearly 30 written comments from federal,

---

[45] *See Weaver's Cove Energy, LLC*, 112 FERC ¶ 61,070 (2005).

[46] Commission staff held the public scoping sessions between February 13 and 16, 2017, in Durant, Ardmore, Elmore City, and El Reno, Oklahoma.

state, and local agencies; elected officials; environmental and public interest groups; potentially affected landowners; and other interested stakeholders were received. The comments were placed into the public record for the project for consideration in the draft EIS. Major issues raised include the potential for induced seismicity; possible alternative routes; and potential impacts on agricultural lands, cattle grazing, threatened and endangered species, surface water and groundwater resources, air quality and noise, and safety.[47]

51.     The pre-filing review ended on May 31, 2017, when Midship filed its application with the Commission under NGA section 7(c) seeking authorization to construct and operate the project.

52.     To satisfy the requirements of the National Environmental Policy Act of 1969 (NEPA),[48] Commission staff evaluated the potential environmental impacts of the proposed project in an EIS. The U.S. Environmental Protection Agency (EPA) participated as a cooperating agency in the preparation of the EIS. Cooperating agencies have jurisdiction by law or special expertise with respect to resources potentially affected by the proposals and participate in the NEPA analysis.

53.     Commission staff issued the draft EIS on February 9, 2018, which addressed the issues raised during the scoping period and up to the point of publication. Notice of the draft EIS was published in the *Federal Register* on February 16, 2018, establishing a 45-day public comment period ending on April 2, 2018.[49] The draft EIS was mailed to the environmental mailing list for the project. Commission staff held four public comment sessions between April 12 and 15, 2018, to receive comments on the draft EIS.[50] Four people provided oral comments at these sessions. We also received nine written comment letters from federal and state agencies; Native American tribes; companies/organizations; and individuals in response to the draft EIS. The transcripts of the public comment sessions and all written comments on the draft EIS are part of the public record for the project.

---

[47] Table 1.3-1 of the final EIS provides a detailed and comprehensive list of issues raised during and after scoping.

[48] 42 U.S.C. §§ 4321 *et seq.* (2012). *See also* the Commission's NEPA-implementing regulations at Title 18 of the Code of Federal Regulations, Part 380.

[49] 83 Fed. Reg. 7030 (Feb. 16, 2018).

[50] Commission staff held the public comment sessions in Durant, Ardmore, Elmore City, and El Reno, Pennsylvania.

54.     On June 19, 2018, Commission staff issued the final EIS for the project, and a public notice of the availability of the final EIS was published in the *Federal Register*.[51] The final EIS addresses all substantive comments received on the draft EIS.[52]  The final EIS was mailed to the environmental mailing list for the project.[53]  The final EIS addresses geology; soils; water resources; wetlands; vegetation, wildlife, and fisheries; special status species; land use, recreation, and visual resources; socioeconomics; cultural resources; air quality and noise; reliability and safety; cumulative impacts; and minor route alternatives/variations incorporated into the project's design.  As of August 1, 2018, no comments have been received on the final EIS.[54]

## 2.     Major Environmental Issues Addressed in the EIS

55.     The final EIS concludes that construction and operation of the project will result in some adverse environmental impacts, but impacts will be reduced to less-than-significant levels with the implementation of Midship's proposed, and Commission staff's recommended, mitigation measures (now adopted as the 22 conditions in the appendix to this order).  This determination is based on a review of the information provided by Midship and further developed from data requests; field investigations; scoping; literature research; alternatives analyses; and contacts with federal, state, and local agencies, as well as Native American tribes and individual members of the public.  Major issues of concern addressed in the final EIS are summarized below and include: geology and seismic hazards; groundwater, surface water, and wetlands; vegetation, wildlife, and aquatic species; threatened, endangered, and other special status species; land use concerns; socioeconomics; cultural resources; air quality and noise; safety; cumulative impacts; and alternatives.

### a.     Geology and Seismic Hazards

56.     Before and after the draft EIS was issued, we received comments regarding pipeline safety due to the recent trend of increased frequency and magnitude of induced earthquakes.  According to the *Susceptibility of the Midship Pipeline to Damage from*

---

[51] 83 Fed. Reg. 30,165 (June 27, 2018).

[52] Appendix O of Volume II of the final EIS includes responses to comments on the draft EIS.  No comments were received or new issues raised after the close of the comment period.

[53] The distribution list is provided in Appendix A of the final EIS.

[54] By letter dated July 30, 2018, the EPA noted that it had provided detailed comments on the draft EIS and, based on its review of the Final EIS, the "EPA has no further comments."

*Seismic Events in Oklahoma* report (Seismic Report) prepared for the project, the potential for soil liquefaction in the project area is very low and models indicate that stresses on the pipeline associated with earthquake ground wave propagation will be within acceptable limits.  Modern gas transmission pipelines have been shown to perform well in seismically active areas and, based on Pipeline and Hazardous Materials Safety Administration pipeline incident data, the increased frequency and magnitude of earthquakes has not increased pipeline failures in Oklahoma.  In addition, as stated in the final EIS, Midship must design and construct the pipeline and associated facilities in accordance with applicable U.S. Department of Transportation (DOT) regulations (Title 49 of the Code of Federal Regulations [CFR], Part 192) and applicable federal and state standards and design requirements, which will allow the project facilities to withstand probable seismic hazards.[55]

57.    The final EIS concludes that, with Midship's implementation of the Commission's *Upland Erosion Control, Revegetation, and Maintenance Plan* (Plan) and *Wetland and Waterbody Construction and Mitigation Procedures* (Procedures); Midship's *Karst Mitigation Plan*, *Blasting Plan*, and other proposed mitigation measures,[56] coupled with the findings in the Seismic Report, impacts on geologic resources will be adequately avoided or minimized.[57]  We agree with this conclusion.

## b.    <u>Groundwater, Surface Water, and Wetlands</u>

58.    The U.S. Department of the Interior (DOI) commented on the draft EIS, including a recommendation that Midship develop a spring and well water quality sampling plan with recommended sampling parameters.  The final EIS recommends, and we require in Environmental Condition 12, that Midship file a spring and well water quality sampling plan before commencing construction.  If construction-related activity affects the yield or water quality of a well or spring, Midship will work with the landowner to repair or restore the well or spring and provide an alternate water source until repairs are made, or provide compensation to the owner for damages.[58]

59.    We agree with the final EIS's conclusion that the project will not significantly affect groundwater resources because most of the construction will involve shallow, temporary, and localized excavation; and potential impacts on groundwater resources will be avoided, minimized, or mitigated by using construction techniques and mitigation

---

[55] *See* Final EIS at 4-15.

[56] *Id.* at 4-13 to 4-15.

[57] *Id.* at 5-2.

[58] *See* Midship's Final Resource Report 2 at 2-9 (May 2017).

Docket No. CP17-458-000                                                            - 22 -

measures described in the Plan and Procedures, Midship's *Karst Mitigation Plan* and *Blasting Plan*, and the environmental conditions in the appendix to this order.[59]  Midship will also prevent or adequately minimize inadvertent spills and leaks of hazardous materials into groundwater resources during construction and operation by adhering to its *Spill Prevention and Response Procedures*.

60.     The pipeline facilities and construction workspace will cross 407 waterbodies (58 perennial waterbodies, 121 intermittent waterbodies, 213 ephemeral waterbodies, and 15 ponds).  Of these, 53 waterbodies are in the workspace, but are not crossed by the pipeline, and 15 are associated with access roads (5 of which are also crossed by the pipeline).  Midship will install the pipeline across 327 waterbodies via the open-cut crossing method and 17 waterbodies via the horizontal directional drill (HDD) method.

61.     Three of the five major waterbody crossings (greater than 100 feet wide) will be crossed using the HDD method, and the remaining two (an unnamed pond and an unnamed tributary to Caddo Creek) will be crossed using the open-cut crossing method.  To reduce the potential environmental impacts associated with the open-cut crossing of the unnamed tributary to Caddo Creek, the final EIS recommends, and we require in Environmental Condition 14, that Midship file a feasibility assessment for shifting the pipeline route to minimize the crossing length or conduct the crossing using an alternative crossing method.

62.     The project will cross 21 waterbodies listed as impaired for their designated use, including 17 along the mainline, one along the Chisholm Lateral, and three along the Velma Lateral.  The mainline crosses the Nationwide Rivers Inventory-listed Blue River, which supports the least darter (a U.S. Fish and Wildlife Service [FWS]-identified fishery of special concern); the Canadian River, which supports the federally listed (threatened) Arkansas River shiner; and the Canadian River and the 300-foot-wide riparian buffer on either side of the river, which is designated as critical habitat for the Arkansas River shiner.  Further, the mainline crosses sensitive fisheries at Pennington Creek, which is a state designated cool water aquatic community and a High Quality Water.  Midship will minimize impacts by using the HDD method to cross the Blue River, Canadian River, and Pennington Creek.

63.     We agree with the final EIS's conclusion that, with the implementation of the construction techniques and mitigation described in the Plan and Procedures, protective measures Midship developed, and the environmental conditions in the appendix to this order, project construction and operation will not result in significant impacts on surface water resources.[60]

---

[59] *See* Final EIS at 5-4.

[60] *Id.* at 5-5.

64.     Construction of the project pipeline facilities will affect 3.5 acres of wetlands, including 0.1 acre of palustrine-forested wetlands, 2.7 acres of palustrine-emergent wetlands, and 0.6 acre of palustrine-scrub-shrub wetlands.  Construction or operation of the aboveground facilities, contractor yards, or access roads will not affect any wetlands. Although the project will convert some forested and scrub-shrub wetlands to emergent wetlands, it will not result in any permanent loss of wetlands.

65.     Construction and operation-related impacts on wetlands will be mitigated by Midship's compliance with the Procedures, any U.S. Army Corps of Engineers (COE) section 401 and 404 permit conditions, and, if required by the COE, implementing any required mitigation to offset unavoidable impacts on wetlands through the creation, restoration, enhancement, or preservation of wetlands.

66.     We support the final EIS's conclusion that, although minor adverse and long-term effects on wetlands will occur, project construction and operation will result in minor impacts on wetlands that will be appropriately mitigated and reduced to less-than-significant levels with adherence to the Procedures.[61]

### c.     Vegetation, Wildlife, and Aquatic Species

67.     Project construction will affect 3,198.8 acres of vegetated lands, including 462.4 acres of upland forest and 0.1 acre of forested wetland.  After construction, Midship will seed the construction workspace and revegetate disturbed workspaces in accordance with the Plan and Procedures.  During operations, Midship will maintain vegetation along the rights-of-way to facilitate routine patrols and emergency access to the pipeline centerline.  Project operation will impact 1,438.5 acres of vegetated lands, including 192.6 acres of upland forest and 0.1 acre of forested wetlands (which will be permanently converted to non-forested wetlands).

68.     We support the final EIS's conclusion that impacts on vegetation, including forested areas, will be reduced to less-than-significant levels, by restoring temporary workspaces and the permanent right-of-way and collocating the pipeline routes with existing, maintained rights-of-way through the majority of large forested areas.[62] Midship will further mitigate impacts on forested and non-forested vegetation types, as well as the introduction or spread of noxious weeds or invasive plant species, through adherence to the measures in the Plan and Procedures.

69.     The final EIS concludes, and we agree, that construction and operation of the project will not significantly impact wildlife resources, based on the presence of suitable

---

[61] *Id.* at 5-7.

[62] *Id.* at 5-8.

adjacent habitat available for use; the temporary nature of pipeline construction; the relatively low amount of habitat converted to developed land; and the impact avoidance, minimization, and mitigation measures Midship proposed (e.g., Midship's implementation of the measures in the Plan and Procedures and its *Spill Prevention and Response Procedures*).[63]  In addition, we support the final EIS's conclusion that the project will result in some temporary impacts on aquatic resources, which will be minimized and adequately mitigated with implementation of Midship's impact avoidance, minimization, and mitigation measures, including adherence to multiple resource protection plans.[64]

### d.    Threatened, Endangered, and Other Special Status Species

70.    Based on FWS input, seven federally listed species (the black-capped vireo, least tern, piping plover, rufa red knot, whooping crane, Arkansas River shiner, and American burying beetle), and critical habitat for the Arkansas River shiner, potentially occur in the project area.  Based on state resource agency input, no state-listed species potentially occur in the project area.  The final EIS concludes that the project would have *no effect* on the rufa red knot and, with implementation of Midship's proposed mitigation measures, the project *is not likely to adversely affect* the remaining six federally listed species or the Arkansas River shiner critical habitat.[65]  The final EIS recommends, and we require in Environmental Conditions 17 and 18, that Midship conduct updated surveys for the American burying beetle during the 2018 active season and that Midship not begin construction until the Commission staff receives written comments from the FWS regarding the proposed action and completes section 7 of the Endangered Species Act consultation with the FWS, if required.

### e.    Land Use

71.    Project construction will affect 3,340.7 acres.  About 91 percent will be used for the pipeline facilities.  The remaining acreage will be associated with aboveground facilities (4 percent), access roads (3 percent), and contractor yards (2 percent).  During operation, 1,474.4 acres will be within the new permanent pipeline right-of-way, aboveground facilities, and permanent access roads.

72.    Project construction will affect about 939 acres of agricultural land, of which about 413 acres will be retained during project operation.  The mainline will cross seven

---

[63] *Id.* at 5-9.

[64] *Id.* at 5-10.

[65] *Id.* at 5-11 to 5-12.

pecan groves, but will cross no other known specialty agricultural areas or organic farm operations.  Agricultural land in the construction rights-of-way will generally be taken out of production for one growing season.  Following construction, all cropland, hay field, and pastureland used will be restored, and prior agricultural uses will be allowed to continue within the permanent pipeline right-of-way.[66]  Midship has tried to minimize impacts on pecan groves by avoiding them, and will continue to work with individual landowners through the easement process to avoid and minimize impacts where these trees are present; where avoidance is not possible, Midship will compensate landowners for loss of pecan trees removed during construction.[67]

73.     The project will cross or be within 0.25 mile of three areas that support recreation or special interests:  Historic Route 66 (a scenic highway), the Texoma/Washita Arm of the Tishomingo Wildlife Management Area, and the Nationwide Rivers Inventory-listed Blue River.  Midship will use the HDD method to cross Historic Route 66 and the Nationwide Rivers Inventory-listed Blue River, avoiding direct impacts on these features.  The project will pass about 0.2 mile north of the Texoma/Washita Arm of the Tishomingo Wildlife Management Area in an area of mixed open land and forest near Mainline Milepost 146.0.  Therefore, the final EIS concludes, and we agree, that the project will not directly impact the Tishomingo Wildlife Management Area during construction or operation.

74.     In the draft EIS, we recommended that Midship provide updated information regarding conservation easements crossed by the project.  Because additional conservation easements might be identified, the final EIS recommends, and we require in Environmental Condition 19, that Midship file updated information before beginning construction regarding properties the project will cross that are enrolled in Natural Resources Conservation Service, Farm Service Agency, or other conservation programs, including any proposed mitigation measures developed in consultation with the landowner and/or the administering agency.

75.     The draft EIS recommended that Midship provide a visual screening plan to reduce the visibility of the Bennington Compressor Station from the nearest homes.  In response, Midship provided a Landscape Management Plan for the Bennington Compressor Station that includes detailed plans for visually screening the compressor station from the nearest home using a combination of native grasses and deciduous, evergreen, and ornamental trees.

76.     We support the final EIS's conclusion that, with adherence to Midship's proposed impact avoidance, minimization, and mitigation plans, as well as the environmental

---

[66] *Id.* at 4-100.

[67] *Id.* at 4-101.

conditions included in the appendix to this order, the overall impacts of the project on land use and visual resources will be adequately minimized.[68]

### f. __Socioeconomics__

77.     The EPA submitted comments on the draft EIS regarding potential air quality and noise impacts of the aboveground facilities, and potential visual impacts of the Calumet and Tatums Compressor Stations, on environmental justice communities.  Emissions from the project's aboveground facilities will meet air quality requirements and comply with required air emissions permits, and the facilities will be designed and constructed to avoid intrusive noise levels at residences, recreational areas, and other special interest areas.  Therefore, the final EIS concludes, and we agree, that operating the aboveground facilities will not significantly impact air quality or noise for any population, including environmental justice populations.[69]  Furthermore, and as described in section 4.8.8 of the final EISs, the existing vegetation at the Calumet and Tatums Compressor Stations provides sufficient visual screening from nearby residences; therefore, no additional visual screening plans or mitigation were required.[70]

78.     Traffic will temporarily increase due to construction workers commuting to the project area, as well as construction vehicles and vehicles delivering equipment and materials traveling to the construction right-of-way.  In its response to the recommendations in the draft EIS, Midship committed to providing a traffic management plan before project construction begins that details specific measures to minimize impacts on traffic, including identification of traffic control measures and personnel, emergency access management procedures, off-site vehicle parking areas, alternative worker transportation methods (e.g., bussing to construction worksites), and a communication plan for notifying emergency services personnel, school systems, and the public about the location and duration of road closures.[71]

79.     The final EIS concludes that project construction will not have significant adverse impacts on local populations, housing, employment, or the provision of community services, and that, although the project will affect some areas that meet the criteria for environmental justice areas, there is no evidence that the project will cause adverse and disproportionate impacts on minorities or low income populations.[72]  The final EIS

---

[68] *Id.* at 5-16.

[69] *Id.* at 4-124.

[70] *Id.* at 4-108.

[71] *Id.* at 4-117.

[72] *Id.* at 5-16.

Docket No. CP17-458-000                                                    - 27 -

concludes, and we agree, that the project will not have significant adverse impacts on the socioeconomic conditions of the project area.

### g.  <u>Cultural Resources</u>

80.    Midship identified 36 isolated finds and 58 cultural resources in the area of potential effect.  The cultural resources identified included 49 archaeological sites and 9 historic architectural resources.  The State Historic Preservation Office concurred that the historic archaeological sites and architectural resources are not eligible for listing in the National Register of Historic Places; the Oklahoma Archeological Survey concurred that identified pre-contact archaeological sites are not eligible for listing in the National Register of Historic Places, and the project subsequently avoided one site.[73]   The EIS concurred with these findings.[74]

81.    Commission staff and Midship consulted 18 federally-recognized Native American tribes, as well as several other non-governmental organizations and other potentially interested parties.

82.    To ensure our responsibilities under section 106 of the National Historic Preservation Act are met, the final EIS recommends, and we include as Environmental Condition 20, that Midship not begin construction until it completes any additional required surveys, and appropriate parties review survey reports and treatment plans (if necessary).  The final EIS concludes, and we agree, that Midship's studies and impact avoidance and minimization measures, as well as the environmental conditions in in the appendix to this order, will ensure that any adverse effects on cultural resources will be appropriately mitigated.[75]

### h.  <u>Air Quality and Noise</u>

83.    Air contaminants associated with construction of the project include emissions from fossil-fueled vehicles and off-road construction equipment, HDD activities, fugitive dust, and open burning.  Construction emissions will be temporary, occurring over the duration of construction activity, and will be emitted at different times and locations along the length of the proposed pipelines and at the aboveground facility sites.  Section 4.11.1.3 of the final EIS concludes, and we agree, that construction emissions would not result in a significant impact on air quality.[76]

---

[73] *Id*. at 4-131.

[74] *Id.* at 5-17.

[75] *Id.*at 5-17.

[76] *Id.* at 4-139.

84.     Project operation will result in air emissions from stationary equipment, including emissions of oxides of nitrogen, carbon monoxide, particulate matter, sulfur dioxide, volatile organic compounds, greenhouse gases, and hazardous air pollutants.  The results of the air quality modeling analyses demonstrate that emissions from the Calumet, Tatums, and Bennington Compressor Stations and the Sholem Booster Station, when combined with background air quality concentrations, will be below the National Ambient Air Quality Standards.  Because Midship will be required to acquire applicable air permits, based on the air quality modeling analysis, and with Midship's proposed mitigation measures, the EIS concludes that air quality impacts from project operation, although long-term, will not result in a significant impact on local and regional air quality or cause or contribute to a violation of applicable air quality standards.[77]

85.     We received a comment on the draft EIS regarding the potential risk of exposure to radon gas should a rupture of the pipeline occur due to seismic activity.  As described in section 4.1.4.1 of the final EIS, seismic events are not anticipated to affect a modern arc-welded pipeline.[78]  Further, radon gas within the pipeline will be reduced through processing to make the gas pipeline quality.  Therefore, we support the conclusion of the final EIS that the risk of exposure to radon is not significant.[79]

86.     Construction noise associated with the pipeline will be spread over the length of the pipeline route and will not be concentrated at any one location for an extended time, except at the proposed HDD sites.  Construction noise associated with compressor, booster, and meter station installation will be concentrated near each site and will extend for several months, but will vary depending on the specific activities taking place at any given time.  With the implementation of Midship's proposed noise mitigation measures, the estimated noise attributable to HDD equipment operations will meet the Commission's noise criteria (day-night sound level of 55 decibels on the A-weighted scale) at the nearest noise-sensitive area (NSA) at all of the HDD locations, except for the Pennington Creek HDD.  The final EIS concludes that the proposed mitigation is reasonable and that the noise attributable to the HDD activities will have a moderate but short-term impact on NSAs near the Pennington Creek HDD.  The final EIS recommends, and we require in Environmental Condition 21, that Midship file HDD noise assessments for the North Canadian River; Oklahoma, Kansas and Texas Railroad; Blue River; and Rock Creek HDDs to ensure that the final proposed site-specific noise mitigation measures will effectively reduce noise attributable to HDD activities at the nearest NSAs to levels consistent with Midship's estimates.

---

[77] *Id.* at 5-18.

[78] *Id.* at 4-10.

[79] *Id.* at 5-18.

87.     Project operation will have a long-term effect on noise levels near the compressor stations, booster station, and meter stations.  The noise associated with some of these facilities is likely to be perceptible at some nearby NSAs; however, Midship will implement mitigation measures at the compressor stations and booster station to minimize continuous noise levels from these facilities at nearby NSAs.  To ensure that the noise levels during compressor and booster station operation meet the FERC sound criterion of 55 decibels on the A-weighted scale at NSAs, the final EIS recommends, and we require in Environmental Condition 22, that Midship file noise surveys at full load conditions and install additional noise controls if the levels are exceeded.

88.     We support the final EIS's conclusion that project construction and operation will not result in significant noise impacts on residents and the surrounding environment based on the analyses conducted and with implementation of the proposed mitigation measures and the environmental conditions included in the appendix to this order.[80]

### i.    <u>Safety</u>

89.     Before and after we issued the draft EIS, we received comments regarding the potential effects of a pipeline rupture.  The risk of a pipeline rupture at any given location is extremely low, as identified in section 4.12.2 of the final EIS.  The DOT publishes rules that define high consequence areas where a gas pipeline accident could considerably harm people and their property and require an integrity management program to minimize the potential for an accident.  Midship will follow federal safety standards for pipeline class locations based on population density.  The DOT regulations are designed to ensure adequate safety measures are implemented to protect all populations.

90.     The DOT requires that each operator establish and maintain liaisons with appropriate fire, police, and public officials to learn the resources and responsibilities of each organization that may respond to a natural gas pipeline emergency, and to coordinate mutual assistance.  The operator must also establish a continuing education program to enable customers, the public, government officials, and those engaged in excavation activities to recognize a gas pipeline emergency and report it to the appropriate public officials.  Midship will provide the required training to local emergency service personnel before the pipeline is placed in service.[81]

91.     Midship will design, construct, operate, and maintain the proposed pipelines and aboveground facilities in accordance with, or in exceedance of, DOT Minimum Federal Safety Standards in 49 C.F.R. Part 192 and other applicable federal and state

---

[80] *Id.* at 5-20.

[81] *Id.* at 4-164.

regulations.[82]  We support the conclusion of the final EIS that Midship's implementation of the above measures will ensure compliance with the DOT's regulations regarding public safety and the integrity of the proposed facilities.[83]

## j.    **Cumulative Impacts**

92.    Project construction, combined with other recently completed or proposed projects or actions, will have some long-term cumulative impacts on forested wetlands and forested uplands with respect to the vegetative communities and associated wildlife habitats.[84]  Operating the new aboveground facilities, in particular the three compressor stations, will contribute to cumulative impacts on air emissions and, where they are near other existing or future facilities, on noise levels.[85]  Due to specialized construction techniques, the relatively short construction timeframe in any one location, and resource protection and mitigation plans designed to minimize and control environmental impacts for the project, the final EIS concludes,[86] and we agree, that minimal cumulative impacts will occur.

## k.    **Alternatives**

93.    The final EIS evaluated the no-action alternative, system alternatives, route alternatives, and aboveground facility site alternatives.[87]  The final EIS concludes that there are no known natural gas pipeline systems proposed in the region that would meet the objectives of the MIDSHIP Project.  Although there are several existing natural gas pipeline systems that operate nearby, most operate at or near capacity and none are configured to receive and deliver natural gas based on the requirements of the MIDSHIP Project shippers.  Moreover, to use any system alternative, additional pipeline looping, compression, and laterals would be needed, which would likely have similar environmental impacts as the project.  Therefore, none of these pipeline systems would offer a significant environmental advantage.

94.    The draft EIS recommended that Midship assess the feasibility of route adjustments or alternative construction techniques to minimize impacts on a dike on a landowner's property.  In response, Midship incorporated a route variation to avoid crossing the dike, as well as documentation that the landowner finds the route variation

---

[82] *Id*. at 5-19.

[83] *Id.* at 5-20.

[84] *Id.* at 4-180 to 4-181.

[85] *Id.* at 4-187 to 4-190.

[86] *Id.* at 5-21.

[87] *Id.* at 3-1-7.

acceptable.  After filing its application, Midship also identified and incorporated an alternative location for its Sholem Booster Station based on landowner input.  No comments were received regarding possible alternative sites for the three new compressor stations, and no significant impacts have been identified at their proposed sites.

95.     Midship incorporated 28 route variations into the proposed route evaluated in the final EIS in response to input from its environmental and engineering staff and landowner consultations, and to address constructability issues identified during field surveys.  No comments were received on the draft EIS that suggested a major route alternative, and no major route alternatives were identified that would offer environmental advantages over the proposed route.

### l.     Environmental Analysis Conclusion

96.     We have reviewed the information and analysis contained in the final EIS regarding potential environmental effects of the project, as well as other information in the record.  We are adopting the environmental recommendations in the final EIS and include them as conditions in the appendix to this order.  Compliance with the environmental conditions appended to our orders is integral to ensuring that the environmental impacts of approved projects are consistent with those anticipated by our environmental analyses.  Thus, Commission staff carefully reviews all information submitted.  Commission staff will only issue a notice to proceed with an activity when satisfied that the applicant has complied with all applicable conditions.  We also note that the Commission has the authority to take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the project, including authority to impose any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order, as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation.

97.     Based on our consideration of this information and the discussion above, we agree with the conclusions presented in the final EIS and find that the project, if constructed and operated as described in the final EIS, is an environmentally acceptable action.  Further, for the reasons discussed throughout the order, as stated above, we find that the project is in the public convenience and necessity.

98.     Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this Certificate.  The Commission encourages cooperation between interstate pipelines and local authorities.  However, this does not mean that state and local agencies, through application of state or

local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[88]

99.     The Commission on its own motion received and made a part of the record in this proceeding all evidence, including the application, and exhibits thereto, and all comments and upon consideration of the record,

The Commission orders:

(A)     A certificate of public convenience and necessity is issued to Midship in Docket No. CP17-458-000 authorizing it to construct and operate the proposed MIDSHIP project, as described and conditioned herein, and as more fully described in the application.

(B)     The certificate authority granted in Ordering Paragraph (A) is conditioned on Midship's:

(1)     completion of construction of the proposed facilities and making them available for service within two years of the date of this order pursuant to section 157.20(b) of the Commission's regulations;

(2)     compliance with all applicable Commission regulations including, but not limited to Parts 154, 157, and 284, and paragraphs (a), (c), (e), and (f) of section 157.20 of the Commission's regulations;

(3)     compliance with the environmental conditions in the appendix to this order; and

(4)     prior to commencement of construction, filing a written statement affirming that it has executed firm contracts for the volumes and service terms equivalent to those in its precedent agreements.

(C)     Midship's initial recourse rates, retainage percentage, and *pro forma* tariff are approved, as conditioned and modified above.  Provided, however, in lieu of revising its initial recourse rates to remove the proposed income tax allowance, Midship, in the

---

[88] *See* 15 U.S.C. § 717r(d) (state or federal agency's failure to act on a permit considered to be inconsistent with Federal law); *see also Schneidewind v. ANR Pipeline Co*., 485 U.S. 293, 310 (1988) (state regulation that interferes with FERC's regulatory authority over the transportation of natural gas is preempted) and *Dominion Transmission, Inc. v. Summers,* 723 F.3d 238, 245 (D.C. Cir. 2013) (noting that state and local regulation is preempted by the NGA to the extent it conflicts with federal regulation, or would delay the construction and operation of facilities approved by the Commission).

alternative, may provide, no later than 180 days prior to commencement of service, for review and further order by the Commission, additional and detailed arguments as to why Midship is entitled to an income tax allowance.

(D)     Midship shall file actual tariff records that comply with the requirements contained in the body of this order at least 60 days prior to the commencement of interstate service consistent with Part 154 of the Commission's regulations.

(E)     Within three (3) months after its first three years of actual operation, as discussed herein, Midship must make a filing to justify its existing cost-based firm and interruptible recourse rates.  Midship's cost and revenue study should be filed through the eTariff portal using a Type of Filing Code 580.  In addition, Midship is advised to include as part of the eFiling description, a reference to Docket No. CP17-458-000 and the cost and revenue study.

(F)     Midship is directed to file its negotiated rate agreements no less than 30 days or more than 60 days before service commences.

(G)     Midship shall adhere to the accounting and reporting requirements discussed in the body of the order.

(H)     Midship shall notify the Commission's environmental staff by telephone or e-mail of any environmental noncompliance identified by other federal, state or local agencies on the same day that such agency notifies Midship.  Midship shall file written confirmation of such notification with the Secretary of the Commission (Secretary) within 24 hours.

(I)     Midship's request for a blanket construction certificate under Subpart F of Part 157 of the Commission's regulations is granted.

(J)     Midship's request for a blanket transportation certificate under Subpart G of Part 284 of the Commission's regulations is granted.

By the Commission.  Commissioner Glick is dissenting with a separate statement attached.

( S E A L )

Kimberly D. Bose,
Secretary.

**Appendix**

**Environmental Conditions for the
Midcontinent Supply Header Interstate Pipeline Project**

As recommended in the final environmental impact statement (EIS) and otherwise amended herein, this authorization includes the following conditions. The section number in parentheses at the end of a condition corresponds to the section number in which the measure and related resource impact analysis appears in the final EIS.

1.  Midship shall follow the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests) and as identified in the EIS, unless modified by this Order. Midship must:

    a.  request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);

    b.  justify each modification relative to site-specific conditions;

    c.  explain how that modification provides an equal or greater level of environmental protection than the original measure; and

    d.  receive approval in writing from the Director of the Office of Energy Projects (OEP) **before using that modification**.

2.  The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of this Order, and take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the project. This authority shall allow:

    a.  the modification of conditions of this Order;

    b.  stop-work authority; and

    c.  the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of this Order as well as the avoidance or mitigation of unforeseen adverse environmental impact resulting from project construction and operation.

3.  **Prior to any construction**, Midship shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, environmental inspectors (EI), and contractor personnel will be informed of the EIs' authority and have been or will be trained on the implementation of the environmental mitigation measures appropriate to their jobs **before** becoming involved with construction and restoration activities.

4.     The authorized facility locations shall be as shown in the EIS, as supplemented by filed alignment sheets.  **As soon as they are available, and before the start of construction**, Midship shall file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by this Order.    All requests for modifications of environmental conditions of this Order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets.

Midship's exercise of eminent domain authority granted under the Natural Gas Act of 1938 (NGA) section 7(h) in any condemnation proceedings related to this Order must be consistent with these authorized facilities and locations.  Midship's right of eminent domain granted under NGA section 7(h) does not authorize it to increase the size of its natural gas facilities to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas.

5.     Midship shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, pipe storage yards, new access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary.  Approval for each of these areas must be explicitly requested in writing.  For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area.  All areas shall be clearly identified on the maps/sheets/aerial photographs.  Each area must be approved in writing by the Director of OEP **before construction in or near that area**.

This requirement does not apply to extra workspace allowed by the Federal Energy Regulatory Commission's *Upland Erosion Control, Revegetation, and Maintenance Plan* and/or minor field realignments per landowner needs and requirements that do not affect other landowners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all route realignments and facility location changes resulting from:

a.     implementation of cultural resources mitigation measures;

b.     implementation of endangered, threatened, or special concern species mitigation measures;

c.     recommendations by state regulatory authorities; and

d.     agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6.   **Within 60 days of the acceptance of the authorization and before construction begins**, Midship shall file an Implementation Plan with the Secretary for review and written approval by the Director of OEP.  Midship must file revisions to the plan as schedules change.  The plan shall identify:

   a.   how Midship will implement the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests), identified in the EIS, and required by this Order;

   b.   how Midship will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to on-site construction and inspection personnel;

   c.   the number of EIs assigned per spread, and how the company will ensure that sufficient personnel are available to implement the environmental mitigation;

   d.   company personnel, including EIs and contractors, who will receive copies of the appropriate material;

   e.   the location and dates of the environmental compliance training and instructions Midship will give to all personnel involved with construction and restoration (initial and refresher training as the project progresses and personnel change), with the opportunity for OEP staff to participate in the training session(s);

   f.   the company personnel (if known) and specific portion of Midship's organization having responsibility for compliance;

   g.   the procedures (including use of contract penalties) Midship will follow if noncompliance occurs; and

   h.   for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

      i.    the completion of all required surveys and reports;
      ii.   the environmental compliance training of on-site personnel;
      iii.  the start of construction; and
      iv.   the start and completion of restoration.

7.   Midship shall employ a team of EIs (i.e., three or more or as may be established by the Director of OEP) per construction spread.  The EIs shall be:

   a.   responsible for monitoring and ensuring compliance with all mitigation measures required by this Order and other grants, permits, certificates, or other authorizing documents;

b.      responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see condition 6 above) and any other authorizing document;

c.      empowered to order correction of acts that violate the environmental conditions of this Order, and any other authorizing document;

d.      a full-time position, separate from all other activity inspectors;

e.      responsible for documenting compliance with the environmental conditions of this Order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

f.      responsible for maintaining status reports.

8.   **Beginning with the filing of its Implementation Plan**, Midship shall file updated status reports with the Secretary on a **weekly** basis until all construction and restoration activities are complete.  On request, these status reports will also be provided to other federal and state agencies with permitting responsibilities.  Status reports shall include:

a.      an update on Midship's efforts to obtain the necessary federal authorizations;

b.      the construction status of each spread, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally sensitive areas;

c.      a listing of all problems encountered and each instance of noncompliance observed by the EIs during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

d.      a description of the corrective actions implemented in response to all instances of noncompliance;

e.      the effectiveness of all corrective actions implemented;

f.      a description of any landowner/resident complaints that may relate to compliance with the requirements of this Order, and the measures taken to satisfy their concerns; and

g.      copies of any correspondence received by Midship from other federal, state, or local permitting agencies concerning instances of noncompliance, and Midship's response.

9.  Midship must receive written authorization from the Director of OEP **before commencing construction of any project facilities.**  To obtain such authorization, Midship must file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

10. Midship must receive written authorization from the Director of OEP **before placing the project into service**.  Such authorization will only be granted following a determination that rehabilitation and restoration of the right-of-way and other areas affected by the project are proceeding satisfactorily.

11. **Within 30 days of placing the authorized facilities in service**, Midship shall file an affirmative statement with the Secretary, certified by a senior company official:

    a.  that the facilities have been constructed in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

    b.  identifying which of the conditions in this Order Midship has complied with or will comply with.  This statement shall also identify any areas affected by the project where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

12. **Prior to construction**, Midship shall file with the Secretary, for review and written approval by the Director of OEP, a spring and well water quality sampling plan. The plan shall incorporate the following sampling parameters, or provide sufficient explanation as to why a specific parameter would not provide information relevant to restoring wells and springs affected by construction of the project:

    a.  total dissolved solids;

    b.  total suspended solids;

    c.  pH;

    d.  specific conductance;

    e.  arsenic;

    f.  metals (including beryllium, cadmium, chromium, iron, lead, and vanadium);

    g.  major ions (including calcium, chloride, potassium, sodium, and sulfate);

    h.  nitrate and nitrite;

    i.  total petroleum hydrocarbons;

j.    explosive residue compounds (U.S. Environmental Protection Agency method[s] 8330[a]); and

k.    fecal coliform (if the well head is opened for sampling purposes). *(Section 4.3.1.7)*

13.   **Prior to construction**, Midship shall file with the Secretary, for review and written approval by the Director of OEP, an updated *Horizontal Directional Drill Procedures and Mud Monitoring Plan* that revises section 10.4.2 to confirm it would test all non-municipal water sources prior to being used for drilling mud and that revises section 10.4.4 to confirm it would conduct laboratory sampling of drilling fluid for inorganic and organic environmental contaminants prior to reuse or disposal. *(Section 4.3.2.5)*

14.   **Prior to construction**, Midship shall file with the Secretary, for review and written approval by the Director of OEP, the results of a feasibility assessment for shifting the pipeline alignment to minimize the crossing length of waterbody S-BR-TAS-17/10/25-07 at Mainline Milepost 181.1, or implementing an alternative crossing method (e.g., dam-and-pump, flume, horizontal directional drill [HDD]). *(Section 4.3.2.6)*

15.   **Prior to construction**, Midship shall file with the Secretary, for review and written approval by the Director of OEP, a complete set of revised HDD profile and plan drawings, including all geotechnical analyses and detailed mapping of cleared areas, mud pits, and/or pipeline assembly areas, as required in the Commission's *Wetland and Waterbody Construction and Mitigation Procedure*s section V.B.6.d. *(Section 4.3.2.6)*

16.   **Prior to construction**, Midship shall file with the Secretary additional justification for use of the additional temporary workspace associated with the waterbodies identified in bold in table 4.3.2-8 of the EIS, for review and written approval by the Director of OEP. *(Section 4.3.2.6)*

17.   **Prior to construction**, Midship shall complete species-specific surveys for the American burying beetle (ABB) during the ABB's 2018 active season. If these surveys identify the presence of ABB in the project area, Midship shall not begin construction of the MIDSHIP Project **until**:

a.    Midship files with the Secretary a project-specific mitigation plan for the ABB that demonstrates how avoidance and mitigation will be accomplished; and

b.    the FERC staff receives documentation of U.S. Fish and Wildlife Service (FWS) concurrence with the plan. *(Section 4.7.1.7)*

18.   Midship shall not begin construction of the MIDSHIP Project **until**:

    a.   the FERC staff receives comments from the FWS regarding the MIDSHIP Project;

    b.   the FERC staff completes Endangered Species Act consultation with the FWS; and

    c.   Midship has received written notification from the Director of OEP that construction or use of mitigation may begin. *(Section 4.7.1.8)*

19.   **Prior to construction**, Midship shall file with the Secretary, for review and written approval by the Director of OEP, an updated list of properties crossed by the MIDSHIP Project that are enrolled in Natural Resources Conservation Service, Farm Service Agency, or other conservation programs, including any proposed mitigation measures Midship will implement to maintain the status of properties enrolled in these programs based on its consultation with the landowner(s) and the administering agency(ies). *(Section 4.8.4)*

20.   Midship shall not begin construction of facilities and/or use of staging, storage, or temporary work areas and new or to-be-improved access roads **until:**

    a.   Midship files with the Secretary:

        i.   the remaining cultural resources survey report(s);

        ii.   site evaluation report(s) and avoidance/treatment plan(s), as required; and

        iii.   comments on the cultural resources reports and plans from the Oklahoma State Historic Preservation Office and interested Indian tribes.

    b.   The Advisory Council on Historic Preservation is afforded an opportunity to comment if historic properties would be adversely affected.

    c.   The FERC staff reviews and the Director of OEP approves the cultural resources reports and plans, and notifies Midship in writing that treatment plans/mitigation measures (including archaeological data recovery) may be implemented and/or construction may proceed.

All materials filed with the Commission containing **location, character, and ownership** information about cultural resources must have the cover and any relevant pages therein clearly labeled in bold lettering "**CUI/PRIV – DO NOT RELEASE**." *(Section 4.10.5)*

21. **Prior to construction of the North Canadian River; Oklahoma, Kansas and Texas Railroad; Blue River; and Rock Creek HDDs**, Midship shall file with the Secretary, for review and written approval by the Director of OEP, an HDD noise mitigation plan to reduce the projected noise level attributable to the proposed drilling operations at noise-sensitive areas (NSA) with predicted noise levels above 55 decibels on the A-weighted scale (dBA).  During drilling operations, Midship shall implement the approved plan, monitor noise levels, and make all reasonable efforts to restrict the noise attributable to the drilling operations to no more than 55 dBA day-night sound level at the NSAs.  *(Section 4.11.2.2)*

22. Midship shall file noise surveys with the Secretary **no later than 60 days** after placing the Calumet, Tatums, and Bennington Compressor Stations and the Sholem Booster Station in service.  If a full load condition noise survey is not possible, Midship shall provide an interim survey at the maximum possible horsepower load and provide the full load survey **within 6 months**.  If the noise attributable to the operation of any of the compressor or booster stations under interim or full horsepower load conditions exceeds a day-night sound level of 55 dBA at any nearby NSAs, Midship shall file a report on what changes are needed and shall install the additional noise controls to meet the level **within 1 year** of the in-service date.  Midship shall confirm compliance with the above requirement by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.  *(Section 4.11.2.2)*

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Midship Pipeline Company LLC                                          Docket No.  CP17-458-000

(Issued August 13, 2018)

GLICK, Commissioner, *dissenting*:

      In today's order, the Commission grants Midship Pipeline Company LLC's (Midship) request for authorization to construct and operate its Midcontinent Supply Header Interstate Pipeline Project (Project), which is designed to provide up to 1,440 million standard cubic feet (MMcf) per day of incremental firm transportation capacity from the Anadarko Basin in Oklahoma to Gulf Coast and Southeast markets.[1]  The Commission concludes that the Project is required by the public convenience and necessity and that it will not have a significant effect on the environment.[2]  In reaching these conclusions, the Commission relies exclusively on precedent agreements for only 64 percent of the Project's proposed transportation capacity—59 percent excluding affiliated agreements[3]—and fails to consider the harm from the Project's contribution to climate change.[4]

      Before issuing a certificate of public convenience and necessity under section 7 of the Natural Gas Act (NGA), the Commission must find both that the pipeline is needed, and that, on balance, the pipeline's potential benefits outweigh its potential adverse impacts.[5]  As I have stated previously,[6] I believe that today's order fails to comply with

---

[1] *Midship Pipeline Company LLC*, 164 FERC ¶ 61,103, at P 1 (2018).

[2] *Id.* PP 23, 95.

[3] *Id.* P 22.

[4] EIS 4-191–4-192 ("[W]e cannot determine whether the [Project's] contribution to climate change would be discretely or cumulatively significant.").

[5] 15 U.S.C. § 717f (2012).

[6] *Florida Southeast Connection, LLC*, 164 FERC ¶ 61,099 (2018) (Glick, Comm'r, dissenting); *PennEast Pipeline Company, LLC*, 164 FERC ¶ 61,098 (2018) (Glick, Comm'r, dissenting); *Spire STL Pipeline LLC*, 164 FERC ¶ 61,085 (2018) (Glick, Comm'r, dissenting); *NEXUS Gas Transmission, LLC*, 164 FERC ¶ 61,054 (2018) (Glick, Comm'r, dissenting).

Docket No. CP17-458-000                                              - 2 -

our obligations under the NGA and the National Environmental Policy Act.[1]

    For these reasons, I respectfully dissent.

_____

Richard Glick
Commissioner

---

[1] 42 U.S.C. § 4321 *et seq.* (2012); *see Florida Southeast Connection, LLC*, 164 FERC ¶ 61,099 at 2–3 (Glick, Comm'r, dissenting) (In analyzing the environmental impacts of a proposed project, under the NGA and NEPA, "the Commission must determine whether the impacts are 'significant' and whether those impacts can be mitigated.  Only then will the Commission determine whether the project is environmentally acceptable."); *id.* at 5–8.