# EXHIBIT 4.3

FERC FEIS for MIDSHIP Project (continued)

The USGCRP's report notes the following observations of environmental impacts that may be attributed to climate change in the Great Plains region:

- Rising temperatures are leading to increased demand for water and energy. In parts of the region, this would constrain development, stress natural resources, and increase competition for water among communities, agriculture, energy production, and ecological needs.

- Changes to crop growth cycles due to warming winters and alterations in the timing and magnitude of rainfall events have already been observed; as these trends continue, they will require new agriculture and livestock management practices.

- Landscape fragmentation is increasing, including land development for energy production. A highly fragmented landscape will hinder adaptation of species when climate change alters habitat composition and timing of plant development cycles.

- Communities that are already the most vulnerable to weather and climate extremes will be stressed even further by more frequent extreme events occurring within an already highly variable climate system.

The USGCRP's report also notes that the rate and magnitude of expected changes will exceed those experienced in the last century. Existing adaptation and planning efforts are inadequate to respond to these projected impacts.

In addition to the GHG emissions associated with construction and operation of the MIDSHIP Project, the downstream end use of transported natural gas would result in additional GHG emissions. In the draft EIS, at section 4.13.2.10 – Climate Change, we estimated the potential upper bound GHG emissions from downstream combustion of the gas that could be transported by the project. The estimate was for informational purposes only, as such emissions are neither causally related to the project nor reasonably foreseeable. The ultimate end use is not known because the gas can be directed to other pipeline systems or be delivered to a local distribution system. The gas could be used to replace existing gas sources, replace higher carbon sources such as oil and coal, or be used as an industrial feedstock. Accordingly, it is not given that the project's increase in transportation capacity will result in a proportional increase in end-use GHG emissions. Moreover, a portion of the gas transported by the MIDSHIP Project (about 75 MMcf/d or 5 percent) would be delivered to the Cheniere Sabine Pass LNG facility. The end use emissions from these volumes either would not be emitted within the United States due to shipment overseas or would arise from power generation at the Cheniere Sabine Pass LNG facility. The potential emissions from power generation were already included in previous FERC environmental documents (FERC, 2011). As the ultimate end use of the gas transmitted is not known and is not causally related to the proposed action, no downstream emissions are considered as part of the final NEPA review.

We will continue to analyze upstream and downstream environmental effects when those effects are sufficiently causally connected to the proposed project and are reasonably foreseeable, as contemplated by CEQ's regulations.

The GHG emissions from the construction and operation of the MIDSHIP Project would increase the atmospheric concentration of GHGs in combination with past, present, and future emissions from all other sources. This increase would contribute incrementally to climate change that produces the impacts previously described. But there is no widely accepted standard established by international or federal policy or by a recognized scientific body to ascribe significance to a given rate or volume of GHG emissions.

We received a comment letter from the Environmental Defense Fund, Institute for Policy Integrity at New York University School of Law, and the Sierra Club requesting that we quantify the social cost of GHG emissions associated with the MIDSHIP Project. The Social Cost of Carbon tool (SCC tool) estimates the monetized climate change damage associated with an incremental increase in $CO_2$ emissions in a given year. Similar tools exist for methane and nitrous oxide emissions. The commentors make four general assertions: that GHG emissions should be monetized if other costs and benefits are monetized in the EIS, that monetized climate damages calculated with the SCC tool would give context to project GHG emissions, that the SCC tool is appropriate for analyzing project-level emissions of the magnitude of the MIDSHIP Project, and that we must use the SCC tool that reflects currently available data and methodologies to quantify global climate change damages associated with project GHG emissions.

We recognize the availability of the SCC tool; however, the Commission has previously indicated[27] that it is not appropriate for use in our project-specific analyses for the following reasons:

- The incorporation of the SCC tool into our review under NEPA cannot meaningfully inform the Commission's decision whether and how to authorize a proposed project under the NGA.

- The Commission does not use monetized cost-benefit analyses as part of the review under NEPA or the decision under the NGA.

- The SCC tool has methodological limitations—e.g., different discount rates introduce substantial variation in results and no basis exists to designate a particular monetized value as significant—that limit the tool's usefulness in the review under NEPA and the decision under the NGA.

As such, we did not use the SCC tool in the MIDSHIP Project NEPA analysis. Further details regarding our response to this comment letter are included in appendix O.

For the reasons above, we cannot determine whether the MIDSHIP Project's contribution to climate change would be discretely or cumulatively significant.

### 4.13.3 Conclusion

Recently completed, presently occurring, and reasonably foreseeable future actions in the temporal and geographic scope of the MIDSHIP Project were identified for inclusion in this cumulative impact analysis. Actions that contribute to cumulative impacts with pipelines are generally different than actions that contribute to cumulative impacts with aboveground facilities and compressor stations. The majority of the cumulative impacts associated with these projects and with the MIDSHIP Project would be minor and temporary during construction. However, some long-term cumulative impacts would occur in forested wetlands and forested uplands with respect to the vegetative communities and associated wildlife habitats. Some long-term cumulative benefits would be realized through new jobs and wages, purchases of goods and materials, and tax revenues. Operational emissions associated with the aboveground facilities built for the MIDSHIP Project would contribute to cumulative impacts on air emissions, and operation of these facilities would contribute to cumulative noise impacts where they are in close proximity to other existing or future facilities. Due to the implementation of specialized construction techniques, the relatively short construction timeframe in any one location, and resource protection and mitigation plans designed to minimize and control environmental impacts for the MIDSHIP Project, minimal cumulative impacts are anticipated.

---

[27] Order on Remand Reinstating Certificate and Abandonment Authorization, Southeast Market Pipelines Project (SMP Project) CP14-554-002, CP15-16-003, CP15-17-002, March 14, 2018.

# 5.0   CONCLUSIONS AND RECOMMENDATIONS

## 5.1   SUMMARY OF THE ENVIRONMENTAL ANALYSIS

The conclusions and recommendations presented in this section are those of the FERC environmental staff. Our conclusions and recommendations were developed with input from the EPA as a cooperating agency. The cooperating agency may adopt the EIS per 40 CFR 1506.3 if, after an independent review of the document, it concludes that its permitting requirements and/or regulatory responsibilities have been satisfied. However, the cooperating agency would present its own conclusions and recommendations in its respective and applicable record of decision. Otherwise, it may elect to conduct its own supplemental environmental analysis, if necessary.

We determined that construction and operation of the MIDSHIP Project would result in some limited adverse environmental impacts. Most of these environmental impacts would be temporary or short term during construction and operation, but long-term and potentially permanent environmental impacts on wetlands, vegetation, land use, air quality, and noise would also result from the project. However, if the project is constructed and operated in accordance with applicable laws and regulations, the mitigating measures discussed in this EIS, and our recommendations, these impacts would be reduced to less than significant levels. This determination is based on a review of the information provided by Midship Pipeline and further developed from data requests; field investigations; scoping; literature research; alternatives analysis; and contacts with federal, state, and local agencies as well as individual members of the public. As part of our review, we developed specific mitigation measures that we determined would appropriately and reasonably reduce the environmental impacts resulting from construction and operation of the project. We are therefore recommending that our mitigation measures be attached as conditions to any authorization issued by the Commission. A summary of the anticipated impacts, our conclusions, and our recommended mitigation measures is provided below, by resource area.

### 5.1.1   Geology

The overall effect of the MIDSHIP Project on surface geology would be minor. The primary effect of construction on geologic resources would be temporary disturbance of surficial geologic materials within the right-of-way. All areas temporarily disturbed during construction would be graded and restored as closely as possible to preconstruction contours during cleanup and restoration. Grading and filling may be required at aboveground facilities; however, these activities would result in minor permanent impacts on surface geology.

Blasting and rock removal may be required as part of construction activities in areas of shallow bedrock. About 61.0 miles (31 percent) of the Mainline, 17.2 miles (84 percent) of the Chisholm Lateral, and 6.3 miles (46 percent) of the Velma Lateral may encounter bedrock less than 5 feet below the ground surface. Midship Pipeline would conduct blasting activities in accordance with applicable federal, state, and local regulations. In addition, impacts on geologic resources and nearby residences and facilities would be avoided or adequately minimized by the measures and notifications in Midship Pipeline's project-specific *Blasting Plan* (see appendix I). We have reviewed the *Blasting Plan* and find it acceptable.

The MIDSHIP Project is within 0.25 mile of 1 active mine and 587 active oil and gas wells. Of these, about 53 oil and gas wells are within 150 feet of the project workspace. If a previously unidentified oil and gas well is encountered within the workspace prior to construction, Midship Pipeline would coordinate with the landowner to avoid the well and report the well to the OCC.

The MIDSHIP Project would not cross any active faults. However, we received comments expressing concern about pipeline safety due to the recent trend of increased frequency and magnitude of induced earthquakes. According to the Seismic Report for the project, the potential for soil liquefaction in the project area is very low and models indicate that stresses on the pipeline associated with earthquake ground wave propagation would be within acceptable limits. Modern gas transmission pipelines have been shown to perform well in seismically active areas and, based on PHMSA pipeline incident data, the increased frequency and magnitude of earthquakes has not caused an increase of pipeline failures in Oklahoma. Midship Pipeline would design and construct the pipeline and associated facilities in accordance with applicable DOT regulations (49 CFR 192) and applicable federal and state standards and design requirements, which would allow the project facilities to withstand probable seismic hazards.

The MIDSHIP Project would cross areas of potential karst topography where limestone is present at about MPs 120 to 150, 160 to 180, and 190 to the end of the Mainline. In addition, between MPs 0 to 40 of the Mainline, gypsum and other evaporite deposits are present near the surface that may form pseudokarst features. Midship Pipeline's *Karst Mitigation Plan* includes engineered mitigation options in the event that karst is encountered during construction and re-routing or avoidance of karst is not feasible (see appendix H). We reviewed the Karst Mitigation Plan and consider it to be adequate. With the implementation of measures in the *Karst Mitigation Plan* and FERC's Plan and Procedures, we conclude that the project would not adversely affect karst terrain.

Direct effects on paleontological resources could occur during project construction by activities such as grading or trenching. Indirect effects on fossil beds could result from erosion caused by slope regrading, vegetation clearing, and/or unauthorized collection. The Mainline route would cross the Cretaceous-aged Antlers sandstone formation between about MPs 130 and 163, which has been documented to contain petrified wood and also has the potential to contain dinosaur bones. The project also crosses the Cretaceous-aged Kiamichi formation between about MPs 163 and 174, which comprises dense, dark gray shale interbedded with fossiliferous limestone beds. Midship Pipeline would train contractor personnel to recognize fossils during construction and, if a fossil is discovered, report the discovery to the landowner and abstain from collecting fossils.

With implementation of the Plan and Procedures; Midship Pipeline's *Karst Mitigation Plan*, *Blasting Plan*, and other proposed mitigation measures; we conclude that impacts of the MIDSHIP Project on geologic resources would be adequately avoided or minimized.

## 5.1.2   Soils

The MIDSHIP Project would traverse a variety of soil types and conditions. Construction activities, such as clearing, grading, trenching, and backfilling, could adversely affect soil resources by causing erosion, compaction, and the introduction of excess rock or fill material to the surface, which could hinder restoration. However, Midship Pipeline would implement the mitigation measures contained in the Plan and Procedures to control erosion and enhance successful restoration. Specifically, soil impacts would be mitigated through measures such as topsoil segregation, temporary and permanent erosion controls, and post-construction restoration and revegetation of work areas. Additionally, Midship Pipeline would implement its SPRP during construction and operation to prevent, contain, and, if necessary, clean up accidental spills of any material that may contaminate soils. If contaminated soil and/or groundwater is encountered during construction, Midship Pipeline would implement the measures in its Unanticipated Contamination Plan.

Permanent impacts on soils would mainly occur at the aboveground facilities where the sites would be converted to industrial use. Implementation of the Plan and Procedures and Midship Pipeline's SPRP and Unanticipated Contamination Plan would adequately avoid, minimize, or mitigate construction

impacts on soil resources for the remainder of the project. Based on our analysis of Midship Pipeline's proposed measures, we conclude that potential impacts on soils would be avoided or effectively minimized or mitigated.

### 5.1.3   Water Resources

**Groundwater**

Groundwater resources in the project area include five major aquifer systems and two minor bedrock aquifers. Between MPs 147.2 and 147.6, the Mainline would cross the Arbuckle-Simpson aquifer, which is a major aquifer classified as a "sensitive sole source groundwater basin" due to the EPA's designation of the eastern portion as an SSA. We received scoping comments related to potential impacts of leaks and spills on vulnerable aquifers. The North Canadian, Canadian, and Washita River alluvial aquifers are classified as having very high vulnerability, while the Arbuckle-Simpson and Antlers bedrock aquifers are classified as having high and moderate vulnerabilities, respectively. To minimize the potential for groundwater impacts associated with an inadvertent spill of hazardous materials, Midship Pipeline would implement the measures in its SPRP, which includes spill response measures, emergency notification procedures, and spill containment measures to recover spilled materials and facilitate cleanup operations. Midship Pipeline would also avoid storage of hazardous materials, refueling of equipment or vehicles, or parking of equipment or vehicles overnight within 100 feet of a wetland or waterbody unless a reasonable alternate location cannot be identified.

The potential exists that certain bedrock units within the proposed right-of-way may exhibit karst-like features. If karst is encountered during construction, Midship Pipeline would implement the best management practices described in its *Karst Mitigation Plan* as necessary to mitigate the risks to groundwater quality.

One potentially contaminated site was identified southwest of access road 70 and Mainline MP 102.0; however, the EPA determined that contamination is not present at the site. Although it is not anticipated, should project construction encounter areas of contaminated soil or groundwater, Midship Pipeline would implement the measures outlined its Unanticipated Contamination Plan.

We received several scoping comments related to concerns about impacts on water wells and springs near the project workspaces. No wells or springs have been identified within the project workspace; however, Midship Pipeline would install fences around any newly identified wells within the construction workspace to prevent damage from construction equipment and would work with the landowner to permanently mark or fence off these wells to prevent damage from operational maintenance activities (e.g., mowing). Nineteen private water wells and two springs were identified within 150 feet of the project workspace, none of which are within the proposed workspace. In addition, no public water supply wells are within 400 feet of the proposed workspace. One municipal wellhead protection area was identified along the Mainline; however, the ODEQ confirmed the well does not exist. Midship Pipeline has agreed to perform pre- and post-construction well and spring yield and water quality monitoring for private wells and springs within 150 feet of the project workspace, subject to landowner approval. Midship Pipeline would test these wells and springs for total suspended solids, well yield, and compounds associated with the incomplete detonation of explosives such as nitrate and nitrite. On March 22, 2018, the DOI recommended in its comments on the draft EIS that Midship Pipeline develop a spring and well water quality sampling plan, as well as a list of recommended sampling parameters. We agree that a plan should be developed and are recommending Midship Pipeline file a spring and well water quality sampling plan prior to construction. In the event that construction-related activity affects the yield or water quality of a well or spring, Midship Pipeline would work with the landowner to repair or restore the well or spring and provide an alternate water source until repairs are made, or provide compensation to

the owner for damages. To further minimize impacts on groundwater, Midship Pipeline would implement the mitigation measures included in its *Blasting Plan*, including obtaining all required federal, state, and local permits and employing licensed blasting contractors to conduct blasting activities in accordance with applicable regulations. Midship Pipeline has also confirmed it would not store hazardous materials, refuel equipment or vehicles, or park equipment or vehicles overnight within 100 feet of wells and springs.

The project would not significantly affect groundwater resources because the majority of construction would involve shallow, temporary, and localized excavation. These potential impacts would be avoided or further minimized by the use of the construction techniques and mitigation described in the Plan and Procedures and Midship Pipeline's *Karst Mitigation Plan* and *Blasting Plan*. In addition, Midship Pipeline would prevent or adequately minimize inadvertent spills and leaks of hazardous materials into groundwater resources during construction and operation by adhering to its SPRP. Therefore, we conclude that potential impacts on groundwater resources would be avoided, minimized, or mitigated.

**Surface Waters**

The pipeline facilities and construction workspace would cross 407 waterbodies (58 perennial waterbodies, 121 intermittent waterbodies, 213 ephemeral waterbodies, and 15 ponds). Of these, 53 waterbodies are within the workspace, but not crossed by the proposed pipeline, and 15 are associated with access roads (5 of which are also crossed by the proposed pipeline). The project would include five major waterbody crossings (greater than 100 feet wide) along the Mainline, including the Canadian River, the Washita River (twice), an unnamed pond (S-JO-RFT-17/02/03-02), and an unnamed tributary to Caddo Creek (S-BR-TAS-17/10/25-07). With the exception of one waterbody within the ATWS associated with the Velma Meter Station, no waterbodies would be affected at the proposed aboveground facility sites, along proposed access roads associated with the aboveground facilities, or within the proposed contractor yards.

Midship Pipeline proposes to cross 327 waterbodies via the open-cut method, 43 waterbodies via the dry crossing method, and 17 waterbodies via the HDD method. Dry crossing methods (flume pipe or dam-and-pump) may be used at other waterbody crossings if field conditions allow at the time of construction. As discussed previously, several waterbodies are within Midship Pipeline's proposed construction workspaces, but would not be directly crossed by the pipeline. Impacts on such waterbodies would be avoided to the extent possible. The 15 access roads that would cross waterbodies are existing roads that may require improvements; however, the improvements would not require in-stream work.

Midship Pipeline would minimize effects on surface waters during construction by implementing the construction and mitigation measures outlined in the Procedures. In accordance with the Procedures, Midship Pipeline must file with the Secretary a schedule identifying when trenching would occur within each waterbody greater than 10 feet wide.

Midship Pipeline has proposed to cross one new major waterbody (unnamed tributary to Caddo Creek [S-BR-TAS-17/10/25-07]) at Mainline MP 181.1 using the open-cut method. To reduce the potential environmental impacts associated with an open-cut crossing of a major waterbody, we are recommending that, prior to construction, Midship Pipeline file a feasibility assessment for shifting the pipeline route to minimize the crossing length or conducting the crossing via an alternative crossing method.

The potential effects on waterbodies crossed using the HDD method would be minor because the pipeline would be installed below the bed and banks of the waterbody and the HDD method would avoid

clearing a majority of riparian vegetation and trenching within the bed and banks of the waterbody. The primary effect that could result from use of the HDD method would be an inadvertent release of drilling fluid (or drilling mud) directly or indirectly into the waterbody. Although drilling fluid consists of non-toxic materials, in large quantities the release of drilling fluid into a waterbody could affect fisheries or other aquatic organisms by causing turbidity and/or temporarily coating the streambed with a layer of clay. In the event of an inadvertent release of drilling mud within a waterbody, Midship Pipeline would implement the measures outlined in its HDD Plan, including the immediate suspension of drilling operations if the released volume is determined to pose a threat to human health and safety.

Because Midship Pipeline's HDD alignment sheet/plan was missing for the Henry House Creek HDD due to lack of survey permission, we are further recommending that Midship Pipeline file, prior to construction, a complete set of revised HDD profile and plan drawings, including all geotechnical analyses and detailed mapping of cleared areas, mud pits, and/or pipeline assembly areas as required in the Procedures section V.B.6.d.

Three intermittent waterbodies along the Mainline contain shallow bedrock and may require blasting during construction. To minimize impacts during blasting activities, Midship Pipeline would implement the mitigation measures included in its project-specific *Blasting Plan*, require its construction contractor to develop site-specific blasting plans for each waterbody crossing where blasting is determined to be necessary, and, in accordance with the Procedures, file with the Secretary a schedule identifying when blasting would occur within any waterbody greater than 10 feet wide. With these measures, we conclude that blasting, if required, would not result in significant impacts on waterbodies.

One public water supply intake (for the City of Tishomingo) has been identified about 2.2 miles downstream of the Mainline crossing of Pennington Creek. Because Midship Pipeline would cross Pennington Creek via the HDD method, the water intake is over 2 miles downstream, and Midship Pipeline would comply with the Procedures and its SPRP, no direct impacts on the water supply would occur.

The project would cross 21 waterbodies listed as impaired for their designated use, including 17 along the Mainline, 1 along the Chisholm Lateral, and 3 along the Velma Lateral. No federally designated wild and scenic rivers would be crossed by the proposed pipeline routes. However, the proposed Mainline would cross the Blue River, which is included on the NRI and is known to support the least darter. The Mainline would also cross the Canadian River that supports the Arkansas River shiner, which is federally listed as a threatened species. In addition, the Canadian River and the 300-foot-wide riparian buffer on either side of the river are designated critical habitat for the Arkansas River shiner. Further, the Mainline would cross sensitive fisheries at Pennington Creek, which is a designated cool water aquatic community and a High Quality Water. Midship Pipeline would minimize impacts by using the HDD method to cross the Blue River, Canadian River, and Pennington Creek.

Midship Pipeline requested alternate measures from the FERC Procedures in several areas where it concluded that site-specific conditions do not allow for a 50-foot setback of ATWS from waterbodies. Based on our review, Midship Pipeline has provided adequate justification for the majority of requested ATWS; however, we are recommending that Midship Pipeline provide additional justification for the need for the ATWS at some locations prior to construction.

Construction and operation of the MIDSHIP Project would not have long-term effects on surface waters. The project would not permanently affect designated water uses because the pipelines would be buried beneath the bed of the waterbodies, erosion controls would be implemented during construction, and streambanks and streambed contours would be restored as close as practicable to preconstruction conditions. Midship Pipeline would conduct pipeline construction activities in accordance with the Plan

and Procedures, as well as its SPRP, HDD Plan, and *Blasting Plan*, where appropriate. With these protective measures in place, and our additional recommendations, we conclude that construction and operation of the project would not result in significant impacts on surface water resources.

**Water Uses During Construction**

Midship Pipeline is proposing to use both surface water and municipal water sources for hydrostatic testing. Midship Pipeline would require about 58,978,549 gallons of water for hydrostatic testing of the pipelines and new and aboveground facilities. An additional 1,084,349 gallons of water would be required to hydrostatically test all of the HDD segments. Upon completion of the hydrostatic test, the water would either be pumped to the next segment for testing or discharged at an upland location through an energy-dissipating device in compliance with NPDES permit conditions.

During HDD crossings, Midship Pipeline would use an estimated 1,559,053 gallons of water from the waterbody being crossed or municipal water sources to create the drilling mud used to lubricate the drill bit, remove drill cuttings, and hold the hole open. After completion of the HDDs, the recovered drilling mud would be recycled, designated for beneficial reuse as fill or a soil amendment, or disposed of at a commercial disposal site authorized for management of such wastes. Because it is possible that drilling mud could become contaminated during HDD operations; we are recommending that Midship Pipeline file an updated HDD Plan that confirms it would test all non-municipal water sources prior to being used for drilling mud and that it would conduct laboratory sampling of drilling fluid for inorganic and organic environmental contaminants prior to reuse or disposal.

The project would also require about 73,681,545 gallons of water from 9 streams and 17 ponds or lakes for dust control activities. Water would be transported to the project workspace by truck. Given the length of the proposed pipeline and that weather conditions would play a large role in water requirements, it is difficult to predict how much water would ultimately be needed for dust suppression. Midship Pipeline would complete dust control activities in accordance with its FDCP and all applicable permits and regulations.

Midship Pipeline would minimize impacts associated with the withdrawal and discharge of water by implementing the mitigation measures outlined in the Procedures. In addition, Midship Pipeline would obtain appropriate NPDES discharge permits prior to conducting hydrostatic testing. Accidental spills during construction and operations would be prevented or adequately minimized through implementation of Midship Pipeline's SPRP. With implementation of these measures, we conclude that the impacts associated with project-related withdrawal and discharge of water would be effectively minimized.

**5.1.4    Wetlands**

No impacts on wetlands would occur during construction or operation of the aboveground facilities, contractor yards, or access roads associated with the MIDSHIP Project. Construction of the pipeline facilities would affect a total of 3.5 acres of wetlands, including 0.1 acre of PFO wetlands, 2.7 acres of PEM wetlands, and 0.6 acre of PSS wetlands. The project would not result in any permanent loss of wetlands.

In PEM wetlands, the impact of construction would be relatively brief because the emergent vegetation would regenerate quickly, typically within 1 to 3 years. In scrub-shrub and forested wetlands, Midship Pipeline would maintain a 10-foot-wide corridor centered over the pipeline in an herbaceous state and would selectively cut trees within 15 feet of the pipeline centerline. As a result, 0.1 acre of PFO wetlands and 0.1 acre of PSS wetlands would be permanently converted to non-forested wetlands during

operation of the project. The remainder of the PFO and PSS vegetation would be allowed to return to preconstruction conditions and would not be affected during operation.

Midship Pipeline proposes to use the HDD method to install the mainline beneath three wetlands, which would reduce mechanical clearing and eliminate the need for trenching and operating heavy construction equipment within these wetlands.

Midship Pipeline is consulting with the COE, which could require Midship Pipeline to offset wetlands that would be converted to PEM or PSS through an agency-required *Compensatory Mitigation Plan*. The *Compensatory Mitigation Plan* would be subject to review and approval by the District Engineer for the COE, Tulsa District. Midship Pipeline filed its Pre-construction Notification to the COE Tulsa District in May 2017.

Midship Pipeline requested alternate measures from the Procedures in several areas where it concluded that site-specific conditions do not allow for a 50-foot setback of ATWS from wetlands. Based on our review, we determined that Midship Pipeline has provided adequate justification for the requested ATWSs.

Construction and operation-related impacts on wetlands would be mitigated by Midship Pipeline's compliance with any conditions of the COE section 401 and 404 permits and by implementing the wetland protection and restoration measures contained in the Procedures and, if required by the COE, its forthcoming *Compensatory Mitigation Plan*. In accordance with the Procedures, Midship Pipeline would conduct routine wetland monitoring for a minimum of 3 years to assess the success of wetland revegetation (until revegetation is successful). As applicable, specific monitoring requirements required by other permitting agencies would also be implemented. Three years after construction (or sooner if determined to be successful), Midship Pipeline would file a report with the Secretary identifying the status of wetland revegetation efforts and documenting success as defined above. Where revegetation is not successful at the end of 3 years, Midship Pipeline would develop and implement remedial revegetation plans, in consultation with a professional wetland ecologist, to actively revegetate these wetlands and continue revegetation efforts and file annual reports until wetland revegetation is deemed successful.

While minor adverse and long-term effects on wetlands would occur, with adherence to the Procedures, we conclude that construction and operation of the project would result in minor effects on wetlands that would be appropriately mitigated and reduced to less than significant levels. In addition, the COE could require Midship Pipeline to offset unavoidable impacts on wetlands through the creation, restoration, enhancement, or preservation of at least an equal amount of wetlands through implementation of an agency-approved *Compensatory Mitigation Plan*.

### 5.1.5   Vegetation

Construction of the project, including the construction right-of-way, ATWS, aboveground facilities, contractor yards, and access roads would result in 3,198.8 acres of impact on vegetated lands. This total includes 462.4 acres of upland forest and 0.2 acre of forested wetland. During operations, Midship Pipeline would mow a 50-foot-wide permanent right-of-way no more than once every 3 years; however, a 10-foot-wide swath may be mowed more frequently to facilitate routine patrols and emergency access to the pipeline centerline. Operation of the project would result in 1,438.5 acres of impact on vegetated lands, including 192.6 acres of upland forest and 0.1 acre of forested wetlands.

The majority of vegetation affected by construction of the project would be on open uplands, which would result in temporary to short-term impacts. Lands currently dominated by herbaceous growth

would revegetate quickly, often within one growing season after seeding and otherwise typically within 3 years. Most impacts on agricultural lands would be temporary to short-term because these areas are disturbed annually to produce crops and would typically return to their previous condition shortly following construction, cleanup, and restoration.

The greatest impact on vegetation would be on forested areas because of the time required for tree regrowth back to preconstruction condition. Construction in forest lands would remove the tree canopy over the width of the construction right-of-way, which would change the structure and environment of the underlying and adjacent areas. Forested uplands within the maintained right-of-way would be permanently converted to an herbaceous cover type.

The proposed project crosses several large forested areas, which are primarily within Garvin, Stephens, Carter, and Johnston Counties. The pipeline routes would be collocated in many of these areas, thus reducing overall impacts on adjacent forested communities and forest fragmentation. However, several densely forested tracts near the border of Garvin and Carter Counties would be fragmented by construction of the MIDSHIP Project. The creation of edge habitat could increase the risk of invasive species and other impacts on wildlife species. The regrowth of shrubs and trees within the temporary workspaces would reduce the edge effect and provide connectivity between adjacent forested tracts to some extent, but it may take decades before these areas resemble the forest vegetation that was present before construction, resulting in long-term impacts.

Following construction, Midship Pipeline would seed the construction workspace and allow natural succession to revegetate workspaces disturbed by construction in accordance with the Plan and Procedures. Midship Pipeline would use and apply a seed mix that incorporates recommendations from the local soil conservation authority, the landowner, or land management agency.

Midship Pipeline would implement mitigation measures to reduce the spread of noxious weed species within the project area, including using certified weed-free seed products and mulch materials; cleaning construction machinery, equipment, and vehicles; documenting the presence of existing noxious weed populations observed during clearing and construction; and monitoring and controlling occurrences of noxious and invasive weed species in locations along the route where infestations were not identified prior to construction.

Based on our review of the potential impacts on vegetation as described above, we conclude that the primary impact from construction and operation of the project would be on forested lands. However, based on the eventual regrowth of prior forested areas outside of the permanent right-of-way, and collocation with existing, maintained rights-of-way through the majority of large forested areas crossed by the proposed pipeline routes, we conclude that impacts on vegetation, including forested areas, would be adequately reduced to less than significant levels. In addition, impacts on forested and non-forested vegetation types, as well as the introduction or spread of noxious weeds or invasive plant species, would be further mitigated through adherence to the measures outlined in the Plan and Procedures, and Midship Pipeline's forthcoming *Compensatory Mitigation Plan* for wetlands.

### 5.1.6    Wildlife and Aquatic Resources

**Wildlife**

Construction of the MIDSHIP Project would result in both temporary and permanent impacts on wildlife and wildlife habitat. Direct impacts of construction on wildlife include displacement, stress, and direct mortality of some individuals. The cutting, clearing, and/or removal of existing vegetation within the construction work area could also affect wildlife by reducing suitable cover, nesting, and foraging

habitat for some wildlife species. Some of these effects would be temporary, lasting only while construction is occurring, or short term, lasting no more than a few years until the preconstruction habitat and vegetation type would be reestablished. Other impacts would be longer term, such as the re-establishment of forested habitats, which could take several years or decades.

The project crosses several large forested areas. These areas would be converted to successional stages of open herbaceous and scrub-shrub habitat either permanently or until a mature forest community redevelops within temporary workspaces. Wildlife species that rely on forested habitat for foraging, breeding, and nesting could be negatively affected by the long-term loss of forest cover; species that prefer open upland habitat could benefit from the permanent or temporary habitat conversion. The pipeline routes would be collocated through the majority of the forested areas, reducing overall impacts on adjacent forested communities and forest fragmentation. However, several large forested tracts, totaling about 2.0 miles in length (about 24.0 acres), near the border of Garvin and Carter Counties would be fragmented by construction of the MIDSHIP Project, which would reduce the amount of interior habitat for forest-dwelling species. With habitat conversion and forest fragmentation, there is also a risk of intrusion by invasive or noxious species. Increased predation could also occur during construction and operation of the pipeline due to the removal of vegetation and loss of cover, which would increase the visibility of prey species.

Two areas in the vicinity of the project are considered significant wildlife habitats: the Tishomingo NWR and the Texoma/Washita Arm of the Tishomingo WMA, both of which are within 1.0 mile of the project. The MIDSHIP Project would not cross either of these areas and the route would be largely collocated with an existing pipeline system near the Tishomingo NWR. Therefore, we conclude that no direct impacts on the Tishomingo NWR or the Texoma/Washita Arm of the Tishomingo WMA would occur, and habitat fragmentation near the refuge would be adequately minimized.

Construction and operation of the aboveground facilities would result in the permanent displacement of wildlife due to the conversion of vegetated habitat to non-vegetated and/or impervious cover, and due to the erection of security fencing at the new aboveground facility sites. In addition, increased noise levels and ambient lighting may result in avoidance or a decrease in wildlife use of adjacent habitat. However, given the amount of suitable habitat present within adjacent areas, we conclude these effects would be negligible.

Based on the presence of suitable adjacent habitat available for use, the temporary nature of pipeline construction, the relatively low amount of habitat converted to developed land, and given the impact avoidance, minimization, and mitigation measures proposed by Midship Pipeline (e.g., Midship Pipeline's implementation of the measures in the Plan and Procedures and its SPRP), we conclude that construction and operation of the project would not have a significant impact on wildlife resources.

**Aquatic Resources**

With the exception of Pennington Creek (Mainline MP 154.1), which has been designated as a cool water fishery, waterbodies crossed by the proposed project are considered warm water fisheries and are not designated for fish and wildlife propagation by the OWRB. The Canadian River, which would be crossed by the Mainline at MP 28.4, contains critical habitat for the Arkansas River shiner and supports populations of the threatened species. The Blue River, which would be crossed by the Mainline at MP 174.0, supports populations of the least darter (an FWS-identified fishery of special concern). Coordination with the FWS indicates that the least darter population within the Blue River is experiencing a decline. The proposed Mainline would be installed beneath Pennington Creek, the Canadian River, and the Blue River using the HDD method, thus avoiding direct impacts on the cool water fishery, Arkansas River shiner, and least darter.

Midship Pipeline would minimize the effects of construction on aquatic species by using the trenchless HDD method to install the pipeline beneath 17 waterbodies, conducting crossings as close to perpendicular to the axis of the waterbody channel as engineering and routing conditions permit, and installing sedimentation control techniques to minimize and route silt-laden flow to well-vegetated areas or erosion control devices. Midship Pipeline would also implement the measures outlined in the Procedures to minimize impacts on aquatic resources such as restoring stream beds and banks to preconstruction conditions and seeding riparian areas.

Three intermittent waterbodies along the proposed Mainline contain shallow bedrock and may require blasting during construction. If blasting is required in a waterbody, Midship Pipeline would develop site-specific blasting plans and would obtain blasting permits from appropriate agencies.

Midship Pipeline would use surface water and municipal sources of water to create the drilling mud for crossings using the HDD method and for hydrostatic testing. Midship Pipeline would appropriate surface water through screened intakes to prevent entrainment of fish and other aquatic organisms, and would maintain adequate flow rates for the protection of downstream aquatic resources, in accordance with the Procedures. Midship Pipeline does not propose to withdraw water from any waterbodies with special designations. Upon completion of the hydrostatic test, the water would either be pumped to the next segment for testing or discharged through an energy-dissipating device in compliance with NPDES permit conditions. Water would be discharged to an upland area near the original withdrawal location and not directly into a waterbody. Test water would contact only new pipe, and no chemicals would be added.

Midship Pipeline would minimize the potential for spills to affect aquatic resources by implementing the measures in its SPRP. This includes conducting routine inspections of construction equipment, tanks, and storage containers to help reduce the potential for spills or leaks; restricting refueling and the handling of hazardous materials to greater than 100 feet from wetland and waterbody resources; and the use of secondary containment around all containers and tanks.

Given the impact avoidance, minimization, and mitigation measures proposed by Midship Pipeline, including adherence to multiple resource protection plans, we conclude that the project would result in some temporary effects on aquatic resources, but that these effects would be minimized or adequately mitigated.

### 5.1.7 Threatened, Endangered, and Other Special Status Species

To comply with section 7 of the ESA, we consulted either directly or indirectly (through Midship Pipeline's informal consultation) with the FWS and state resource agencies regarding the presence of federally listed and federally proposed species and their habitats that are protected under the ESA, as amended; species that are currently candidates for federal listing under the ESA; state-listed threatened or endangered species; and species otherwise granted special status at the state or federal level (e.g., species protected under the MBTA and the Bald and Golden Eagle Protection Act). Because there are no marine or anadromous habitats within the project area, consultation with NOAA Fisheries is not required for the project. Based on these consultations, we identified seven federally listed species that could be affected by the project: the black-capped vireo, least tern, piping plover, rufa red knot, whooping crane, Arkansas River shiner, and ABB. Critical habitat has been designated for one species, the Arkansas River shiner, within the project area.

Potentially suitable breeding habitat for the black-capped vireo within Canadian County is limited to riparian habitat adjacent to the Canadian River (between Mainline MPs 28.0 and 28.7). Impacts on this potentially suitable habitat are not anticipated because Midship Pipeline proposes to use the HDD

construction method to install the pipeline beneath the Canadian River. The HDD entry and exit locations are each over 1,200 feet from the edge of the waterbody, which would avoid impacts on both in-water and riparian habitat. However, if HDD operations were to begin during the black-capped vireo's nesting season, increased noise and activity levels could cause black-capped vireos to abandon active nests. To ensure that the black-capped vireo is not affected by construction activities at this location, Midship Pipeline would conduct surveys for active black-capped vireo nests within riparian habitat adjacent to the Canadian River HDD, consult with the FWS to determine appropriate avoidance and mitigation measures, and receive written approval from the Director of OEP before commencing construction activities associated with the Canadian River crossing between April 1 and July 31. Because impacts would be temporary (limited to the duration of construction activities), the black-capped vireo is highly mobile, similar habitat is present in the vicinity, we have determined that the project *is not likely to adversely affect* the black-capped vireo.

The southeastern portion of the project is within the Red River Valley; in this area, there is potential for least terns to utilize waterbody crossings along the proposed Mainline for stopover habitat during migration. Potential impacts on the least tern are likely limited to avoidance of the area due to increased noise levels and human activity. Because impacts would be temporary (limited to the duration of construction activities), the least tern is highly mobile, and ample suitable stopover habitat is present in the vicinity, we have determined that the project *is not likely to adversely affect* the least tern.

Although unlikely, the project areas could provide habitat for resting and foraging piping plovers during migration. If construction activities occur within potentially suitable habitat during the migratory season (mid-March through mid-May and mid-July through late October), there is potential for the piping plovers to avoid the area due to increased noise and human activity. However, given the apparent rarity for the species to utilize stopover habitat during migration, the isolated areas where sandy beaches are present along the pipeline routes, and the proximity of larger expanses of sandy habitat in the general vicinity of the project (e.g., areas with sandy beach habitat along the Washita, Blue, Canadian, and Red Rivers), we have determined that the project *is not likely to adversely affect* the piping plover.

Within Oklahoma, nearly all records of the rufa red knot occur on man-made impoundments. Ponds along the proposed route could provide potentially suitable stopover habitat for the rufa red knot; however, because this species occurs almost exclusively on man-made impoundments, it is not expected to be present within the project area. Therefore, we have determined that the project would have *no effect* on the rufa red knot.

The whooping crane is a highly mobile species and suitable migratory habitat is present within the project area. Because construction activities are scheduled to occur during both the spring and fall migratory seasons, there is potential for the whooping crane to avoid the area due to increased noise and human activity. To reduce potential impacts on this species, EIs would monitor the project area and, if whooping cranes are observed, construction activities at that location would cease, Midship Pipeline has committed to notifying the FWS of the observation, and construction would only resume after the cranes have the left the area and the FWS provides approval. Therefore, we have determined that the project *is not likely to adversely affect* the whooping crane.

The proposed Mainline would cross the Canadian River at MP 28.4, which is a portion of the river known to support the Arkansas River shiner and has been designated as critical habitat for this species. Midship Pipeline proposes to install the Mainline beneath the Canadian River using the HDD method, which would avoid impacts on both in-water and critical habitat (300 feet either side of the waterbody). The Canadian River would not be used as a surface water source for hydrostatic test water or drilling mud, nor would hydrostatic test water be discharged into the Canadian River. However, the FWS has indicated that inadvertent returns of drilling fluid have sometimes occurred during the HDD process,

which could adversely affect this species. Therefore, if an inadvertent release occurs within the Canadian River, Midship Pipeline would immediately notify FERC and the FWS, contain the released drilling mud, and receive approval from FERC and the FWS prior to commencing any cleanup operations within or adjacent to the Canadian River and prior to resuming drilling operations. Because no in-water activities are proposed in the Canadian River, and with the implementation of the monitoring measures described above, we have determined that the project *is not likely to adversely affect* the Arkansas River shiner.

The proposed Mainline would cross approximately 75 miles of the current range for the ABB. Midship Pipeline conducted species-specific surveys for the ABB during the 2017 survey season, which did not document the presence of the ABB within the project area. However, because the survey results are only valid until the beginning of the species' active season (May 2018), Midship Pipeline has scheduled additional surveys for the ABB during the species' 2018 active season. Because the ABB was not documented within the project area during the ABB's 2017 active season, we conclude that it is unlikely that the ABB is present in the project area. Therefore, we have determined that the proposed project *is not likely to adversely affect* the ABB if the 2018 survey results do not document the presence of the ABB within that portion of the project area within the ABB's range. However, if the surveys conducted during the ABB's 2018 active season document the presence of ABB in the project area, we are recommending that Midship Pipeline not begin construction of the project until it files a project-specific mitigation plan for the ABB that demonstrates how avoidance and mitigation would be accomplished and the FERC staff receives documentation of FWS concurrence with the plan.

With the implementation of the measures described above, we have determined that the project would have *no effect* on the rufa red not and *is not likely to adversely affect* the black-capped vireo, least tern, piping plover, whooping crane, Arkansas river shiner, and ABB. Similarly, we have determined that the project would not result in the destruction or adverse modification of designated critical habitat for the Arkansas River shiner. However, to ensure compliance with the ESA, we are recommending that construction of the MIDSHIP Project not begin until Midship Pipeline receives written notification that consultation with the FWS has been completed and construction or use of mitigation may begin.

A total of 58 priority migratory bird species were identified in the general vicinity of the project area, 24 of which breed in the area. Habitat removal and/or modification during construction and the long-term or permanent conversion of habitats associated with tree clearing and the maintenance of rights-of-way would have indirect effects on migratory birds. These activities could affect egg and young survival and result in bird displacement impacts on bird migration, nesting, foraging, and mating behaviors. Construction could also reduce the amount of habitat available for foraging and predator protection and would temporarily displace birds into adjacent habitats, which could increase the competition for food and other resources. In addition, the increased presence of humans, noise, and vibrations associated with project activities would likely cause sensory disturbances of migratory birds, which may lead to temporary displacement and avoidance of the project area.

Construction activities would likely begin in fall of 2018 and conclude in the summer of 2019, which would include the peak nesting season. To avoid impacts on nesting birds, Midship Pipeline would conduct preconstruction migratory bird nesting surveys 1 week prior to vegetation clearing. If bird nesting is observed, Midship Pipeline has agreed not to conduct construction activities (including clearing) within 10 feet of the nest until nesting activities have concluded (i.e., chicks have fledged). Minimization measures during construction would include delaying construction in certain areas, expediting construction in certain areas, implementing dust abatement measures, and other measures identified in coordination with the FWS to minimize disturbance to nesting birds. Further, migratory birds not already nesting would be able to avoid these activities and move to abundant habitat adjacent to the right-of-way. Therefore, we conclude that impacts on migratory birds from construction of the project would be temporary and would not be significant. Operational impacts on migratory birds would be

limited to minor maintenance and vegetation clearing operations that would be conducted outside of the peak nesting season, which would avoid direct impacts on migratory birds. Further, routine vegetation mowing or clearing within the operational right-of-way would not be conducted more frequently than once every 3 years. As such, population-level impacts on migratory birds would be minimized and reduced to less than significant levels. With implementation of these mitigation measures, we conclude that impacts on migratory birds would be temporary and minor, and impacts on migratory bird populations would not be significant.

Based on a review of the ONHI database, nine bald eagles have been documented in the vicinity of the project; the golden eagle has not been documented in the project area. Midship Pipeline would perform preconstruction surveys for bald and golden eagles in accordance with the project-specific *Migratory Bird Conservation Plan*. If Midship Pipeline was to discover an eagle nest during surveys or project-related activities, it would adhere to the general migratory bird avoidance measures and FWS avoidance measures specific to eagles in the *Oklahoma Ecological Services Field Office Migratory Bird and Eagle Impact Avoidance Measures for Actions Associated with Oil and Gas Projects* (FWS, 2014c). With the implementation of these measures, we have determined that impacts on bald eagles would be temporary and minor.

No state-listed threatened or endangered species occur in counties that would be crossed by the project. Therefore, we conclude the project would not affect state-listed protected species.

Consultation with the FWS regarding potential impacts on federally listed species along the proposed pipeline routes is ongoing. As such, concurrence with our determinations of effect has not been received. Midship Pipeline, FERC, and the FWS will continue to discuss the potential impacts on federally listed species along the proposed routes. Midship Pipeline would not begin construction of the MIDSHIP Project until the FERC staff completes consultation with the FWS and has received written notification from the Director of OEP that construction or use of mitigation may begin. Further, should a federally listed species be identified during construction of the project that may be affected by that construction, Midship Pipeline would stop construction activities until FERC reinitiates consultation with the FWS, consultation is completed, and Midship Pipeline is granted approval to restart construction in that area. Therefore, we conclude that impacts on special status species would be adequately avoided or minimized.

### 5.1.8  Land Use, Recreation, and Visual Resources

Construction of the project would affect a total of 3,340.7 acres of land. About 91 percent of this acreage would be utilized for the pipeline facilities. The remaining acreage affected during construction would be associated with aboveground facilities (4 percent), access roads (3 percent), and contractor yards (2 percent). During operation, the new permanent pipeline right-of-way, aboveground facilities, and permanent access roads would newly encumber 1,474.4 acres of land.

The land retained as new permanent right-of-way would generally be allowed to revert to its former use, except for forested land. Certain activities, such as the construction of permanent structures or the planting of trees, would be prohibited within the permanent right-of-way. To facilitate pipeline inspection, operation, and maintenance, the entire permanent right-of-way in upland areas would be maintained in an herbaceous/scrub-shrub vegetated state. This maintained right-of-way would be mowed no more than once every 3 years, but a 10-foot-wide strip centered over the pipeline might be mowed more frequently to facilitate corrosion and other operational surveys.

In upland areas, Midship Pipeline proposes to use a 100-foot-wide construction right-of-way for the Mainline and Chisholm Lateral and a 75-foot-wide construction right-of-way for the Velma Lateral

and Tie-in Piping. Additionally, Midship Pipeline proposes to use a 75-foot-wide construction right-of-way in wetlands.

Midship Pipeline's proposed construction work area is within 50 feet of 17 structures, none of which are residences. Seven structures (five along the Mainline and two along the Velma Lateral) are within the proposed construction workspace. Midship Pipeline would move the structures intersected by the workspace out of the construction right-of-way, except the structure at MP VE2.0, which would be marked and avoided during construction. Following construction, structures that were removed would be relocated to adjacent areas, restored to their original locations, or taken to an approved disposal site, depending on landowner requests. No structures would be relocated to the permanent right-of-way. Landowners would be compensated for damage to or loss of any intact structures.

One platted subdivision was identified near Mainline MP 116.5; however, Midship Pipeline modified the proposed route to accommodate the planned development. No other planned residential or commercial developments have been identified within 0.25 mile of the pipeline or aboveground facilities.

Construction of the project would affect a total of about 939.2 acres of agricultural land, of which about 412.9 acres would be retained during operation of the project. Agricultural land in the construction rights-of-way would generally be taken out of production for one growing season. Following construction, all cropland, hay field, and pastureland used for construction of the pipelines would be restored, and prior agricultural uses would be allowed to continue within the permanent right-of-way.

The Mainline would cross seven pecan groves; however, no other known specialty agricultural areas or organic farm operations would be crossed by the MIDSHIP Project. Midship Pipeline has attempted to minimize effects on pecan groves through avoidance, and would continue to work with individual landowners through the easement process to avoid and minimize impacts where these trees are present. Where avoidance would not be possible, Midship Pipeline would compensate landowners for loss of pecan trees removed during construction of the project.

We received several comments from landowners concerned about the effects of the MIDSHIP Project on cattle operations. In the draft EIS, we recommended that Midship Pipeline file a description of the specific mitigation measures that would be implemented on each landowner's property to address these concerns. Midship Pipeline indicated that it had reached an agreeable resolution with all but one landowner. We encourage Midship Pipeline to continue its attempts to consult directly with this landowner to address his concerns.

Seven landowners in the vicinity of the proposed Mainline were identified by the FSA as having CRP easements on their land. Midship Pipeline continues to consult with these landowners to determine if the properties that would be crossed by the Mainline are currently enrolled in the CRP. The FSA did not identify any CREP easements in the project area. In addition, the MIDSHIP Project would not affect any known NRCS program land, such as the Wetland Reserve Program, Grassland Reserve Program, Healthy Forest Reserve Program, or Emergency Watershed Protection – Floodplain Easement Program easements. However, subsequent marketable title searches and landowner consultations identified several properties with county conservation easements, quit claim deeds, or other conservation/wetland programs.

A landowner expressed concerns regarding construction impacts on property that is part of USDA conservation program and benefits wildlife. Because it is possible that additional conservation easements may be identified that are crossed by the MIDSHIP Project, we are recommending that Midship Pipeline file updated information prior to construction regarding properties crossed by the project that are enrolled in NRCS, FSA, or other conservation programs, including any proposed mitigation measures developed in consultation with the landowner and/or the administering agency.

The MIDSHIP Project pipelines would cross about 18.9 miles of lands managed by the CLO as State Resource Management Areas, which are leased for minerals, agriculture, commercial property, special uses (wind farms, hunting, sand and gravel mining, and recreation), easements for oil and gas pipelines, salt water lines, electrical transmission lines, roads, and conservation. Midship Pipeline would be required to construct across and restore CLO lands in accordance with the terms of the easement agreements, which are issued for a term of 20 years. Following construction, most existing land uses, with the exception of forested areas, would be allowed to return to their previous state.

The MIDSHIP Project would cross or be within 0.25 mile of three areas that support recreation or special interests: Historic Route 66 (a scenic highway), the Texoma/Washita Arm of the Tishomingo WMA, and the NRI-listed Blue River. The Mainline would cross Historic Route 66 (a scenic highway) at about MP 15.7; however, use of the HDD crossing method would avoid direct impacts on the historic highway. The project would pass about 0.2 mile north of the Texoma/Washita Arm of the Tishomingo WMA in an area of mixed open land and forest near Mainline MP 146.0. Based on the distance between the MIDSHIP Project and the Texoma/Washita Arm of the Tishomingo WMA, no direct impacts on the WMA would occur during construction or operation of the project. Midship Pipeline plans to cross the NRI-listed Blue River via the HDD construction method in a forested area at about Mainline MP 174.0; however, direct impacts on the Blue River and adjacent forested areas would be minimized by the over 700-foot setback of the HDD entry and exit sites from the river's edge and avoidance of forest clearing between the entry and exit sites. A temporary increase in noise levels due to the HDD crossings would occur, however, these impacts would be short term and limited to the period of active construction (i.e., drilling activities).

The MIDSHIP Project would not cross or be within 0.25 mile of any NWRs, National Fish Hatchery System lands, The Nature Conservancy Conservation Easements, or other WMAs. In addition, no other special land uses, such as scenic rivers or other public land associated with schools, parks, places of worship, cemeteries, sports facilities, campgrounds, golf courses, and/or ball fields, would be affected by the MIDSHIP Project.

Visual resources along the proposed pipeline route are a function of geology, climate, and historical processes, include topographic relief, vegetation, water, wildlife, land use, and human uses and development. About 54 percent of the MIDSHIP Project pipeline facilities would be collocated with or installed adjacent to existing rights-of-way. As a result, the visual resources along these portions of the project have been previously affected by other similar activities. Impacts in other areas would be greatest where the pipeline route would parallel or cross roads and the pipeline right-of-way may be seen by passing motorists; from residences where vegetation used for visual screening or for ornamental value is removed; and where the pipeline is routed through forested areas.

After construction, all disturbed areas, including forested areas, would be restored in compliance with the Plan and Procedures; federal, state, and local permits; landowner agreements; and easement requirements. Generally, this would include seeding the restored areas with grasses and other herbaceous vegetation, after which trees would be allowed to regenerate within the temporary workspaces. The visual effects of construction in forested areas would be permanent on the maintained right-of-way where the regrowth of trees would not be allowed, and would be long term, lasting several years or longer, in the temporary workspaces. The greatest potential visual effect would result from the removal of large specimen trees, but the visual effects of removing even smaller trees would still last for several years.

Visual effects are also often associated with recreation areas and trails that are valued for their scenic quality. As mentioned above, the Mainline would cross Historic Route 66 and the NRI-listed Blue River. Midship Pipeline would cross Historic Route 66 via a 0.3-mile-long HDD, with an over 600-foot setback between the HDD entry/exit sites and the road, in an area dominated by agricultural fields and

open land, limiting the impacts on the existing visual setting to distant views of the pipeline right-of-way. Midship Pipeline would also cross the Blue River via the HDD method, maintaining an over 700-foot setback between the HDD entry/exit sites and the river's edge. Because direct impacts on the river and adjacent forested areas would be avoided or minimized by use of the HDD construction technique, construction and operation of the project would have minimal effect on the scenic uses of the Blue River.

Midship Pipeline has proposed mitigation measures to reduce visual impacts at the new aboveground facilities, including installing perimeter fences, limiting outdoor lighting to the minimum required for security during unmanned nighttime operation, and utilizing directional control or downward-facing lighting at the main gates, yards, and building entry and exit doors; and using non-reflective, basic shades of color from a low-contrast palette for compressor station structures. Vegetation and/or trees would limit direct views of the Calumet and Tatums Compressor Stations. Midship Pipeline conducted a visual assessment and prepared a Landscape Management Plan for the Bennington Compressor Station. The Landscape Management Plan includes detailed plans for visually screening the compressor station from the nearest residence using a combination of deciduous, evergreen, ornamental trees, and native grasses. We have reviewed the Landscape Management Plan and find it acceptable.

With adherence to Midship Pipeline's proposed impact avoidance, minimization, and mitigation plans, including the Landscape Management Plan, we conclude that overall impacts on land use, recreation, and visual resources would be adequately minimized.

### 5.1.9   Socioeconomics

Construction of the MIDSHIP Project would not have a significant adverse impact on local populations, housing, employment, or the provision of community services. There would be temporary increases in traffic levels due to the commuting of the construction workforce to the project area, as well as the movement of construction vehicles and delivery of equipment and materials to the construction right-of-way. In response to our recommendation in the draft EIS, Midship Pipeline committed to providing a traffic management plan prior to construction that details specific measures it would implement to minimize impacts on traffic, including identification of traffic control measures and personnel, emergency access management procedures, off-site vehicle parking areas, alternative worker transportation methods (e.g., bussing to construction worksites), and a communication plan for notifying emergency services personnel, school systems, and the public about the location and duration of road closures.

While the project would affect some areas that meet the criteria for environmental justice areas, there is no evidence that the project would cause adverse and disproportionate impacts on minorities or low income populations. The long-term socioeconomic effect of the project is likely to be beneficial, although minor, based on the increase in tax revenues that would accrue in the counties affected by the project. Based on the analysis presented, we conclude that the project would not have a significant adverse effect on the socioeconomic conditions of the project area.

### 5.1.10   Cultural Resources

Midship Pipeline conducted cultural resources surveys of the proposed pipeline routes and aboveground facilities to identify historic aboveground resources and locations for additional subsurface testing in areas with potential for pre-contact and historic archaeological sites. This included historic structures and archaeological surveys along the pipeline routes and a desktop review of historic structures within the viewshed of proposed aboveground facilities. The archaeological surveys identified 36 isolated finds and 58 cultural resources within the APE. The cultural resources identified during survey include 49 archaeological sites (28 pre-contact sites, 18 historic sites, and 3 containing both

historic and pre-contact components), and 9 historic architectural resources. Midship Pipeline's cultural resources consultant recommended the majority (39) of the archaeological sites (18 pre-contact, 18 historic, and 3 sites containing both historic and pre-contact components), the 9 historic architectural resources, and all 36 isolated finds as not eligible for listing in the NRHP.

The analysis of the indirect APE identified 20 possible historic structure locations within the viewshed of 8 proposed facilities (the Calumet and Bennington Compressor Stations; the Sholem Booster Station; and the Chisholm, Okarche/Mark West, Grady, Velma, and Bennington Meter Stations). No potential historic structures were identified within the indirect APE of the Tatums Compressor Station or the Canadian Valley, Cana, and NGPL 801 Meter Stations. No impacts on historic properties were identified during the viewshed analysis of historic structures within the indirect APE of the proposed facilities.

The SHPO concurred with the recommendation that the historic archaeological sites, historic architectural resources, and the historic component of three multicomponent sites are not eligible for listing in the NRHP. We concur with SHPOs recommendations.

The OAS concurred with the recommendation that 16 pre-contact archaeological sites and the pre-contact component of 3 multicomponent sites are not eligible for listing in the NRHP. The OAS did not concur with the eligibility recommendation of not eligible for one site, which was subsequently avoided by the project. The boundaries of one additional pre-contact site extend outside of the APE; however, OAS concurred that the portion of the site within the APE lacks research potential and is not eligible. We concur with these recommendations.

Both we and Midship Pipeline consulted with 18 federally recognized Native American tribes, as well as several other non-governmental organizations and other potentially interested parties to provide them an opportunity to comment on the proposed project. To ensure that our responsibilities under section 106 of the NHPA are met, we are recommending that Midship Pipeline not begin construction until any additional required surveys are completed, survey reports and treatment plans (if necessary) have been reviewed by the appropriate parties, and we provide written notification to proceed. The studies and impact avoidance, minimization, and measures proposed by Midship Pipeline, and our recommendation, would ensure that any adverse effects on cultural resources would be appropriately mitigated.

### 5.1.11   Air Quality and Noise

**Air Quality**

Construction and operation of the MIDSHIP Project would result in some localized air quality impacts. Air quality impacts associated with construction of the project would include emissions from fossil-fueled vehicles and off-road construction equipment, HDD activities, fugitive dust, and open burning.

Construction emissions would be temporary, occurring over the duration of construction activity, and would be emitted at different times and locations along the length of the proposed pipelines and at the aboveground facility sites. Midship Pipeline would operate construction equipment on an as-needed basis and generally during daytime hours. Gasoline and diesel engines used during construction would be operated and maintained in a manner consistent with the manufacturers' specifications and EPA standards, thus minimizing emissions. Current EPA sulfur-in-fuel standards for gasoline, on-road diesel, and off-road diesel would also contribute to minimizing emissions from construction equipment. If used by the construction contractor, open burning would be conducted in accordance with ODEQ criteria

identified in OAC 252:100-13, and would not be conducted in counties with restrictions associated with these activities.

We received comments expressing concern about fugitive dust emissions during construction of the project. Midship Pipeline developed an FDCP that outlines specific measures to minimize fugitive dust emissions. Midship Pipeline would require contractors to comply with the methods outlined in the FDCP during construction, restoration, and operation of the project, and have delegated stop work authority to environmental inspectors and other key members of the construction team in the event that fugitive dust control measures are not implemented in accordance with the FDCP.

With the mitigation measures proposed by Midship Pipeline, air quality impacts from construction activities would be temporary or short term, and would not result in a significant impact on local and regional air quality or cause or contribute to a violation of applicable air quality standards.

Operation of the project would result in air emissions from stationary equipment (e.g., compressor, booster, and meter stations), including emissions of $NO_X$, CO, particulate matter, $SO_2$, VOCs, GHGs, and HAPs. These operational emissions would occur over the life of the project and would result in long-term impacts on air quality in the project vicinity.

To assess the potential air quality impacts associated with operation of these aboveground facilities, Midship Pipeline conducted air quality modeling analyses. The results of the air quality modeling analyses demonstrate that emissions from the Calumet, Tatums, and Bennington Compressor Stations and the Sholem Booster Station, when combined with background air quality concentrations, would be below the NAAQS. Because Midship Pipeline would be required to acquire applicable air permits, based on the air quality modeling analysis, and with the mitigation measures proposed by Midship Pipeline, the air quality impacts from operation of the project, although long term, would not result in a significant impact on local and regional air quality or cause or contribute to a violation of applicable air quality standards.

We received one comment on the draft EIS regarding the potential risk of exposure to radon gas should a rupture of the pipeline occur due to seismic activity. As described in section 4.1.4.1, seismic events are not anticipated to affect a modern arc-welded pipeline. Further, radon gas within the pipeline would be reduced through processing to make the gas pipeline quality. Therefore, we conclude that the risk of exposure to radon is not significant.

**Noise**

Midship Pipeline would generate noise during construction of the pipelines and aboveground facilities. Construction noise associated with the pipelines would spread over the length of the pipeline route and would not concentrate at any one location for an extended period of time, except at the proposed HDD sites. Construction noise associated with the installation of the compressor, booster, and meter stations would concentrate in the vicinity of each site and would extend for several months, but would vary depending on the specific activities taking place at any given time.

With implementation of Midship Pipeline's proposed noise mitigation measures, the estimated noise attributable to HDD equipment operations would meet our noise criteria of 55 dBA $L_{dn}$ at the nearest NSAs at all of the HDD locations with the exception of the Pennington Creek HDD. With implementation of Midship Pipeline's proposed noise mitigation measures (i.e., installation of a temporary sound wall), the noise attributable to HDD activities at the Pennington Creek crossing would be 57 dBA $L_{dn}$. We have reviewed the proposed activities and determined that the proposed mitigation is

5-18

reasonable and that the noise attributable to the HDD activities would have a moderate but short-term impact on NSAs in the vicinity of the Pennington Creek HDD.

Because Midship Pipeline indicated that it would identify the specific noise mitigation measures it would implement once detailed HDD design is complete for the North Canadian River; Oklahoma, Kansas and Texas Railroads; Blue River; and Rock Creek HDDs, we are recommending that Midship Pipeline file a noise assessment for each of these HDDs that includes a detailed list of the noise mitigation measures it would implement at each HDD entry/exit site and the predicted noise attributable to HDD activities at each entry/exit site with implementation of the proposed noise mitigation measures that demonstrates that noise levels associated with HDD activities would be reduced to less than 55 dBA $L_{dn}$ at the nearest NSA(s). Where continuous hours of operation are required, Midship Pipeline would work with homeowners in the vicinity of the drilling operations who may be disturbed by the work to come up with a workable situation to alleviate the landowner's concerns.

Because pipeline and aboveground facility construction would occur primarily during daytime hours, the noise impact associated with these activities would not have a significant effect on nearby NSAs. HDD activities may occur continuously; however, with the implementation of mitigation measures proposed by Midship Pipeline and our recommendation, we conclude that the noise impacts associated with HDD activities would be moderate and appropriately mitigated.

Operation of the project would have a long-term effect on noise levels in proximity to the proposed compressor stations, booster station, and meter stations. The noise associated with some of these facilities is likely to be perceptible at some nearby NSAs; however, Midship Pipeline has proposed mitigation measures at the compressor stations and booster station to minimize continuous noise levels from these facilities at nearby NSAs.

Compressor unit blowdowns would occur as part of normal compressor station operation and would also generate noise. Midship Pipeline would affix a silencer at each compressor station site to minimize noise impacts from blowdowns to less than 55 dBA $L_{dn}$ at nearby NSAs. Because blowdown events are temporary and short in duration, noise impacts are expected to be minimal.

To ensure that the noise levels during operation of the compressor stations and booster station meet the FERC 55 dBA $L_{dn}$ sound criterion, we are recommending that Midship Pipeline file noise surveys at full load conditions and install additional noise controls if the levels are exceeded. Based on the analyses conducted, the proposed mitigation measures, and our recommendation, we conclude that construction and operation of the MIDSHIP Project would not result in significant noise impacts on residents and the surrounding environment.

Given adherence to Midship Pipeline's proposed measures as well as our additional recommendations, we conclude that potential air and noise-related impacts associated with the project would be adequately minimized or mitigated.

## 5.1.12  Safety and Reliability

Midship Pipeline would design, construct, operate, and maintain the proposed pipelines and aboveground facilities in accordance with or in exceedance of DOT Minimum Federal Safety Standards in 49 CFR 192 and other applicable federal and state regulations. These regulations include specifications for material selection and qualification; minimum design requirements; and protection of the pipeline from internal, external, and atmospheric corrosion. Several commenters expressed concern about the long-term safety of pipeline operations. The DOT rules require regular inspection and maintenance,

including repairs as necessary, to ensure the pipeline has adequate strength to transport the natural gas safely.

We received several comments about the potential effects of a pipeline rupture and natural gas ignition (the area of potential effect is sometimes referred to as the potential impact radius). While a pipeline rupture does not necessarily ignite, the DOT does publish rules that define HCAs where a gas pipeline accident could do considerable harm to people and their property and requires an integrity management program to minimize the potential for an accident. Midship Pipeline would follow federal safety standards for pipeline class locations based on population density. The DOT regulations are designed to ensure adequate safety measures are implemented to protect all populations.

We received comments from a landowner concerned about the collocation of the proposed pipeline with an existing pipeline on the property and the potential for a rupture or explosion of either pipeline to cause a similar incident on the collocated pipeline. Based on the construction and design methods of pipelines collocated within a shared right-of-way, it is unlikely that one pipeline failure would cause the adjacent pipeline to also fail. We also received a comment expressing concern that a 36-inch depth of cover could potentially result in pipe damage and subsequent loss of cathodic protection in croplands where deep tilling is practiced. Midship Pipeline has committed to 48 inches of cover in cropland, which should minimize the potential for damage from deep tillage.

We also received a comment expressing concern that local emergency services might not be sufficient to respond in the event of a project-related emergency. The DOT requires that each operator establish and maintain liaison with appropriate fire, police, and public officials to learn the resources and responsibilities of each organization that may respond to a natural gas pipeline emergency, and to coordinate mutual assistance. The operator must also establish a continuing education program to enable customers, the public, government officials, and those engaged in excavation activities to recognize a gas pipeline emergency and report it to appropriate public officials. Midship Pipeline would provide the appropriate training to local emergency service personnel before the pipeline is placed in service.

We also received comments concerning potential health impacts from methane and other gases, such as benzene and hydrogen sulfide, if there was a release of natural gas to the atmosphere. Methane is not listed in the International Agency for Research on Cancer, National Toxicology Program, or by the Occupational Safety and Health Administration as a carcinogen or potential carcinogen. Concentrations of benzene and hydrogen sulfide in pipeline gas are very low and would be unlikely to affect public health in the event of a leak.

We conclude that Midship Pipeline's implementation of the above measures would ensure compliance with the DOT's regulations regarding public safety and the integrity of the proposed facilities.

### 5.1.13  Cumulative Impacts

Three types of projects (past, present, and reasonably foreseeable projects) could potentially contribute to a cumulative impact when considered with the MIDSHIP Project. These projects include FERC-jurisdictional natural gas pipelines; oil and natural gas production, transport, processing and storage projects; and other actions including electric transmission and generation projects, transportation projects, and residential and commercial developments. The region of influence for cumulative impacts varied depending on the resource being discussed.

We evaluated cumulative impacts from a geographical perspective recognizing that the proximity of other actions to the MIDSHIP Project is a major predictor of where cumulative impacts would most likely result. Actions occurring outside these geographical boundaries were generally not evaluated

because their potential to contribute to a cumulative impact diminishes with increasing distance from the MIDSHIP Project. Past, present, and reasonably foreseeable projects and actions where the duration of time for construction, operation, and/or restoration overlaps with the timeframe for construction, operation, and restoration of the MIDSHIP Project were included in this analysis. Impacts from older projects (completed 5 or more years ago) are considered to have been mitigated over time with the disturbed environment having become part of the baseline character of the region. Therefore, projects completed 5 or more years ago are not considered ongoing contributors to cumulative impacts unless they have ongoing operational impacts (e.g., air emissions, discharges) with potential to contribute to a cumulative impact on air quality. Past projects that have been recently completed (within 5 years of the MIDSHIP Project) or that have ongoing operational impacts have been considered for their potential to contribute to a cumulative impact.

Recently completed, presently occurring, and reasonably foreseeable future actions in the temporal and geographic scope of the MIDSHIP Project were identified for inclusion in this cumulative impact analysis. Actions that contribute to cumulative impacts with pipelines are generally different than actions that contribute to cumulative impacts with aboveground facilities and compressor stations. The majority of the cumulative impacts associated with these projects and with the MIDSHIP Project would be minor and temporary during construction. However, some long-term cumulative impacts would occur in forested wetlands and forested uplands with respect to the vegetative communities and associated wildlife habitats. Some long-term cumulative benefits would be realized through new jobs and wages, purchases of goods and materials, and tax revenues.

Operational emissions associated with the aboveground facilities built for the MIDSHIP Project would contribute to cumulative impacts on air emissions, and operation of these facilities would contribute to cumulative noise impacts where they are in close proximity to other existing or future facilities. Due to the implementation of specialized construction techniques, the relatively short construction timeframe in any one location, and resource protection and mitigation plans designed to minimize and control environmental impacts for the MIDSHIP Project, minimal cumulative impacts would occur.

### 5.1.14 Alternatives

As alternatives to the proposed action, we evaluated the no-action alternative, system alternatives, route alternatives, and aboveground facility site alternatives. While the no-action alternative would eliminate the short- and long-term environmental impacts identified in the EIS, the stated objectives of Midship Pipeline's proposal would not be met.

Our analysis of system alternatives included an evaluation of whether existing or proposed natural gas pipeline systems could meet Midship Pipeline's objectives while offering an environmental advantage. We are not aware of any natural gas pipeline systems proposed in the region that would meet the objectives of the MIDSHIP Project. There are several existing natural gas pipeline systems that operate in the vicinity of the project; however, most of these pipeline systems operate at or near capacity in their current configuration. Moreover, none of the existing pipeline systems are configured to receive and deliver natural gas based on the requirements of the project shippers. Additional pipeline looping, compression, and laterals would be required to transport the natural gas, which would likely result in similar environmental impacts. Therefore, none of these pipeline systems would offer a significant environmental advantage and we do not consider them to be preferable alternatives to the MIDSHIP Project.

Midship Pipeline developed the proposed project routing based on the receipt and delivery points identified by its customers. During this process, Midship Pipeline indicated that it attempted to maximize

collocation with existing rights-of-way, avoid developed areas, and minimize impacts on sensitive resources. Midship Pipeline incorporated 28 route variations into the proposed route based on input from its environmental and engineering staff; landowner consultations; and to address constructability issues identified during field surveys. We have reviewed the route variations and agree with Midship Pipeline's conclusions regarding incorporation of these variations into the proposed route.

We did not receive any comments during scoping suggesting that we evaluate any major route alternatives and, based on our review of the project, we did not identify any major route alternatives that would offer environmental advantages over the proposed route. However, after receipt of Midship Pipeline's application, we received comments from two landowners requesting that Midship Pipeline modify the pipeline alignment across their properties. To address Mr. Sloan's concerns, Midship Pipeline indicated that it would restore the disturbed right-of-way to pre-existing conditions using a seed mix containing native bluestem and other species approved by the landowner. We find these measures acceptable. We encourage Midship Pipeline to continue its attempts to consult directly with Mr. Sloan; however, we note that environmental recommendation no. 5 would allow Midship Pipeline to make minor field realignments per landowner needs and requirements that do not affect other landowners or sensitive environmental areas.

In the draft EIS, we recommended that Midship Pipeline assess the feasibility of extending the North Canadian River HDD to span a dike on Mark Schweitzer's property and/or provide detailed information on any route adjustments and/or construction techniques developed in consultation with Mr. Schweitzer to minimize impacts on the dike. Midship Pipeline filed comments on the draft EIS indicating it has incorporated a route variation into the proposed route to avoid crossing the dike as well as documentation that the Schweitzers find the route variation acceptable.

Midship Pipeline proposes to construct three new compressor stations (the Calumet, Tatums, and Bennington Compressor Stations) and one new booster station (the Sholem Booster Station). After filing its application, Midship Pipeline identified and incorporated an alternative location for its Sholem Booster Station based on landowner input. Our alternatives analysis is comment and resource driven. Because we did not receive any comments regarding possible alternative sites for these facilities and no significant impacts have been identified from their proposed siting, we did not identify or further evaluate alternative locations for the new compressor and booster station facilities.

We did not evaluate alternative locations for the meter stations because no specific concerns were raised during scoping, no sensitive resources would be affected, and the station sites are generally limited to those locations where shippers have indicated they would deliver or receive natural gas, which are essential to the project objective as previously discussed. We also did not evaluate alternative locations for MLVs, pig launchers, or pig receivers because they would either be collocated with aboveground facilities, located entirely within the permanent pipeline right-of-way and/or would not affect sensitive resources, or their locations are partly determined by regulations.

## 5.2    FERC STAFF'S RECOMMENDED MITIGATION

If the Commission authorizes the MIDSHIP Project, we are recommending that the following measures be included as specific conditions in the Commission's Order. We conclude that these measures would further mitigate the environmental impacts associated with the construction and operation of the project.

1.   Midship Pipeline shall follow the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests) and as identified in the EIS, unless modified by the Order.  Midship Pipeline must:

   a.   request any modification to these procedures, measures, or conditions in a filing with the Secretary;

   b.   justify each modification relative to site-specific conditions;

   c.   explain how that modification provides an equal or greater level of environmental protection than the original measure; and

   d.   receive approval in writing from the Director of OEP **before using that modification.**

2.   The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of the Order, and take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the project.  This authority shall allow:

   a.   the modification of conditions of the Order;

   b.   stop-work authority; and

   c.   the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the Order as well as the avoidance or mitigation of unforeseen adverse environmental impact resulting from project construction and operation.

3.   **Prior to any construction,** Midship Pipeline shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, EIs, and contractor personnel will be informed of the EIs' authority and have been or will be trained on the implementation of the environmental mitigation measures appropriate to their jobs **before** becoming involved with construction and restoration activities.

4.   The authorized facility locations shall be as shown in the EIS, as supplemented by filed alignment sheets.  **As soon as they are available, and before the start of construction,** Midship Pipeline shall file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by the Order.  All requests for modifications of environmental conditions of the Order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets.

   Midship Pipeline's exercise of eminent domain authority granted under NGA section 7(h) in any condemnation proceedings related to the Order must be consistent with these authorized facilities and locations.  Midship Pipeline's right of eminent domain granted under NGA section 7(h) does not authorize it to increase the size of its natural gas facilities to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas.

5.   Midship Pipeline shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, pipe storage yards, new access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary.  Approval

for each of these areas must be explicitly requested in writing. For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area. All areas shall be clearly identified on the maps/sheets/aerial photographs. Each area must be approved in writing by the Director of OEP **before construction in or near that area.**

This requirement does not apply to extra workspace allowed by the Commission's Plan and/or minor field realignments per landowner needs and requirements that do not affect other landowners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all route realignments and facility location changes resulting from:

a.    implementation of cultural resources mitigation measures;

b.    implementation of endangered, threatened, or special concern species mitigation measures;

c.    recommendations by state regulatory authorities; and

d.    agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6.    **Within 60 days of the acceptance of the authorization and before construction begins,** Midship Pipeline shall file an Implementation Plan with the Secretary for review and written approval by the Director of OEP. Midship Pipeline must file revisions to the plan as schedules change. The plan shall identify:

a.    how Midship Pipeline will implement the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests), identified in the EIS, and required by the Order;

b.    how Midship Pipeline will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to on-site construction and inspection personnel;

c.    the number of EIs assigned per spread, and how the company will ensure that sufficient personnel are available to implement the environmental mitigation;

d.    company personnel, including EIs and contractors, who will receive copies of the appropriate material;

e.    the location and dates of the environmental compliance training and instructions Midship Pipeline will give to all personnel involved with construction and restoration (initial and refresher training as the project progresses and personnel change), with the opportunity for OEP staff to participate in the training session(s);

f.    the company personnel (if known) and specific portion of Midship Pipeline's organization having responsibility for compliance;

    g.    the procedures (including use of contract penalties) Midship Pipeline will follow if noncompliance occurs; and

    h.    for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

        i.    the completion of all required surveys and reports;
        ii.    the environmental compliance training of on-site personnel;
        iii.    the start of construction; and
        iv.    the start and completion of restoration.

7.    Midship Pipeline shall employ a team of EIs (i.e., three or more or as may be established by the Director of OEP) per construction spread.  The EIs shall be:

    a.    responsible for monitoring and ensuring compliance with all mitigation measures required by the Order and other grants, permits, certificates, or other authorizing documents;

    b.    responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see condition 6 above) and any other authorizing document;

    c.    empowered to order correction of acts that violate the environmental conditions of the Order, and any other authorizing document;

    d.    a full-time position, separate from all other activity inspectors;

    e.    responsible for documenting compliance with the environmental conditions of the Order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

    f.    responsible for maintaining status reports.

8.    **Beginning with the filing of its Implementation Plan,** Midship Pipeline shall file updated status reports with the Secretary on a **weekly** basis until all construction and restoration activities are complete.  On request, these status reports will also be provided to other federal and state agencies with permitting responsibilities.  Status reports shall include:

    a.    an update on Midship Pipeline's efforts to obtain the necessary federal authorizations;

    b.    the construction status of each spread, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally sensitive areas;

    c.    a listing of all problems encountered and each instance of noncompliance observed by the EIs during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

     d.     a description of the corrective actions implemented in response to all instances of noncompliance;

     e.     the effectiveness of all corrective actions implemented;

     f.     a description of any landowner/resident complaints that may relate to compliance with the requirements of the Order, and the measures taken to satisfy their concerns; and

     g.     copies of any correspondence received by Midship Pipeline from other federal, state, or local permitting agencies concerning instances of noncompliance, and Midship Pipeline's response.

9.     Midship Pipeline must receive written authorization from the Director of OEP **before commencing construction of any project facilities.** To obtain such authorization, Midship Pipeline must file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

10.     Midship Pipeline must receive written authorization from the Director of OEP **before placing the project into service.** Such authorization will only be granted following a determination that rehabilitation and restoration of the right-of-way and other areas affected by the project are proceeding satisfactorily.

11.     **Within 30 days of placing the authorized facilities in service,** Midship Pipeline shall file an affirmative statement with the Secretary, certified by a senior company official:

     a.     that the facilities have been constructed in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

     b.     identifying which of the conditions in the Order Midship Pipeline has complied with or will comply with. This statement shall also identify any areas affected by the project where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

12.     **Prior to construction,** Midship Pipeline shall file with the Secretary, for review and written approval by the Director of OEP, a spring and well water quality sampling plan. The plan shall incorporate the following sampling parameters, or provide sufficient explanation as to why a specific parameter would not provide information relevant to restoring wells and springs affected by construction of the project:

     a.     total dissolved solids;
     b.     total suspended solids;
     c.     pH;
     d.     specific conductance;
     e.     arsenic;
     f.     metals (including beryllium, cadmium, chromium, iron, lead, and vanadium);
     g.     major ions (including calcium, chloride, potassium, sodium, and sulfate);
     h.     nitrate and nitrite;
     i.     total petroleum hydrocarbons;
     j.     explosive residue compounds (EPA method[s] 8330[a]); and
     k.     fecal coliform (if the well head is opened for sampling purposes). *(Section 4.3.1.7)*

13.   **Prior to construction**, Midship Pipeline shall file with the Secretary, for review and written approval by the Director of OEP, an updated HDD Plan that revises section 10.4.2 to confirm it would test all non-municipal water sources prior to being used for drilling mud and that revises section 10.4.4 to confirm it would conduct laboratory sampling of drilling fluid for inorganic and organic environmental contaminants prior to reuse or disposal. *(Section 4.3.2.5)*

14.   **Prior to construction**, Midship Pipeline shall file with the Secretary, for review and written approval by the Director of OEP, the results of a feasibility assessment for shifting the pipeline alignment to minimize the crossing length of waterbody S-BR-TAS-17/10/25-07 at Mainline MP 181.1, or implementing an alternative crossing method (e.g., dam-and-pump, flume, HDD). *(Section 4.3.2.6)*

15.   **Prior to construction**, Midship Pipeline shall file with the Secretary, for review and written approval by the Director of OEP, a complete set of revised HDD profile and plan drawings, including all geotechnical analyses and detailed mapping of cleared areas, mud pits, and/or pipeline assembly areas, as required in the Commission's Procedures section V.B.6.d. *(Section 4.3.2.6)*

16.   **Prior to construction,** Midship Pipeline shall file with the Secretary additional justification for use of the ATWS associated with the waterbodies identified in bold in table 4.3.2-8 of the EIS, for review and written approval by the Director of OEP. *(Section 4.3.2.6)*

17.   **Prior to construction,** Midship Pipeline shall complete species-specific surveys for the ABB during the ABB's 2018 active season. If these surveys identify the presence of ABB in the project area, Midship Pipeline shall not begin construction of the MIDSHIP Project **until:**

   a.   Midship Pipeline files with the Secretary a project-specific mitigation plan for the ABB that demonstrates how avoidance and mitigation will be accomplished; and

   b.   the FERC staff receives documentation of FWS concurrence with the plan. *(Section 4.7.1.7)*

18.   Midship Pipeline shall not begin construction of the MIDSHIP Project **until:**

   a.   the FERC staff receives comments from the FWS regarding the MIDSHIP Project;

   b.   the FERC staff completes ESA consultation with the FWS; and

   c.   Midship Pipeline has received written notification from the Director of OEP that construction or use of mitigation may begin. *(Section 4.7.1.8)*

19.   **Prior to construction,** Midship Pipeline shall file with the Secretary, for review and written approval by the Director of OEP, an updated list of properties crossed by the MIDSHIP Project that are enrolled in NRCS, FSA, or other conservation programs, including any proposed mitigation measures Midship Pipeline will implement to maintain the status of properties enrolled in these programs based on its consultation with the landowner(s) and the administering agency(ies). *(Section 4.8.4)*

20.  Midship Pipeline shall not begin construction of facilities and/or use of staging, storage, or temporary work areas and new or to-be-improved access roads **until**:

   a.  Midship Pipeline files with the Secretary:

      i.   the remaining cultural resources survey report(s);

      ii.  site evaluation report(s) and avoidance/treatment plan(s), as required; and

      iii. comments on the cultural resources reports and plans from the Oklahoma State Historic Preservation Office and interested Indian tribes.

   b.  The ACHP is afforded an opportunity to comment if historic properties would be adversely affected.

   c.  The FERC staff reviews and the Director of OEP approves the cultural resources reports and plans, and notifies Midship Pipeline in writing that treatment plans/mitigation measures (including archaeological data recovery) may be implemented and/or construction may proceed.

   All materials filed with the Commission containing **location, character, and ownership** information about cultural resources must have the cover and any relevant pages therein clearly labeled in bold lettering **"CUI/PRIV – DO NOT RELEASE."** *(Section 4.10.5)*

21.  **Prior to construction of the North Canadian River; Oklahoma, Kansas and Texas Railroad; Blue River; and Rock Creek HDDs**, Midship Pipeline shall file with the Secretary, for review and written approval by the Director of OEP, an HDD noise mitigation plan to reduce the projected noise level attributable to the proposed drilling operations at NSAs with predicted noise levels above 55 dBA. During drilling operations, Midship Pipeline shall implement the approved plan, monitor noise levels, and make all reasonable efforts to restrict the noise attributable to the drilling operations to no more than 55 dBA $L_{dn}$ at the NSAs. *(Section 4.11.2.2)*

22.  Midship Pipeline shall file noise surveys with the Secretary **no later than 60 days** after placing the Calumet, Tatums, and Bennington Compressor Stations and the Sholem Booster Station in service. If a full load condition noise survey is not possible, Midship Pipeline shall provide an interim survey at the maximum possible horsepower load and provide the full load survey **within 6 months**. If the noise attributable to the operation of any of the compressor or booster stations under interim or full horsepower load conditions exceeds an $L_{dn}$ of 55 dBA at any nearby NSAs, Midship Pipeline shall file a report on what changes are needed and shall install the additional noise controls to meet the level **within 1 year** of the in-service date. Midship Pipeline shall confirm compliance with the above requirement by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls. *(Section 4.11.2.2)*

**FEDERAL ENERGY REGULATORY COMMISSION**
Routing Code PJ 11.1
Washington, DC 20426


Official Business
Penalty for Private Use

20180621-3006 FERC PDF (Unofficial) 06/21/2018



**FERC/FEIS-0277**
**Volume I**

# Final Environmental Impact Statement

## Midcontinent Supply Header Interstate Pipeline Project

**Docket No.**
**CP17-458-000**

**June 2018**





**Office of
Energy
Projects**

**June 2018**

**FERC/FEIS-0277**

## FINAL ENVIRONMENTAL IMPACT STATEMENT

### FOR

**Midship Pipeline Company, LLC – Midcontinent Supply Header Interstate Pipeline Project**

**Volume II – Appendices**

Docket No. CP17-458-000



Federal Energy Regulatory Commission
Office of Energy Projects
888 First Street, NE, Washington, DC 20426

**Cooperating Agency:**



**APPENDIX A**

**DISTRIBUTION LIST FOR THE FINAL ENVIRONMENTAL IMPACT STATEMENT**

20180621-3006 FERC PDF (Unofficial) 06/21/2018

## APPENDIX A
### DISTRIBUTION LIST FOR THE DRAFT ENVIRONMENTAL IMPACT STATEMENT

**Federal Government Agencies**

Advisory Council on Historic Preservation, Office of Federal Programs, Charlene D. Vaughn, DC

Council on Environmental Quality, Edward Boling, DC

Council on Environmental Quality, Marna McDermott, DC

U.S. Army Corps of Engineers, Andrew Commer, OK

U.S. Army Corps of Engineers, Karla Roberts, OK

U.S. Army Corps of Engineers, Marcus Ware, OK

U.S. Army Corps of Engineers, Michelle Horn, OK

U.S. Army Corps of Engineers, Planning and Policy Division, John Furry, DC

U.S. Department of Agriculture, Farm Services Agency, Bill James, OK

U.S. Department of Agriculture, Farm Services Agency, Conservation and Environmental Program Division, Nell Fuller, DC

U.S. Department of Agriculture, Farm Services Agency, Lyndal Stoup, OK

U.S. Department of Agriculture, Farm Services Agency, Reimer Krey, OK

U.S. Department of Agriculture, Farm Services Agency, Terry Peach, OK

U.S. Department of Agriculture, Forest Service, Ecosystem Management Coordination, Joe Carbone, DC

U.S. Department of Agriculture, Natural Resources Conservation Service, Andree DuVarney, DC

U.S. Department of Agriculture, Natural Resources Conservation Service, Gary O'Neill, OK

U.S. Department of Agriculture, Natural Resources Conservation Service, Steve Glasgow, OK

U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Marine Fisheries Service, Rusty Swafford, TX

U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Marine Fisheries Service, NOAA NEPA Coordinator, MD

U.S. Department of Energy, John Anderson, DC

U.S. Department of Energy, Office of Environmental Management, Mark Whitney, DC

U.S. Department of Energy, Office of National Environmental Policy Act Policy and Compliance, Brian Costner, DC

U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Environmental Health, Sharunda Buchanan, GA

U.S. Department of Health and Human Services, Everett Bole, CHMM, DC

U.S. Department of Homeland Security, Customs and Border Protection, Christopher Oh, DC

U.S. Department of Housing and Urban Development, Office of Environment and Energy, Danielle Schopp, DC

U.S. Department of Justice, Environment and Natural Resources Division, NEPA Coordinator, DC

U.S. Department of State, Bureau of Oceans and International Environmental and Scientific Affairs, Alexander Yuan, DC

U.S. Department of the Interior, Bureau of Indian Affairs, BJ Howerton, VA

U.S. Department of the Interior, Bureau of Indian Affairs, Dan Deerinwater, OK

U.S. Department of the Interior, Bureau of Indian Affairs, Dave Anderson, OK

U.S. Department of the Interior, Bureau of Indian Affairs, Eddie Streater, OK

U.S. Department of the Interior, Bureau of Indian Affairs, Mosby Halderman, OK

## APPENDIX A (cont'd)

**Federal Government Agencies (cont'd)**

U.S. Department of the Interior, Bureau of Indian Affairs, Terry L. McClung, DC

U.S. Department of the Interior, Bureau of Land Management, NEPA Specialist, DC

U.S. Department of the Interior, Bureau of Ocean Energy Management, Dr. Jill Lewandowski, VA

U.S. Department of the Interior, Bureau of Safety and Environmental Enforcement, David Fish, VA

U.S. Department of the Interior, National Park Service, Patrick Walsh, CO

U.S. Department of the Interior, Office of Environmental Policy and Compliance, Stephen R. Spencer, NM

U.S. Department of Transportation, Office of Assistant Secretary for Transportation Policy, Camille Mittelholtz, DC

U.S. Department of Transportation, Office of Assistant Secretary for Transportation Policy, Helen Serassio, DC

U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety, Ahuva Battams, DC

U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety, Alan Mayberry, DC

U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety, Karen Lynch, DC

U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety, Kenneth Y. Lee, DC

U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety, Melanie Stevens, DC

U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety, William Schoonover, DC

U.S. Department of Transportation, Surface Transportation Board, Victoria Rutson, DC

U.S. Environmental Protection Agency, Jerome Blackman, DC

U.S. Environmental Protection Agency, Office of Enforcement and Compliance Assurance, Lawrence Starfield, DC

U.S. Environmental Protection Agency, Region 6, Gabriel Gruta, TX

U.S. Environmental Protection Agency, Region 6, Michael Jansky, TX

U.S. Environmental Protection Agency, Region 6, Randy Gee, TX

U.S. Environmental Protection Agency, Region 6, Rob Lawrence, TX

U.S. Environmental Protection Agency, Region 6, Robert Houston, TX

U.S. Environmental Protection Agency, Region 6, Suzanna Perea, TX

U.S. Environmental Protection Agency, Region 6, Compliance Assurance and Enforcement Division, Cheryl T. Seager, TX

U.S. Environmental Protection Agency, Susan E. Bromm, DC

U.S. Fish and Wildlife Service, Oklahoma Ecologial Services Field Office, David Martinez, OK

U.S. Fish and Wildlife Service, Oklahoma Ecologial Services Field Office, Jonna Polk, OK

U.S. Geological Survey, Esther Eng, VA

**Federal Senators and Representatives**

U.S. House of Representatives, Eddy Dempsey, Field Representative to Representative Markwayne Mullin, OK

U.S. House of Representatives, Representative Frank Lucas, OK

U.S. House of Representatives, Representative Markwayne Mullin, OK

U.S. House of Representatives, Representative Tom Cole, OK

## APPENDIX A (cont'd)

### Federal Senators and Representatives (cont'd)

U.S. Senate, Steve Carson, Field Representative to Senator James Lankford, OK

U.S. Senate, Senator James (Jim) Inhofe, OK

U.S. Senate, Senator James Lankford, OK

U.S. Senate, Senate Energy and Natural Resources Committee, Lisa Murkowski, DC

### State Senators and Representatives

Oklahoma House of Representatives, District 19, Representative Justin (JJ) Humphrey, OK

Oklahoma House of Representatives, District 21, Representative Dustin Roberts, OK

Oklahoma House of Representatives, District 22, Representative Charles McCall, OK

Oklahoma House of Representatives, District 41, Representative John Enns, OK

Oklahoma House of Representatives, District 43, Representative Tim Downing, OK

Oklahoma House of Representatives, District 48, Representative Pat Ownbey, OK

Oklahoma House of Representatives, District 49, Representative Tommy Hardin, OK

Oklahoma House of Representatives, District 51, Representative Scott Biggs, OK

Oklahoma House of Representatives, District 56, Representative David Perryman, OK

Oklahoma House of Representatives, District 57, Representative Harold Wright, OK

Oklahoma House of Representatives, District 59, Representative Mike Sanders, OK

Oklahoma House of Representatives, District 60, Representative Rhonda Baker, OK

Oklahoma State Senate, District 6, Senator Josh Brecheen, OK

Oklahoma State Senate, District 13, Senator Greg McCortney, OK

Oklahoma State Senate, District 14, Senator Frank Simpson, OK

Oklahoma State Senate, District 20, Senator AJ Griffin, OK

Oklahoma State Senate, District 23, Senator Lonnie Paxton, OK

Oklahoma State Senate, District 26, Senator Darcy Jech, OK

Oklahoma State Senate, District 43, Senator Paul Scott, OK

### State Government Agencies

Office of the Oklahoma State Fire Marshal, Robert Doke, OK

Oklahoma Archeological Survey, Kary Stackelbeck, OK

Oklahoma Building and Construction Trades Council, Jimmy Fish, OK

Oklahoma Corporation Commission, Brad Ice, OK

Oklahoma Corporation Commission, Gayland Darity, OK

Oklahoma Corporation Commission, Grant Ellis, OK

Oklahoma Corporation Commission, Kelly Phelps, OK

Oklahoma Department of Environmental Quality, James Grim, OK

Oklahoma Department of Environmental Quality, Lloyd Kirk, OK

Oklahoma Department of Environmental Quality, Phillip Fielder, OK

Oklahoma Department of Environmental Quality, Rocky Chen, OK

Oklahoma Department of Environmental Quality, Stormwater Program, Karen Milford, OK

Oklahoma Department of Public Safety, Department of Motor Vehicles, Don Westbrook, OK

Oklahoma Department of Transportation, Legal Division Business Office, OK

Oklahoma Department of Transportation, OK

Oklahoma Department of Wildlife Conservation, Kristin Gillman, OK

Oklahoma Department of Wildlife Conservation, Rich Fuller, OK

## APPENDIX A (cont'd)

**State Government Agencies (cont'd)**

Oklahoma Department of Wildlife Conservation, Richard Hatcher, OK

Oklahoma Department of Wildlife Conservation, Russ Horton, OK

Oklahoma Highway Patrol, Rick Adams, OK

Oklahoma Historical Society, State Historic Preservation Office, Melvena Heisch, OK

Oklahoma Office of the Governor, Mary Fallin, OK

Oklahoma Office of the Lieutenant Governor, Todd Lamb, OK

Oklahoma Secretary of Energy and Environment, Deputy Secretary of Energy, Tom Robins, OK

Oklahoma State Courts Network, Associate District Judge G. Brent Russell, OK

Oklahoma State Courts Network, Associate District Judge John E. Herndon, OK

Oklahoma State Courts Network, Associate District Judge Robert E. Davis, OK

Oklahoma State Courts Network, Associate District Judge Rocky L. Powers, OK

Oklahoma State Courts Network, Associate District Judge Thomas K. Baldwin, OK

Oklahoma State Courts Network, District Judge Dennis Morris, OK

Oklahoma State Courts Network, District Judge Gary Miller, OK

Oklahoma State Courts Network, District Judge Ken Graham, OK

Oklahoma State Courts Network, District Judge S. Wyatt Hill, OK

Oklahoma State Courts Network, District Judge Kory Slade Kirkland, OK

Oklahoma State Courts Network, District Judge David A. Stephens, OK

Oklahoma State Courts Network, Presiding District Judge Mark Campbell, OK

Oklahoma State Courts Network, Special Judge Carson M. Brooks, OK

Oklahoma State Courts Network, Special Judge Timothy A. Brauer, OK

Oklahoma State Courts Network, Special Judge Trace C. Sherrill, OK

Oklahoma State School Land, OK

Oklahoma Water Resources Board, Floodplain Management, Charles O'Malley, OK

Oklahoma Water Resources Board, Floodplain Management, Matt Rollins, OK

Oklahoma Water Resources Board, Floodplain Management, Yohanes Sugeng, P.E., OK

Oklahoma Water Resources Board, Planning and Management, Kent Wilkins, OK

State of Oklahoma, Commissioners of the Land Office, Marisa Belknap, OK

State of Oklahoma, Commissioners of the Land Office, OK

**Local Government Agencies**

Stephens County Commissioners, David McCarley, OK

Ardmore Development Authority, Brian Carter, OK

Ardmore Emergency Management, Amber Wilson, OK

Ardmore Fire Department, Cary Williamson, OK

Ardmore Police Department, Ken Grace, OK

Bennington Public Works Authority, Ida Wright, OK

Bray Emergency Management, George Noe, OK

Bryan County Commissioners, Jay Perry, OK

Bryan County Commissioners, Ron Boyer, OK

Bryan County Commissioners, Tony Simmons, OK

Bryan County Courthouse, Donna Alexander, OK

Bryan County Courthouse, Tammy Reynolds, OK

Bryan County Emergency Management, James Dalton, OK

A-4

20180621-3006 FERC PDF (Unofficial) 06/21/2018

## APPENDIX A (cont'd)

**Local Government Agencies (cont'd)**

Bryan County, Kenneth Golden, OK

Canadian County Commissioners, Dave Anderson, OK

Canadian County Commissioners, Jack Stewart, OK

Canadian County Commissioners, Marc Hader, OK

Canadian County Emergency Management, Timothy J. Smith, OK

Canadian County, Randall Edwards, OK

Carter County 911 Office, Shelly Stahlbusch, OK

Carter County Commissioners, Bill Baker, OK

Carter County Commissioners, Jerry Alvord, OK

Carter County Commissioners, Joe McReynolds, OK

Carter County Emergency Management, Paul Tucker, OK

Carter County Farm Bureau, Thurman Rail, OK

Carter County, John Ryan, OK

Carter County, Milton Anthony, OK

Chickasha Economic Development Council, OK

City of Ardmore Commissioners, John Moore, OK

City of Ardmore Commissioners, Keith King, OK

City of Ardmore Commissioners, Sheryl Ellis, OK

City of Ardmore, City Engineer, Thomas Mansur, P.E., D. WRE Mansur, OK

City of Ardmore, Doug Pfau, OK

City of Ardmore, J.D. Spohn, OK

City of Ardmore, Jessica Scott, OK

City of Ardmore, Martin Dyer, OK

City of Duncan, Alex Henry, OK

City of Duncan, Dr. Michael Nelson, OK

City of Duncan, Jimmy Peters, OK

City of Duncan, Kimberly Meek, OK

City of Duncan, Nate Schacht, OK

City of Duncan, Patty Wininger, OK

City of Duncan, Rick Mayes, OK

City of Duncan, Ritchie Dennington, OK

City of Durant, Bill Orr, OK

City of Durant, Chad Hitchcock, OK

City of Durant, Destry Hawthorne, OK

City of Durant, Jerry L. Tomlinson, OK

City of Durant, Jim Dunegan, OK

City of Durant, Stewart Hoffman, OK

City of El Reno, Dan Galloway, OK

City of El Reno, J.T. Chronister, OK

City of El Reno, Jeff Kouba, OK

City of El Reno, Lindsey Grigg, OK

City of El Reno, Matt Sandidge, OK

City of El Reno, Matt White, OK

City of El Reno, Tim Robinson, OK

City of Gene Autry, Kyle Lawson, OK

City of Kingfisher Commissioners, Kenneth Davis, OK

City of Kingfisher Commissioners, Roxie Alexander, OK

City of Kingfisher Commissioners, Tammy Mueggenborg, OK

City of Kingfisher Commissioners, Wendell Prim Sr., OK

City of Kingfisher, Anita James, OK

City of Kingfisher, Brittney Shladik, OK

City of Kingfisher, Dave Slezickey, OK

City of Kingfisher, Steve Richards, OK

City of Ratliff, Bobbie Robbins, OK

City of Ratliff, Doreetha McLemore, OK

City of Tishomingo, Brison McSwain, OK

City of Tishomingo, Darcy Ratliff, OK

City of Tishomingo, Marlon Sullivan, OK

20180621-3006 FERC PDF (Unofficial) 06/21/2018

## APPENDIX A (cont'd)

**Local Government Agencies (cont'd)**

City of Tishomingo, Planning and Zoning Commission, David Brown, OK

City of Tishomingo, Rhonda Brown, OK

City of Tishomingo, Sue Robbins, OK

City of Tishomingo, Tom Lokey, OK

City of Tishomingo, Woody Jumper, OK

Duncan Police Department, Danny Ford, OK

Durant Fire Department, Roger Joines, OK

Durant Police Department, David R. Houser, OK

El Reno Chamber of Commerce, OK

El Reno Emergency Management, Kent Lagaly, OK

El Reno Fire Department, Kent Lagaly, OK

El Reno Police Department, Ken Brown, OK

Elmore City Emergency Medical Services, Eddie Stewart, OK

Elmore City Police Department, Josh Hines, OK

Elmore City, Larry Cleveland, OK

Elmore City, Pam Helvey, OK

Elmore City, Paul Martin, OK

Garvin County Commissioners, Gary Ayers, OK

Garvin County Commissioners, Johnny Mann, OK

Garvin County Emergency Management, H. D. Ramming, OK

Garvin County, Beverly Strickland, OK

Garvin County, Larry Rhodes, OK

Garvin County, Lori Fulks, OK

Garvin County, Sandy Goggans, OK

Garvin County, Stan Spivey, OK

Gene Autry Emergency Management, Donald Morgan, OK

Grady County Commissioners, Mike Lennier, OK

Grady County Commissioners, Ralph Beard, OK

Grady County Commissioners, Windle Hardy, OK

Grady County Emergency Management, Dale Thompson, OK

Grady County Farm Bureau, Jay Fulton, OK

Grady County Fire Department, Perry Wenzel, OK

Grady County Safety Program, George Manning, OK

Grady County, Jim Weir, OK

Grady County, Sharon Shoemake, OK

Grady County, Terry Beard, OK

Greater Oklahoma City Chamber, Economic Development, OK

Johnston County Chamber of Commerce, OK

Johnston County Commissioners, Melvin Farmer, OK

Johnston County Commissioners, Mike Thompson, OK

Johnston County Commissioners, Roy Wayne Belvins, OK

Johnston County Courthouse, Jon Smith, OK

Johnston County Courthouse, OK

Johnston County Emergency Management, Jason Thomas Bryant, OK

Johnston County Farm Bureau, Glenn Orr, OK

Johnston County, Jon Smith, OK

Kingfisher Chamber of Commerce, OK

Kingfisher County Commissioners, Jeff Moss, OK

Kingfisher County Commissioners, Keith Schroder, OK

Kingfisher County Commissioners, Ray Alan Shimanek, OK

Kingfisher County Courthouse, Dennis Banther, OK

Kingfisher County Sheriff's Department, Dennis Banther, OK

Kingfisher Emergency Management, Steve Loftis, OK

## APPENDIX A (cont'd)

**Local Government Agencies (cont'd)**

Kingfisher Fire/EMS Department, Chief Tony Stewart, OK

Stephens County Commissioners, David McCarley, OK

Stephens County Commissioners, Dee Bowen, OK

Stephens County Commissioners, Lonnie Estes, OK

Stephens County Courthouse, Jenny Moore, OK

Stephens County Courthouse, Jerry Herberger, OK

Stephens County Courthouse, Wayne McKinney, OK

Stephens County Emergency Management, Gary Ball, OK

Stephens County Farm Bureau, Eddie Sutton, OK

Tishomingo Fire Department, Paul Wilson, OK

Tishomingo Police Department, Shannon Smith, OK

Town of Bennington, Idanel Wright, OK

Town of Bokchito, Cathey Keirsey, OK

Town of Caddo, Ron Fryer, OK

Town of Calumet, John Morris, OK

Town of Calumet, Kelly Hobbs, OK

Town of Calumet, Steve Snow, OK

Town of Kenefic, Patricia Hackler, OK

Town of Kenefic, Robert Brewer, OK

Town of Ravia, Angie Oxley, OK

Town of Ravia, Darvin Nanney, OK

Town of Rush Springs, Brian Hale, OK

Town of Rush Springs, John Morrow, OK

Town of Rush Springs, Linda Nichols, OK

Town of Springer, Charlene Robinson, OK

Town of Springer, Mayor, OK

Town of Tatums, Jackelyn Williams, OK

Town of Tatums, Lovie Carter, OK

Town of Velma, Clyde Womack, OK

Town of Velma, Holly McGuire, OK

Town of Velma, Jacob Lemons, OK

Town of Velma, Justin Tugmon, OK

Town of Velma, Shawn Enloe, OK

Town of Velma, Winston Dumas, OK

Velma EMS Department, Patricia Snider, OK

Velma Fire Department, David Bloodworth, OK

Velma Police Department, Randy Whipple, OK

**Native American Groups**

Alabama-Quassarte Tribal Town, Town King, Tarpie Yargee, OK

Alabama-Quassarte Tribal Town, Tribal Historic Preservation Officer, Molly Franks, OK

Apache Tribe of Oklahoma, Chairperson, Bobby Kormardley, OK

Apache Tribe of Oklahoma, Chairperson, Lyman Guy, OK

Caddo Nation of Oklahoma, Chairperson, Tamara Francis-Fourkiller, OK

Caddo Nation of Oklahoma, Director of the Environmental Protection Program, Polly A. Edwards, OK

Cheyenne and Arapaho Tribes, Chief Executive Policy Analyst, Robert Wilson, OK

Cheyenne and Arapaho Tribes, Grants and Contracts Developer, Damon Dunbar, OK

Cheyenne and Arapaho Tribes, Land Resources Technician, Daniel Tallbear, OK

Cheyenne and Arapaho Tribes, Oklahoma, Governor, Eddie Hamilton, OK

Cheyenne and Arapaho Tribes, Oklahoma, Research Analyst of THPO, Micah Looper, OK

Cheyenne and Arapahoe Tribes, Economic Development Director, Nathan Hart, OK

Cheyenne and Arapahoe Tribes, Tribal Historic Preservation Officer, Research Analyst, Margaret Sutton, OK

A-7

## APPENDIX A (cont'd)

### Native American Groups (cont'd)

Chickasaw Nation, Governor, Bill Anoatubby, OK

Chickasaw Nation, Tribal Historic Preservation Officer, Karen Brunso, OK

Choctaw Nation of Oklahoma, Chief, Gary Batton, OK

Choctaw Nation of Oklahoma, Director, Ryan Spring, OK

Choctaw Nation of Oklahoma, Ian Thompson, OK

Choctaw Nation of Oklahoma, Section 106 Coordinator, Daniel Ragle, OK

Choctaw Nation of Oklahoma, Tribal Archaeologist, Robert Cast, OK

Comanche Nation of Oklahoma, Chairman, William Nelson, OK

Comanche Nation of Oklahoma, Tribal Historic Preservation Officer, Theodore Villacana, OK

Comanche Nation of Oklahoma, Tribal Historic Preservation Officer, Kelly Banderas, OK

Comanche Nation of Oklahoma, Tribal Historic Preservation Officer, Susan Nahwooksy, OK

Delaware Nation, Cultural Preservation Department Director, Nekole Alligood, OK

Delaware Nation, Section 106 Manager, Jason Ross, OK

Delaware Nation, Vice-President, C.J. Watkins, OK

Fort Sill Apache Tribe of Oklahoma, Chairman, Jeff Haozous, OK

Fort Sill Apache Tribe of Oklahoma, Tribal Historian, Leland Michael Darrow, OK

Kialegee Tribal Town, Mekko, Jeremiah Hobia, OK

Kiowa Indian Tribe of Oklahoma, Chairman, Matthew Komalty, OK

Kiowa Indian Tribe of Oklahoma, Chairperson, Amber Toppah, OK

Kiowa Indian Tribe of Oklahoma, Kiowa Business Committee Secretary, Rhonda Ahhaitty, OK

Kiowa Indian Tribe of Oklahoma, Poolaw Kellie, OK

Muscogee (Creek) Nation, Principal Chief, George Tiger, OK

Muscogee (Creek) Nation, Tribal Historic Preservation Officer, Corain Lowe-Zepeda, OK

Osage Nation, Principal Chief, Geoffrey Standing Bear, OK

Osage Nation, Tribal Historic Preservation Officer, Andrea Hunter, OK

Quapaw Tribe of Oklahoma, Chairperson, John Berrey, OK

Quapaw Tribe of Oklahoma, Tribal Historic Preservation Officer, Everett Bandy, OK

Seminole Nation of Oklahoma, Historic Preservation, Natalie Harjo, OK

Seminole Nation of Oklahoma, Principal Chief, Leonard Harjo, OK

Seminole Nation of Oklahoma, Tribal Historic Preservation Officer, Theodore Isham, OK

Thlopthlocco Tribal Town, Mekko, Ryan Morrow, OK

Thlopthlocco Tribal Town, Tribal Historic Preservation Officer, Emman Spain, OK

Tonkawa Tribe of Oklahoma, North American Graves Protection and Repatriation Act Coordinator, Lauren Brown, OK

Tonkawa Tribe of Oklahoma, President, Russell Martin, OK

Wichita and Affiliated Tribes, Historic Preservation, Gary McAdams, OK

Wichita and Affiliated Tribes, President, Terri Parton, OK

### Libraries

Ardmore Public Library, OK

Chickasha Public Library, OK

Donald W. Reynolds Community Center and Library, OK

## APPENDIX A (cont'd)

**Libraries (cont'd)**

Duncan Public Library, OK

El Reno Carnegie Library, OK

Garland Smith Public Library, OK

Glover-Spencer Memorial Library, OK

Healdton Community Library, OK

Hennessey Public Library, OK

Johnston County Library, OK

Kingfisher Memorial Library, OK

Mabel C. Fry Public Library, OK

Mustang Public Library, OK

Piedmont Public Library, OK

Robert L. Williams Public Library, OK

Wilson Public Library, OK

**Media**

Chickasha Express Star, OK

Durant Daily Democrat, OK

El Reno Tribune, OK

Garvin County News Star, OK

Johnston County Capital-Democrat, OK

Kingfisher Times and Free Press, OK

Mustang Times, OK

Pauls Valley Daily Democrat, OK

The Daily Ardmoreite, OK

The Duncan Banner, OK

**Companies and Organizations**

1031 Services, Sam E. and Glenda D. Kirk, OK

3-J Farms, OK

4812 Lingo Holding LLC, OK

A T and L Railroad Co LLC (R015), OK

AA Kloeppel, LLC, Albert and Ann Kloeppel et al., OK

ADW Property LLC, OK

Annuschat Farms LLC, Ron Annuschat, OK

Arco Environmental Remediation, TX

Ardmore Chamber of Commerce, Mita Bates, OK

Atlanta Region Sfh I, LLC, GA

Atlanta Region Sfh I, LLC, PA

Atlantic Richfield Co., TX

Atlas Pipeline Mid-Continent LLC, c/o K E Andrews and Company, TX

Atlas Pipeline Mid-Continent LLC, OK

Bennington Public Work Authority, OK

Blackjack Land & Cattle Company, LLC, Michael and Connie Barrington, OK

Bruno Family Partnership, c/o Jessie Bruno, OK

Bryan County Farm Bureau, Tracy Rogers, OK

Bubba Dove Ranch, LLC, LA

Butterflies of the World Foundation, Bryan Reynolds, OK

Caldwell and Sons Drilling, Inc., c/o Larry Miller, TX

Calumet Industries, Roger Fees, OK

Cana Services LLC, OK

Carnegie Oklahoma Chamber of Commerce, OK

Casto Family Partners Ltd., TX

Century Farm LLC, AR

Chatham Brothers Pecans Cattle and Hay LLC, OK

Chatham Family LLC, OK

Cheniere Energy, Inc., Sean P. Jamieson, TX

Cheniere Midstream Holdings, Inc., Karri Mahmoud, TX

Cheri S. Clark Revocable Trust, OK

Chevron USA Inc., a Pennsylvania Corporation, c/o Chevron Texaco Property Tax, TX

Chickasha Antique Car Club Inc., OK

Chickasha Chamber of Commerce, Mark Rathe, OK

Christensen Angus Ranch, Nathan Barrett, OK

Chuck's Big Rig Repair LLC, OK

A-9

## APPENDIX A (cont'd)

**Companies and Organizations (cont'd)**

Cimarex Energy Co, a Delaware
Corporation, CO

Citation 2004 Investment LP, c/o Raymond
Haddix, Property Tax Dept, TX

Citizens for the Protection of the Arbuckle-
Simpson Aquifer, OK

Clear Creek Farm LLC, OK

Creek Land and Cattle Company, LLC
Rush, OK

CSL Oklahoma System, LLC, AR

Dale and Linda Revocable Trust, OK

Daube Arbuckle Ranch LLC, OK

Daube Ranch Ltd, OK

Daube Ranch Mineral Limited Pr, OK

DCP Midstream, Jason Dean, OK

Don Morris and Michi Morris Irrevocable
Trust, OK

Ducks Unlimited, Greg Arrington, OK

Dufur Farms LLC, OK

Dufur Land and Cattle Co, LLC, OK

Duncan Area Economic Development
Foundation, Lyle Roggow, OK

Duncan Chamber of Commerce and Industry,
Chris Deal, OK

Durant Area Chamber of Commerce, Janet
Reed, OK

Durant Industrial Authority, Tommy
Kramer, OK

Dv Land Interest LP, TX

Enable Products LLC, OK

Enlink Midstream Services 2010 and Fna Devon
Gas Serv, OK

Enogex Gas Gathering LLC, OK

Enogex Products LLC, OK

Enogex, Jerod Herd, OK

Environmental Resources Management, Mike
Buckless, RI

Environmental Resources Management, Tina
Lyons, MN

Eubank Ranch, OK

Explorer Pipe Line Co and F250 William
Cammuso, OK

Falconhead Audobon Society, John
Hubinger, OK

Families First Properties, LLC, OK

Felan Farms Inc, OK

Fireant Ventures, LLC, OK

Fischl, Culp, McMillin, Chaffin, Bahner, and
Long, LLP, OK

Fitzgerald Farming and Ranching, LLC, Dusty
and Staci Franklin, OK

Frensley Partners LTD, William Robert Frensley
c/o J.D. (Butch) Whitten, Jr., OK

Friends of Donald W. Reynolds Community
Center, OK

Getty Oil Co. Fee 1115, TX

Ground Water Protection Council, Inc., Mike
Paque, OK

Gulf Crossing Pipeline Co LLC and G471 David
Hardest Tax Department, OK

Gulf Crossing Pipeline Co LLC and G471 David
Hardest, TX

GW 15 LLC, OK

Hellack Family Partnership, LLC, OK

Hurt Family III, LLC, OK

Integrity Energy Int LLC, TX

International Union of Operating Engineers
Local 627, Rhea Ellen Bobo, OK

James A. Clark Revocable Trust, OK

Jindra Investments LLC and Jindra Land Co.
LLC, OK

Jindra Land Co. LLC, OK

JK Lewis Farms LLC, OK

JLM Land and Livestock LLC, OK

Jud Little Ranch LLC, OK

K. E. Andrews, c/o Jack M. Williams, TX

## APPENDIX A (cont'd)

### Companies and Organizations (cont'd)

K. E. Andrews, c/o Mark M. Williams, TX

K.E. Andrews and Co., TX

KrandK Inc, Dale and Marian Elizabeth Rother et al., OK

KrandK Inc, OK

L A Real Estate Apple, Bank of Oklahoma, Attn: Brenda Mae, OK

L Hatfield Ranch, OK

L.I. Ranch LLC, c/o Albert Riesen Jr., OK

L.I. Ranch, Mark Riesen, OK

Lankard Family LLC, OK

LC-Mac LLC, NV

Legacy Resources LLC, Keith Berry, OK

Lola B LLC, OK

Lotocka LLC, et al, OK

Ludwig Farms Inc, OK

Mack Energy Co., OK

Martha Kroeker Life Estate, OK

Martin W W LLC, OK

Martin, Weems, Schmidt and Schmidt, Jill Parham, OK

Mid-America Midstream Gas Services LLC, OK

Midcontinent Express Pipeline and Public Service, TX

Nickel Hill Land and Cattle Co, OK

Norman Area Land Conservancy, Lyntha Wesner, OK

Oklahoma Gas Association, Rick Whittington, OK

Oklahoma Native Plant Society, Joe Roberts, OK

Oklahoma Oil and Gas Association, Arnella Karges, OK

Oklahoma Ornithological Society, Joseph Grzybowski, OK

Oklahoma Professional Economic Development Council, Brien Thortsenberg, OK

Oklahoma Ranch Com LLC, OK

Oklahoma Sierra Club, Barbara Van Hanken, OK

Oklahoma Southeast, Cecil Carter, OK

Oklahoma State Chamber of Commerce, Fred Morgan, OK

Oklahoma Sustainability Network, Madison Miller, OK

Oklahoma Urban and Community Forestry Council, Inc., OK

ONEOK Field Services Co LLC, Brady Wheeler, OK

ONEOK Field Services Co LLC, Rodney Eischen, OK

ONEOK Field Services Co LLC, OK

Panenergy, Tax Department, CO

Park 53 LLC, Michael Bynum, OK

Perkins Family Investments, LLC, OK

Pilkington Properties, LLC, Mike and Sharon Pilkington, OK

R. Jane Hufnagel Potter Revocable Living Trust, OK

R. Scott Richey, c/o Richey Resources LLC, OK

R1 Brangus LLC, OK

R360 Oklahoma Inc, c/o Anthony Agnello, TX

Rafricia P. Ranch, LLC TX

Rafter J. Ranch LLC, TX

Rafter P. Ranch, LLC, TX

Ratliff City Emergency Management, Robert L. Thornton, OK

Rock Creek Ranch, OK

RV Station Ltd and A Tx Limited Partnership, George Boyce Jr., TX

S and J Operating Company, TX

Sandy Creek Farms, Inc., OK

Shady Grove Elmore City-Pernell Public Schools, OK

Simon Creek, Inc., Don M. Haggerty, OK

## APPENDIX A (cont'd)

### Companies and Organizations (cont'd)

Skelly Oil Co. Fee 1116, TX

Southwest Oklahoma Impact Coalition, Marilyn Feaver, OK

Speake Land Holdings LLC, OK

Spectrum Field Services Inc., c/o K E Andrews and Co., TX

Sugar and Spice Properties, LLC, Mackey Pepper, OK

Sycamore Creek, LLC, an Oklahoma LLC, TX

Ten Point Ranch LLC, TN

Texahoma Cellular LP, IL

Tharp Family Farms LLC, OK

Tishomingo Refuge Ecology and Education Society, Derek Collins, OK

Tom-Stack LLC, KE Andrews and Co., TX

Tph Capital, L.P., TX

Transcanada Keystone Pipeline, TX

Transok Inc, OK

Tribal Energy Resource LLC, Bobby Gonzalez, NH

Triple B Farms LLC, Lou Berry, OK

Turner Land and Cattle, OK

Turner Rentals, LLC, OK

TWI Enterprises LLC, Steve Andrews, OK

Tyler Real Estate Holding, LLC, OK

University of Oklahoma, Oklahoma Natural Heritage Inventory, Todd Fagin, OK

Wapiti LLC, OK

Washita Land and Cattle LLC, OK

Wheeler Family Farms LLC, OK

WLC Land and Mineral, LLC, OK

XTO Energy Inc, Tax Department, TX

XTO Energy Inc., TX

### Individuals

A Michael Monroe, AR

A. Leman and Louise Spoon, Spoon Family Trust, OK

A. Michael Monroe, TX

A.C. Walters et al., c/o Gayla Harper, OK

A.C. Walters Rev Trust and Gala Ann Harper Sucessor Trust, c/o Gayla Harper, OK

Abner Goodbear, OK

Adam and Teresa Ramage, OK

Adrienne Gautier, OK

Alan and Marla Brend, OK

Alan C. Jackson and Cheryl L. Bryant, OK

Albert Johnson, OK

Albert Joseph Skoch et al., OK

Albert Joseph Skoch, OK

Alexander William Grant Trust, OK

Alfonzo and Pearl Drain et al., MD

Alia Dutton, OK

Allen Dale and Cindy Lou Stover, Co-Trsts, OK

Allen L. and Tracy A. Bass, OK

Allene Bollinger, OK

Allison Leigh Krittenbrink, VA

Alvin Glen Self, OK

Amelia Clay Hart, OK

Amy West, Karen A Portwood, Stephen L Portwood, and Gary Earl Adams, OK

Amy West, SC

Andrea Drain-Langston, OK

Andrew Duffle Trust and Alan Duffle, OK

Andrew Mark Hoelscher, OK

Ann Leck Ward, TX

Anna M., Robert L., Raymond A., and William R. Lemons, MD

Anna Mae Cato (Pettus), OK

Anna Marie Greving, OK

Anne Elise Krittenbrink, VA

Annie Austin, c/o Dr. Randy Taylor, CA

Anthony Avello, OK

Arlene E. McComas Rev Trust, OK

Autumn Beaver Trust, OK

Barbara Ann Reuter, Trustee, OK

Barbara Christopher et al., AZ

20180621-3006 FERC PDF (Unofficial) 06/21/2018

## APPENDIX A (cont'd)

Individuals (cont'd)

Barbara M Schaefer, c/o Tom
Schaefer, OK

Barry K. Rich, TX

Bernita G. Youn and Cecil
Hershal, OK

Bernita M. Wolf, Trustee,
Donna Coley POA, OK

Bessie Harris, OK

Betty "Matthies" J. Johnston
et al., OK

Betty Ann Lindheim, OK

Betty C. Starkey and David
R. Starkey, Co-Trustees,
Trust B created by
James R. Starkey
Revocable Trust, OK

Betty C. Starkey, Trustee,
Betty C. Starkey
Revocable Trust, OK

Betty Diemer, Lester Swaine,
Sherrie Marie Diemer
Jr., Betty Diemer as Life
Estate, OK

Betty Diemer, OK

Betty J. Miller-Clark, Robert
Douglas Clark, and
Michael S. Clark, IA

Betty J. Porter Life Estate
and Charles J.
Porter, OK

Betty Maxine Evans, OK

Beverly Dickerson, Lillie
Eaves, and Ole
Dickerson, OK

Beverly Mitchusson, Trustee,
Beverly Mitchusson
Revocable Trust, OK

Beverly Smith Yahola, OK

Bill Miller and Nancy
Miller, OK

Billie Gene Risener, CA

Billie L. and James D.
Lonsford, WA

Billy and Melvin Long, OK

Billy G. and Mary J.
Woodruff, OK

Billy J. and Zola Whitt, OK

Billy J. Hutson, Trustee, Lois
Huston Living
Trust, OK

Billy J. Jones and D J Kelley,
c/o Family Trust, OK

Billy Minyard, OK

Bob Burns, OK

Bob G. and Nelda Keck,
Trustees, OK

Bob R. and Ruby G.
Brush, OK

Bobbie Jean Mayfield, OK

Bobby Gene and Katie M.
Studdard, OK

Bobby Gene Howell, AR

Bobby Gonzalez, OK

Bobby Greenwood, OK

Bobby Osborne et al., OK

Bonney R. Martin, OK

Bonnie and Bobby W.
Bridwell, Co-Trustees,
Bonnie Bridwell Living
Trust, OK

Boyce D. Montgomery,
Trustee, OK

Boyd Dee and Deborah J.
Mills, OK

Brad A. and Jeanna R.
Martin, OK

Brad and Julie Scott, OK

Bradley Charles
Krittenbrink, VA

Brandi Self, OK

Brandon C. and Lindsay R.
Azevedo, OK

Brandon W. Moss, OK

Brenda Drain, TX

Brenda Heffington Rev
Trust, OK

Brent and Karen
Johnson, OK

Brent L. and Julia A.
Balentine, OK

Bret T. and Shantel Denise
Burns, OK

Brian Dow Taylor, FL

Bruce and Sharon Evans, OK

Bruce Vinson, c/o Coby
Wells, OK

Bruce Vinson, Coby Wells,
and Bobbie Wells, OK

Bryan W. and Melissa S.
Bramblett, OK

Brysen K. and Amy R.
Powell, OK

Byron Alan and Abigail
Karen Hardesty, OK

C. H. and Barbara A.
Smith, OK

C. Patrick Wallace, AR

C.G. Miller, Jr. Revocable
Tr., KS

Candance Jo Lane, TX

Carl L. and Karen George
Joy, OK

Carl L. Joy, John C. Joy, and
Vickie Joy, OK

Carl Neal, AR

Carlene and Carl V.
Gragg, OK

Carlene Gragg and Carl V.
Gragg, OK

## APPENDIX A (cont'd)

**Individuals (cont'd)**

Carlene Gragg,
   Remaindermen, Frances
   Wooward Life
   Estate, OK

Carlin Edward and Tina
   Pennon, OK

Carol Campbell, Mary Lou
   Perry, Patricia H, c/o
   Thomas Beckham, TX

Carol Campbell, TX

Carol J. Mincey Living
   Trust, OK

Carol Sechrist, OK

Carolyn A. Pirtle, OK

Carolyn Robertson
   Arthur, OK

Casey B. and Kristy J.
   Smith, OK

Casey Holcomb, OK

Catherine Bruce, OK

Cecil and Bernita Young, OK

Cecil Hooks and Chere
   Hooks, CA

Cecil Jones and Nina Mae
   King, et al., OK

Cecil Paul Tharp Co-Personal
   Representatives of Ilene
   Tharp, OK

Charles A. and Diana M.
   Snyder, OK

Charles Allen Regan, OK

Charles and Donna Utsler,
   and Frances M. Utsler
   Rev Tr, OK

Charles and Jennifer
   Horton, OK

Charles Bishop, OK

Charles Donald Dodd, OK

Charles E. and Helen R.
   Hicks, OK

Charles J. and Oreene
   Jackson Rev Trust, OK

Charles M. Rowe, OK

Charles W. Dickerson, Lillie
   Eaves, and Ole
   Dickerson, OK

Charles Y. Mitchusson, Jr.
   and Marcia J.
   Mitchusson, OK

Charles Y. Sr. and Eva G.
   Mitchusson et al., OK

Charlie W. Pyka, OK

Chase and Callie Pollard, OK

Cheri D. Davis, Trustee,
   Cheri Davis Rev Living
   Trust, OK

Chester L. and Mary
   Horton, OK

Chester L. Horton et al., OK

Chris Cecil and Susan
   McGrew-Cecil, OK

Chris J. and Christy D.
   McComas, Janice
   McComas Estes, OK

Chris Joe McComas, OK

Christian and Wanda Hansen
   Tr Et, OK

Christine Arnold, Donna
   McPherson or Leslie
   Arnold, c/o Leslie
   Arnold, OK

Christine Arnold, OK

Christy Lou Fees and Autum
   Desiree Walling,
   Successor Trustees of
   the Wysetta V. Todd
   Farm Trust, OK

Cindy McIntire, OK

Clara R Pettus, c/o Evelyn D.
   Ray, KS

Claudia A. John M. and
   James M. Wittrock, as
   Co-Trustees, Ralph and
   Claudia Wittrock Family
   Trust, CA

Clayton and Christi Hufnagel
   Trsts and Clayton
   Hufnagel, Property Tax
   Dept, OK

Clayton and Christi Hufnagel
   Trsts and Clayton
   Hufnagel, OK

Clayton W., Clinton J.,
   Cooper J., and Landrie
   A. Decker, OK

Cliff Palmer and Jo Palmer
   Trust and James M
   Palmer, OK

Clint Reuter, OK

Clyde Gene Miller et al., OK

Clyde Miller et al., OK

Coby and Bobbie Wells, OK

Collin W. Gordon, OK

Connie Gail, Todd Shelton,
   and Christy Lou Fees,
   Successor Trustees,
   Roger Fees, OK

Connie Gayle Huseman, OK

Cooper Jack Decker, OK

Craig Anderson and Betty
   Freeman, OK

Craig Anderson, OK

Craig Hughes, OK

Cris and Debbie Thetfold
   Family Trust, OK

Cunningham Family Trust,
   c/o O. K. Bobbie
   Cunningham, OK

Curtis and Loretta Pavy
   Family Trust, OK

Cynthia Brand, OK

## APPENDIX A (cont'd)

**Individuals (cont'd)**

D L and Gail Lynn Martin, OK

Dale and Donna C. Owens, OK

Dale F. Korn, OK

Dale Houston Jeffcoats, OK

Dale L. and Donna R. Hodges, OK

Dale P. Cowan, AR

Dale Schoeling, OK

Dale Shipley, OK

Dale Turner, OK

Dan and Johnettee Christian, TX

Dan Christian, AR

Dan Christian, OK

Dan Hoogerhyde, Lillie Eaves Life Est and Leonard Dickerson Jr. and Ole Dickerson, TX

Dan L. Marlow, OK

Dana Jackson, Earl G. Jackson Trust, OK

Daniel and Nancy Wedman, OK

Daniel E. and Peggy A. Thorne, OK

Daniel E. McCarley, Trustee, c/o Patricia McCarley, FL

Daniel R. and Della Mae Cole, OK

Danny and Barbara Chambers, OK

Danny and Margaret Germany, OK

Danny Gene and Virginia Cunningham, OK

Danny Hendrix, OK

Danny Ray Leck, Trustee, Danny Ray Leck Revoc Tr E, OK

Danny Sean and Tina M. Kelly, OK

Darrell Morris Wesley, TX

Daryl Gene and Jackie Studdard, OK

David A. and Vera M. Hardin, OK

David Alig, OK

David and Terri Skaggs, OK

David B. and Reba Titsworth, OK

David Bryan Thompson, OK

David Craige, OK

David J. and Mona Lisa A. Hoffman, Co-Trustees, OK

David John Rother et al., OK

David Joseph Wittrock, OK

David L. and Janet D. Schmidt, OK

David L. and Nancy L. Steagal, OK

David M. Post, OK

David Michael and Barbara Elizabeth Greenwood, OK

David Wayne and Connie Ticknor, LA

David Wesley Smith, II, OK

Dean McCarley, Trustee, McCarley Family Revocable Trust, FL

Deana Diane Littleton, OK

Deanna Hardesty Living Trust, OK

Deanna Ruth Brewer, OK

Debra Ann Milam, OK

Dechamplain Foley Crawford, OK

Delphia Jo Mays, OK

Denise K. Davis, Special Administrator, Estate of Warren H. Herriott, OK

Dennis Adams Martin, Shane A. West, Shelley A. Crawford, OK

Dennis and Rhonda Hendrix, OK

Dennis G. and Helen M. Jones, Dennis G and Helen M Jones 2015 Revocable Trust, OK

Dennis L. Maddox, OK

Denny R. and Vickie Lynn Clark Rev. Trust, OK

Denny R. Clark et al., OK

Deon and Nancy L. Cavner, OK

Derald D. and Patricia McConnell, TX

Derek Allen Standridge Irr Trust, OK

Derek G. Howard, OK

Derrell D. and Carla J. Dancer, OK

Diane Rowe, OK

Dianne D. Jackson, OK

Dinah M. Warner, Trustee, Dinah M. Warner Living Trust, FL

Dolores J. Frederick, OK

Dolphus and Claudette Genn, OK

Don and Michi Morris, OK

Don M. Haggerty, OK

Don Morris, OK

**APPENDIX A (cont'd)**

Individuals (cont'd)

Don R. and Yvonne Courtney
Trust and Don R.
Courtney Lvg Trust, OK

Donald A. and Michi M.
Morris, DM and MM
Irrevocable Trust, OK

Donald E. and Lorie K.
Sloane, OK

Donald E. and Tammy
Christian, OK

Donald E. Sloane and Lorie
K. Sloane, OK

Donald H. and Tammy
Baker, OK

Donald Haddix, OK

Donald J. and Johnna Y.
Johnson, OK

Donald J. Chaffin, OK

Donald Lee Tharp, OK

Donald Richard Skoch, OK

Donald Wayne Ludwig, OK

Donna Gayle Otey, OK

Donna L. Von Tungeln
Family Trust, OK

Donna McPherson, OK

Donna Smith Landes et
al., OK

Donnie and Lora Renae
Osborne, TX

Donnie and Lora Renae
Osborne, OK

Donovan H. Kremeier et
al., OK

Dora Lawson, OK

Dorothy Miles, OK

Douglas Robert Irwin, OK

Douglas Stephen Lee and
Betty Pollard Chase, OK

Doyle and Ellen Sue
Newsom et al., OK

Doyle and Gail J. Davis and
Billy E. Newey, OK

Duane Ray Covington, TX

Dusty and Staci Franklin, OK

Dwain and Barbara Gayle
Teel, OK

Dwain Hooks, OK

Earlene Rose Skoch
Allison, OK

Ed and Rebecca Clary, OK

Edna J. Edwards Trust, OK

Edward Ray Smallwood and
Julie Flegal-
Smallwood, OK

Edward Rother et al., OK

Edythe Shaw, OK

Elanna Chitwood Living
Trust, OK

Eldon Edison Stiles, OK

Eldon R. Ventris, OK

Eliza Anderson et al., c/o
Larry Rowell, CA

Elizabeth Ann Kitchen,
Trustee, William R.
Clark Rev. Trust, IN

Elizabeth Knight, OK

Ella Fisher, AZ

Elmer B. Floback, Jr. and
Donna A. Hendley
Living Trust, MN

Elvin Davis, AZ

Emil A. Franklin, Trustee,
Emil A. Franklin
Trust, OK

Emily L. Thomas, aka Emily
Conner, FL

Emily L. Thomas, FL

Eric Chapman, OK

Erpal A. Jordan, TX

Essie Mae Hamilton and
Others, c/o Daniel
Hamilton, OK

Estate of Billy Don
Davis, OK

Estate of Cecil Jones aka
Cecil Jones, Sr., OK

Estate of Fred O. Lofton, Sr.,
c/o Lydra Lofton, OK

Estate of Margaret A. Taylor
and Estate of Geraldine
Austin Carr, c/o Dr.
Randy Taylor, CA

Estate of Verlee Jones, OK

Eudaldo W. and Sharon
Castro, OK

Eugene Franklin, OK

F.E. Brimer, c/o Jon
Herd, OK

F.H. Emory, c/o Lois
Elkins, OK

Fances L. Cooley, CA

Florence R. Holland et
al., NE

Floyd and Virginia
Wright, OK

Floyd J. and Virginia Wright
and Floyd K. and Kelly
Tina Wright, OK

Floyd Keith Wright, OK

Floyd Wayne Morris et
al., OK

Fran C. Mcdermott Trustee
Or Vela, Richard
Edward Trustee, OK

Frances G. Pletcher, Trustee,
Frances G. Pletcher
Re, OK

A-16

## APPENDIX A (cont'd)

**Individuals (cont'd)**

Frances L. Cooley,Trustee, William T. Cooley and Frances L. Cooley Survivors Trust, CA

Frances Woodward Life Estate and Micki Runyan, Francis Woodward Life Estate, OK

Frank L. and Joanne Randall, OK

Frankie M. Odom Trust, AZ

Franklin Delano Risener, CA

Franklin Helen Marie et al., OK

Franklin Risener, CA

Fred A. Chapman Jr., Joan C. Chapman, Chapman Family Trust, OK

Fred O. Lofton, Sr., c/o Lydra Lofton, TX

Froman H. Cowan, OK

G.L. Ratliff, OK

Gala Ann Harper, OK

Galen D. and Malinda J. Morrison, Gale Morrison Rev Trust, OK

Galen Morrison Rev Trust, OK

Garland Russell and Priscilla Washington, OK

Gary A. Ludwig et al., OK

Gary and Geraldine L. Mueggenborg et al., OK

Gary and Linda Ainsworth Trust, OK

Gary D. and Yvonne C. Johnson, OK

Gary Earl Adams, TX

Gary Mac and Mary Ruth Hargrove, OK

Gary Miller, KS

Gay L. Leck, Co-Trustee, Leck Family Trust, OK

Gaylan and Donna Hunt, OK

Gayland and Patricia Townsend, OK

Gene Davis, AZ

Gene E. and Deborah D. Wood, OK

Gene Judith Lafitte, OK

George and Maxine Dale et al., OK

George and Theresa Schulte, OK

George Boyce, Jr., TX

George Gunter Risener, CA

George M Bowen Trust, OK

George Michael Brown, OK

George Morgan, Sucessor Trustee, c/o Kiplin Cowan, OK

George W. Lindley et al., OK

Gerald A. and Lucy C. Beecher Living Trust, OK

Gerald and B. Crowly, OK

Gerald and Lucy Beecher, OK

Gerald Mac Brown Irrevocable Trust, OK

Gerald P. Parker, TX

Gerald W. Jones, OK

Giles Francis, OK

Gilles Family Trust, OK

Gina Lynn Lankford, OK

Glenda Kay Day, OK

Glenford O. and Joyce Mcconnell, OK

Glenford O. McConnell, OK

Glenn D. and Vivian I. Stroud, OK

Gloria Kortemeier, Johanna Bollinger et al., OK

Gordon W. and Deena M. Bentley, OK

Goyo A. and Lindsie R. Garcia, OK

GPM Gas Corporation Ptre and C, Attn: Tax Dept, CO

Grant A. and Tiffany D. Turner, OK

Gregory D. and Shelly K. Crowley, OK

Gregory Mark Coffey, MO

Gussie M. Drain, OK

Gwenda Bishop Gwenda D (Surviving Joint Tenant), OK

Gwn and Mmn Land Trust, OK

H. F. Bare, AR

H. O. and Diane B. Estes, OK

H.D. and Diane B. Estes, OK

H.F. Bare, OK

Harold and Betty Scates, OK

Harold and Margaret Gordon Trust, OK

Harold Brent and Serena A Sinclair, OK

Harold F. and Flora E. Hufnagel, Harold F. and Flora E. Hufnagel Trust, OK

Hartwell Wampler and Claice R. Eubank, Hartwell H. Wampler Rev Trust, OK

**APPENDIX A (cont'd)**

<u>Individuals (cont'd)</u>

Harvey Davis, AZ

Hazel Ruth Milam, OK

Helen Jones, OK

Helen L. Miner, OK

Helen M Smith Life
Estate, OK

Helen Marie Franklin et
al., OK

Helena B. Shepperd, OK

Henderson and Sharron
Anderson, Anderson
Family Trust, OK

Henderson and Sharron
Anderson, c/o H G
Anerson, OK

Henryetta Woods, OK

Herbert and Stanford
McConnell et al., OK

Herbert Davis, OK

Houston O. Jones, OK

Howard and Cheryl
Williams, OK

Howard and Patti A.
Betts, OK

Howard L Woodruff II,
Trustee, OK

Ignacio Corona et al., OK

Ilene Tharp, OK

Imogen Gentry, AR

Inez Akers Trust, c/o Leslie
E. Ott, OK

Ira Jay Mann, Jr., Claudia L.
Mann, and Ira J Mann
Trust, OK

Irrevocable Trust for
Supplemental Needs of
Edward H Denney, OK

Isaac and Annie Franklin, c/o
Susan Plunkett, OK

Isaac Franklin,  Susan
Plunkett, OK

Isidro and Antonia Teran Rev
Trust, OK

J.D. (Butch) Whitten, Jr., OK

J.R. Frensley (Heirs), c/o J.D.
(Butch) Whitten, Jr., OK

J.T. Phillips, IL

Jack C. Hensley, OK

Jack C. Scott, Trustee and
Mary L. Scott, Trustee,
J.C. Scott Rev Trust and
M.L. Scott Rev
Trust, OK

Jack D. and Mary J.
Osborne, OK

Jack Wesley Risener, CA

Jack Williams, TX

Jackie D. and Tracy G.
Risner, OK

Jackson Celester, OK

Jacky Connie Hallmark, OK

Jacob Shaw, OK

Jacquelyn S .Shockley Rev
Liv Trust, OK

James A Wates, OK

James A. Clark, OK

James and Brenda Cagle, OK

James and Cara
Lawrence, TX

James and Gladys
Newby, OK

James and Linda McElvany
Irrevocable Trust, 1st
National Bank and Trust
Co., OK

James and Linda McElvany,
James L and Linda
Mcelvany Rev
Trust, OK

James and Mildred
Clifton, OK

James B. Drain, OK

James Brueggen, OK

James C. and Kathy
Berryman, OK

James C. Quigley et al., c/o
Mr Don E Shanklin, OK

James D. and Florence C.
Welden, OK

James D. and Margaret
Rich, OK

James D. and Sherrie J.
Beckham, OK

James D. Brimer, TX

James Davis, AZ

James E. and Lauana M.
Odom, OK

James E. Cagle, OK

James K. Lafevers, OK

James L and Linda R
McElvany Irrevocable
Trust, First National
Bank and Trust, OK

James L. and Celesta J.
Ince, OK

James L. Carter, OK

James L. Shelby rev.
Trust, MO

James Leach and Billie
Valdez Fehrp, c/o Nacho
Valdez, NV

James Loyd Seay, CA

James M. and Donna A.
Young, OK

James McElravy, OK

James Paul and Denise Ann
Rodgers, OK

James Paul Burnett, OK

## APPENDIX A (cont'd)

**Individuals (cont'd)**

James R. and Jane N. Brann, OK

James R. Lawrence III, TX

James R. Wheelbarger, OK

James Rudy and June Townsend, OK

James S. and Linda Ingram, OK

James W. and Pamela S. Goodin, OK

James W. Jr. and Jennye Hardy, OK

Jana Scimeca, KS

Jane Scimeca, OK

Janell W. Dunn et al., KS

Janet Cottrell, OK

Janice M. Estes, OK

Janice T. and Leon A. Bomhoff, OK

Janyth W. Morgan, AR

Janyth W. Morgan, FL

Jared Rother et al., OK

Jared Voegeli, OK

Jason and Nikki Northcutt, OK

Jason L McComas, OK

Jason Smith, OK

Jay Lynn Perkins, AR

Jay Lynn Perkins, FL

Jayne A Roberts and Bonnye K. Willey, OK

Jayne A. Roberts, Bonnye K. Willey, and Mazelle Nash Pannell Rev. Trust, OK

Jayson and Nikki Northcutt, OK

Jayson and Paula Veach, and Garold and Barbara Veach, OK

Jayson S. and Paula M. Veach, OK

Jeanette Vogt Bollman, OK

Jeffery M. and Jamie J. Earles, OK

Jeffrey and Melinda Reuter, OK

Jeffrey L. Dickerson, Lillie Eaves, and Ole Dickerson, OK

Jeffrey Lynn Dickerson, TX

Jeffrey Scott Parson et al., OK

Jennifer Ann Irwin, OK

Jennifer Bass, OK

Jennifer Loyall Matney, OK

Jerald J. Moore, OK

Jerilynn Morrison, OK

Jerry A. and Johnny A. Chasteen, Trustees, Jerry A. and Johnny A. Chasteen Revocable Trust, OK

Jerry and Rebecca Mae Hatton, OK

Jerry Coffey, OK

Jerry D. and Mary L. Kennemer, TX

Jerry G. and Tanya A. Price, TX

Jerry Leon Mclemore Rev Tr and Peggy L Mclemore Rev Trust, OK

Jerry Reimers et al., OK

Jeschke Don Garrett, OK

Jesse Kilcrease, OK

Jewell Larry and Jerry Hughes, OK

Jill Parham, Joan Weems Trust, OK

Jim Beckham, OK

Jim D. and Patricia Mayo, OK

Jim Sims, OK

Jimmie L. and Shelly R. Vickrey, OK

Jimmy Charles Driver, TN

Jimmy Chatham, OK

Jimmy Don Vickey Vaughn et al., OK

Jimmy Driver, c/o Tommy Craighead, OK

Jimmy E Willis, OK

Jimmy L. Clark, OK

Joan M. Watkins, OK

Joan Weems, Trustee, Joan Weems Trust, OK

Joanne Wittrick and Joanne Erwin, OK

Joe and Karen Alig, OK

Joe C. and Lynette M. Parmley Trust and Others, OK

Joe D. Skelton and Diana Skelton, Trstee, OK

Joe Davis, AZ

Joe Jack D. Howell, OK

Joe M. and Doli K. Jones, Trustees, Jones Family Rev Trust, OK

Joe W. McComas and Arlene E Mccomas, Co-Trs, Joe W. McComas Revocable Tr., OK

Joe Wittrock, OK

Johan Bollinger and Johanna Bollinger et al., Trustees, OK

A-19

## APPENDIX A (cont'd)

**Individuals (cont'd)**

John and Barbara Gilby, John C. Bilby Trust, OK

John and Eileen Rowden, OK

John Andrews, OK

John D. and Joann M. Warren, OK

John D. Von Tungeln, OK

John David and Susan Bennett, OK

John E. and Nancy Maher Life Estate, Maher Farms LLC Nancy White, OK

John Ford and Joann Hess, TX

John H. and Martha Mason, TX ·

John H. and Tina J. Davis, OK

John L Marlow Trust, OK

John L. and Debbie Mangus, OK

John O. and Patricia J. Berry, Berry Revocable Trust, NM

John Patrick Regan, c/o Jimmy Barker, OK

John R. and Ingrid M. Meinders, c/o Jeanne Balcerak, OK

John R. Whitten, OK

John W. and Julie D. Haynie, OK

Johnnie Lee and Gayla Jean Collier, OK

Johnny and Alisha M. Walker, OK

Johnny and Joy Russell, OK

Johnny M. and Charlena A. Harrel, Trustees, Harrel Living Trust, OK

Johnyne Rees, OK

Jon A. and Kristi J. Herd, OK

Jon C. and Sandra S. Griffin, OK

Jon Kent Curby, AR

Jon Kent Curby, MO

Jonathan and Mindy Northcutt, OK

Jonathan D. Martin, OK

Jonathon Alan Herd, OK

Jonathon and Mindy Northcutt, OK

Jones Harvey Ranching, LLC, TX

Joseph and Courtney Richardson, OK

Joseph D. and Cynthia L. Settles, OK

Joseph L Hooks, Wardell and Wilma Hooks, Wardell M and Wilma L Hooks Family Trust, IL

Joseph W. Herbert Jr., OK

Joshua Davis, AZ

Joy M. and Linda S. Newby, OK

Joyce J. Smith, c/o Mark A. Smith, POA, OK

Joyce J. Smith, OK

Juanita M. Krittenbrink, OK

Juanita Pappa Greer and Janet G. Streitch, Trustees, Allen E. Greer Trust, OK

Judith Ann Dechamplain, OK

Judith H. Grellner et al., OK

Justin Jirik, OK

Justin Karl Thompson, TX

Justin M. Thompson, OK

Justin R. and Roger E. Post, OK

Kaffie Hill, Mechille Haddix, and Donald Haddix, c/o Raymond Haddix, OK

Karen A. Portwood, OK

Kate Rogene Lawrence Staggs, TX

Keith and Mary White, OK

Keith Carroll Perkins, OK

Keith Carroll, AR

Keith Wright, OK

Kellie Huls Quinton, OK

Ken Christian Perkins, AR

Ken Christian Perkins, CO

Ken Christian, OH

Ken L. and Sharon June McComas, OK

Kendal Lee Wilson, OK

Kenneth B. Driver, OK

Kenneth D. Burchfield, OK

Kenneth E. Tivis, OK

Kenneth Eugene Layn, OK

Kenneth G. and Amanda K. Sharp, OK

Kenneth Hardy, OK

Kenneth J.R. Baker, OK

Kenneth Morrison, OK

Kenneth W. Stephenson, LA

Kent Mclemore, OK

Kermit Davis, AZ

Kerry and Donna Graves, OK

Kevin and Margret Newby, OK

## APPENDIX A (cont'd)

**Individuals (cont'd)**

Kevin Green, OK

Kevin P. and Cindy R.
  Brueggen, OK

Kimberly D. Burks, OK

Kimberly R. Benson, OK

Kiplin Cowan, OK

Kurt Beecher, OK

Kyle L. and Tami A.
  Utsler, OK

Labash Charles Rev
  Trust, OK

Landrie Alexandra
  Decker, OK

Larnell DeWayne Jones, OK

Larry A. Beckham, TX

Larry and Deborah
  Boston, TX

Larry and Debra Myers, CA

Larry and Debra Myers, OK

Larry and Kasandra
  Beavers, OK

Larry Dale and Barbara J.
  Smith, OK

Larry G Foster, OK

Larry Jack Hutchins, OK

Laura J. Gruntmeir, OK

Laverne Hines, OK

Lawanna J. Workman,
  Trustee, Workman
  Revocable Living
  Trust, OK

Lawanna Workman, Kenneth
  Hardy, and Windle
  Hardy, OK

Lawrence James Robert
  III, OK

Lawrence Pettus, OK

Lecreatia Marshalle Decker,
  Clayton Wayne Decker,
  Cooper Jack Decker,
  and Landrie Alexandra
  Decker, Decker Decker,
  Decker & Decker, OK

Leda K. Sparks Rev.
  Trust, OK

Lee and Anna Kathryn
  Chappa, OK

Lee and Kay Chappa, OK

Lee Free and Anita
  Stevens, OK

Leir Henton and Dre Hall et
  al., TX

Leland J. Chapman and
  Myrna R. Chapman, OK

Lenioal and Peggy S.
  Wells, OK

Leo and Wanda Case, OK

Leonard Long, CA

Lester Pyle, OK

Lewis P. and O. Yvonne
  Pembroke, OK

Linda Bamburg, OK

Linda Griffith, OK

Linda Ingram, OK

Linda Lee Foley, OK

Linda Rawls et al., OK

Lisa Wilson Hart, Nina Clay
  Wilson and Amelia Clay
  Hart, OK

Little Jud Family Trust, c/o
  Merit Appraisal and
  Tax, TX

Lloyd Mark and Renea
  Deann Ely, OK

Logan Minnie L. Harris
  Logan et vir, CA

Lois J. Lofton, Trustee, Lois
  J. Lofton Rev Trust, KS

Lonnie Wayne Nichols and
  Kimberly R.
  Benson, OK

Lorce Thompson, AZ

Loretta Rodenburg Trust et
  al., IL

Louis and Ruth Hope,
  Trustees, Hope
  Revocable Living
  Trust, OK

Louise Catherine Ross and
  Nancy Ross Runnels,
  Nancy Ross Runnels
  Family Revocable
  Trust, TX

Louise Catherine Ross
  Family Rev Trust, TX

Louise Catherine Ross, TX

Louise M. Hubbard Living
  Trust, OK

Louise M. Spoon, OK

Loyd E. and Carol
  Schweitzer Trust, OK

Lucy C. Beecher, OK

Luke Scott, OK

Lula and Rosie Pettis et al.,
  c/o Johnnie Petties, OK

Lula H. Pettus, a/k/a Lule H.
  Pettus, or her heirs, c/o
  Johnnie Petties, OK

Lydia L. Roper, OK

Lydia Richette Keck, OK

Lynette Martin Parmley, OK

Lynn and Ann Rolen, OK

### APPENDIX A (cont'd)

<u>Individuals (cont'd)</u>

Lynne Marie Wheeler et al., OK

Mami Bess Lawrence Collins and Kate Rogene Staggs, c/o James Lawrene Jr., TX

Mami Bess Lawrence Collins and Kate Rogene Staggs, TX

Mami Bess Lawrence Collins and the unknown heirs of James Robert Lawrence, Jr., Flonel Bernice Lawrence Mason, Kate Rogene Lawrence Staggs, TX

Manuel Karen Schoeling et al., OK

Marcella Ouzts, OK

Marcella W. Reganm et al., OK

Margaret Ann Mehle et al., MN

Marie Hardin, OK

Marilyn Clift et al., OK

Marilyn Elizabeth Skoch, OK

Marilyn Updegraff, OK

Mark A. Morris Rev Trust and Marilyn Morris Rev Trust, OK

Mark and Carrie Anderson, OK

Mark and Carrie Massey, OK

Mark and Stacy Williams, c/o K.E. Andrews, TX

Mark and Stacy Williams, OK

Mark C. and Annette M. Schweitzer, OK

Markwest Pioneer LLC, OK

Marla Hall Richardson, c/o Craig Hall, OK

Marlene W. Herrin, OK

Marsha Hope Leck Revoc. Liv. Trust et al., OK

Marsha Nan Regan, OK

Martha Ann Graham, OK

Martha Kroeker, OK

Martin Dale and Sharon Ann Hardesty and Betty Ann Lindheim, OK

Marvin A. and Mary A. Wittrock, OK

Marvin Yochum, OK

Mary Ann Kloeppel et al., OK

Mary Ann Reherman, OK

Mary Ann Toun, OK

Mary Charlene Barr Rev. Trust, CO

Mary Charlene Barr, OK

Mary Frances Pyle, OK

Mary Horton, OK

Mary Jo Hoffman of the Mary Jo Hoffman Rev. Trust, OK

Mary Joan Hunter, Trustee, Mary Joan Hunter Trust, OK

Mary L. Beckham, Trustee, Mary L. Beckham Family Rev Trust, OK

Mary Lou Perry, TX

Mary Margaret Reuter et al., OK

Mary Reuter, OK

Mary Ruth Miller, OK

Matthew J. and Jennifer R. Brand, OK

Matthew R. Shanklin (Trust), OK

Matthias B. and Marla M. Schaefer, OK

Maurice E. Thompson, Trustee, Maurice E Thompson Trust, OK

Maxine Ellen Chatham et vir, c/o Jimmy Chatham, OK

Melford and Margaret L. Scott Rev Trust, OK

Melinda K. Craig, OK

Melvin and Marie Horton and Denise Horton, OK

Melvin D. And Norma J. Townsend, OK

Melvin Horton, OK

Michael and Anna Hightower, OK

Michael and Donna Niblett, OK

Michael and Jillian Brandt, OK

Michael and Kathryn Peercy, OK

Michael and Kelly Bradford, OK

Michael and Kimberly Bazzrea, OK

Michael and Linda Newby, OK

Michael D and Melinda Sue Morrison, OK

Michael D. Kelly, OK

Michael Eugene Steffen et al., OK

Michael Hufnagel et al., OK

20180621-3006 FERC PDF (Unofficial) 06/21/2018

## APPENDIX A (cont'd)

### Individuals (cont'd)

Michael Ivan Lawrence, OK

Michael James Driver, Sole Trustee of the Jean Driver Revocable Trust, c/o Tommy Craighead, OK

Michael L. and Connie L. Barrington, OK

Michael L. and Karen E. Beam, Co-Trustees, Beam Family Trust, OK

Michael L. Wright, Trustee, Michael L. Wright Trust, OK

Michael S Clark, WA

Michael Wade and Pamela R. Ables, OK

Michelle Haddix, OK

Mike and Bobbi Lafevers, OK

Mike Bynum, OK

Mildred Nail Miller Trust, c/o Marilyn Rosekelly, UT

Misty Hall Murphree and Marla Hall Richardson, c/o Craig Hall, OK

Molly D Carmack, OK

Monte Dean and Rhonda Drennan, TX

Muriel R. Cantrell, OK

Myrna R. Roberts, OK

Nancy Ross Runnels and Louise Catherine Ross, Louise Catherine Ross and Nancy Ross Runnels Family Revocable Trust, TX

Nathan G.Cossey, OK

Neal Moran, DC

Nesbitt Pettus, OK

Newer Living Trust, OK

Nick L. Gales Living Trust, Nick L. Gales Living Trust, OK

Nicole Wood, OK

Niki D. Cowan, AR

Nina Clay Wilson, OK

Nina May King, OK

Nolen G. and Jackie M. Grounds, OK

Norma Chaney, OK

Norman G. Sloan, OK

Odell F. and Glenda N. Parker, OK

Ollie V. Smith, c/o Elizabeth Knight, OK

Olson Hallmark, OK

Omer and Lillie Davis, Trustees, Red Davis Trust, OK

Orin Montgomery, OK

P. McLemore, OK

Pamela R. Lyons Rev Trust, OK

Patricia Brown, OK

Patricia Kellner, OK

Patrick Todd Martin, OK

Paul and Karen Reel, OK

Paul and Mary E Elledge Jr., OK

Paul B. Jones, OK

Paul Brightwell, OK

Paul Davis, Jr., AZ

Paul F. Grellner, OK

Paul J. and Kay L. Brown, OK

Paul Lackey, OK

Paul M. Elledge, Jr and Mary E. Elledge, Trustees, Elledge Medicaid Trust, OK

Paul Neal, OK

Paul Q. and Opal F. Ferguson, OK

Paul Todd Hobson, OK

Pauletta Sue Haller, OK

Peg Kunneman, OK

Peggy L. McLemore Rev Trust, OK

Pete A. and Nancy Eagan Theisen, MI

Phillip Chitwood Living Trust, OK

Phillip Lee Perkins, AR

Phillip Lee Perkins, TN

Phillip S. and Kambi K Schmidt, OK

Phyllis Hoogerhyde, Eaves Lillie Life Est, TX

Prime Energy Corporation and Dan and J Christian, TX

Quincy Jones, OK

Ralph and Claudia Wittrock Family Trust, CA

Ralph and Joye Ragan, OK

Ralph E. Schaefer, Tom Schaefer et al., OK

Ralph Leon Treece Trust, Doris Jean Treece Trust, OK

Randy J. Roberts et al., OK

Ray A. and Mary L. Drain, OK

Ray Butler, Successor Trustee, Clyde Walker Family Trust, OK

A-23

20180621-3006 FERC PDF (Unofficial) 06/21/2018

## APPENDIX A (cont'd)

<u>Individuals (cont'd)</u>

Ray Newby, c/o Michael Newby, OK

Ray Satterwhite Life Est et al., OK

Raymond and Ranada Hulsey, OK

Raymond L. and Tonya L. Ahuna, OK

Regena and Waymon Harrison Trust et al., Regena and Waymon Harrison Trust et al., OK

Renae Drain Burke, OK

Rhonda B. Argo, c/o Tony Argo, OK

Richard Allen West, OK

Richard Bishop and Gwenda D. Bishop, OK

Richard Key Morris, OK

Richard Q. and Darlene Huffman, OK

Rickey D. and Deborah S. Jones, TX

Ricky and Marilla Parker, OK

Ricky Eugene Vickery, OK

Robert C. Alig et al., OK

Robert D. Jones, OK

Robert Douglas Clark, WI

Robert Edward Regan, OK

Robert Eugene Skoch, OK

Robert Harris, OK

Robert J. Reherman Rev Trust, et al., OK

Robert L. and Lauren B. Roesner, NV

Robert Lee and Deborah Lee Burkes, OK

Robert N. Piearcy, OK

Robert Reen Pennon, c/o Tina Pennon, OK

Robert Teran, TX

Rod Hartness, OK

Rodger D. and Verna A. Lincham, OK

Rodney D. and Julann K. Kortemeier, OK

Roger and Janeen Curtis, OK

Roger E. Post, OK

Roger Fees, Calumet Industries, OK

Roger Fees, Wysetta and Leslie Todd, Trustees and Wysetta V. Todd Fa, OK

Ronald and Karon Germany, MN

Ronald D. and Melinda Jones, OK

Ronald Dean Bowen, OK

Ronald E. and Kathleen H. Maurer Trustees, Maurer 19, CA

Ronald G. and Judith Ann Mitchusson, OK

Ronald W. and Janet Ennise Janousek, OK

Ronnie Conyer, OK

Rosalie Hobbs Whatley and Rosalie Hobbs Whatley Rev Trust, OK

Rosie Breath, c/o Dorothy Miles, OK

Rosie Petties, OK

Ross Channing Reed and Amanda Lee Irwin, Reed/Irwin Living Trust, MO

Roxie A. Freeman, Trustee, Freeman Living Trust, WA

Roy and Wanda Turner, OK

Roy C. Koerner Rev Trust, OK

Roy L. Sparks Rev Tr et al., OK

Roy Lee and Jessi Mae Oxford, OK

Roy Wreath, c/o Glenda Davis, OK

Royce Trimble, OK

Ruby Stevenson, AZ

Rudolph V. Hooks et al., c/o Sharon Smith, OK

Ruth Mabel Blasius, OK

Ryan Williams, CA

S. Goodwin Estate et al., c/o Paul Ferguson, OK

Sam and Dorothy Miles, OK

Sammie J. Herriott, OK

Samuel and Sammie W. Adams Rev Living Trust, OK

Sandy Charolette Northcutt, OK

Sara Jo Cobb, OK

Sarah A. Brown, c/o Donna Sullivan, OK

Sarah Beth Oppel et al. Cmr 479, VA

Scott Chapman, OK

Scott E. and Ashley Wood, OK

Scott E. and Shawn C. Niles, OK

Sergio and Maria Govea, OK

Severn Davis, AZ

Shalyn Cooper Layn, OK

Shane A. West, OK

## APPENDIX A (cont'd)

**Individuals (cont'd)**

Sharon Smith, nee Hooks, OK

Sheila Preno, OK

Sheila Wilson and Jennifer Loyall Matney, OK

Shelby Jo Layn, OK

Shelia Y. Jones, OK

Shiloh Marie Kannady, OK

Shirley A. Jones, OK

Shirley Cox, OK

Shirley M. Driksill and Alisha Driskell-Young, OK

Shirley Rowe, Charles M. Rowe, Trustees, Shirley Rowe Revocable Trust and Charles M. Rowe Revocable Trust, OK

Sidney and Fonda Jenkins, OK

Sim Drain III, TX

Sopon and Ann Nakpairat, Ann M Nakpairat Rev, TX

Speake Land Holdings, OK

Speake Ranch Trust, c/o Creed Speake, Jr., Trustee, OK

Stanley and Mary Don Parks, OK

Stanley E. and Robin Comer, OK

Stanley Joe Cook, OK

Stephen and Angela Wilburn, OK

Stephen Joseph Hill and J.H. Nail, OK

Stephen L. and Karen A. Portwood et al., OK

Stephen R. Whitten et al, c/o J.D. (Butch) Whitten, Jr., OK

Sterling Trust Co-Custodian, FBO Warren Samuels, TX

Steve and Debbie Allison, OK

Steve Kelso, OK

Steven Joseph Wittrock, OK

Steven R. and Beverly W. Taylor, OK

Stewart M. and Seretta J. Gaines, OK

Stover O B Rev Trust, OK

Susan Holt, OK

Suzanne Curby Airington, OK

T. Hester, OK

T.E. Mumford, OK

Taylor Stokes and Kelly Deck, OK

Ted and Carolyn Dosh, OK

Teresa E. Wilson, Co-Successor Trustee, c/o Leslie E. Ott, OK

Teressa Johnston and Tamara Putman, Co-Personal Reps of the Estate of Virginia A. Holt, OK

Terrell D. and Tonya M. Hester, OK

Terri Walker, OK

Terry and Pamela Raye Lyons, OK

Terry C. and Karen L. Spivey, OK

Terry D. and Ann G. Thomas, OK

Terry J. and Sharon Riddle, OK

Terry L. and Betty J. Brawley, OK

Terry L. and Wynetta Garrett, OK

Thomas A. Garrett, OK

Thomas and Ina Garrett, OK

Thomas and J. Stone, OK

Thomas Bishop, OK

Thomas Burgin, OK

Thomas Hufnagel, OK

Thomas J. and Betty M. Evans, Trustees, OK

Thomas J. Leck, Trustee, Thomas J. Leck Revoc Trust, DE

Tim Leon Osborn, OK

Tim Shook, OK

Timothy and Deborah O'Neill, OK

Tom Milam, OK

Tom Morris, OK

Tom Saunders, OK

Tommy Craighead, OK

Tony Radcliff, OK

Tracy and April Curington, OK

Tracy G. Maass, OK

Travis D. Jacobs, OK

Troy H. Hastings, Stacey L. Freeman, n/k/a Stacey L. Barber, Tiffany A. Freeman, n/k/a Tiffany A. Cook, WA

Troy Lee Singleton, OK

Turner Family Rev. Trust, OK

Unknown Heirs of Bernice Hooks, OK

20180621-3006 FERC PDF (Unofficial) 06/21/2018

**APPENDIX A (cont'd)**

Individuals (cont'd)

Unknown Heirs of Clara R. Pettis, c/o Evelyn D. Ray, KS

Unknown Heirs of Harvey Powell, OK

Van Chew and June Chew, OK

Vera Ann Lineham, OK

Vernon and Jan Luckinbill, OK

Vernon Daniels, OK

Victoria Mae Edgemon Long, OK

Vincent Mueggenborg Trust, CO

Vincent N Rother, OK

Virginia Holt, OK

Virginia Johnson, c/o The Jackson Rev TR, NV

W. Lee and Patricia B. Coffey, OK

Wade Pilgreen, OK

Walter and Michelle L. Prentice, OK

Wanda F. Crawford, OK

Ward Family Special Needs Trust, OK

Ward H. aka Homer W. and Shelley A. Hill, OK

Warren Samuels, TX

Wayne and Donna Caldwell, OK

Wayne and Shirley Estes, OK

Wayne E. and Carolyn S. Owens, OK

Wd Austin, c/o Bobby Osborne, OK

Wendell and Gussie Hall, OK

Wendell Morris, OK

Wesley A. and Natalie D. Fogle, OK

Wesley and Mary E. Burchfield Rev Liv Trust, OK

Wesley Darrell and Gwen Morris, OK

Willene Grimes, IL

William and Dorothy Rushing, TX

William and Jessie Johnson, OK

William Casto, OK

William David and Melinda S. Craige, OK

William Drain, TX

William E. Weather/ Driskill, OK

William F. Mcmahan Rev. Trust, OK

William King Kelley, OK

William Lynn and Michelle Tate, OK

William M. Bow, OK

William P. Pitts, PA

Williams B. Hestand (Estate), c/o Jimmy Barker, OK

Williamson Estate Trust, c/o Vicki Peters, Trustee, OK

Willis E. Luber et ux, c/o Terry Luber, OK

Wirt Jr. and Barbara Brand, OK

Wysetta and Leslie Todd, Trustees and Wysetta V Todd Fa, OK

Yvonne Courtney Living Trust, OK

Zachariah P Neal, OK

Zachary Hall Layn, OK